1
2
3
4
5

Steve W. Berman (*pro hac vice* to be applied for)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
steve@hbsslaw.com
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

6
7
8
9

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

10

*Attorneys for Plaintiffs*

11

[*Additional Counsel Listed on Signature Page*]

12

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

13
14
15

ASHISH CHADHA, and MILTON LEE, on
behalf of themselves and all others similarly
situated,

16
17

Plaintiffs,

18

v.

19

PORSCHE CARS NORTH AMERICA, INC.,
PORSCHE AG,   AUDI AG, and VOLKSWAGEN
AG

20
21
22

Defendants.

23
24

Case No.

**CLASS ACTION COMPLAINT**

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ....................................................................................................1

II.    JURISDICTION AND VENUE ..............................................................................5

III.   PARTIES ..................................................................................................................6

       A.     Plaintiffs .......................................................................................................6

              1.     Plaintiff Ashish Chadha ....................................................................6

              2.     Plaintiff Milton Lee ...........................................................................8

       B.     Defendants and Co-Conspirators .................................................................8

              1.     Volkswagen AG ................................................................................8

              2.     Porsche AG ........................................................................................9

                     a.     Porsche Cars North America, Inc. .......................................10

                     b.     Audi AG ...............................................................................10

IV.    COMMON FACTUAL ALLEGATIONS .............................................................10

       A.     U.S. Emissions Standards ..........................................................................11

       B.     Volkswagen's Plot to Dominate the Automotive Market ..........................13

       C.     VW's and Porsche's finances at the onset of the emissions cheating
              period ..........................................................................................................17

       D.     The Illegal "Defeat Device" Scheme in VW, Audi and Porsche
              Diesel Vehicles ..........................................................................................20

       E.     Once Caught, Volkswagen Admitted its Fraud – in Part ...........................26

       F.     The 3.0 Liter Defeat Device in the United States.......................................38

       G.     The Concealment of the Defeat Devices in the United States — 3.0 Liter..............38

       H.     Porsche Marketed Its Cars as Environmentally Friendly and
              Emissions Compliant..................................................................................39

V.     THE VW PLEA AGREEMENT ............................................................................54

       A.     The Latest Chapter: Volkswagen and Porsche's Admissions of
              "Irregularities"...........................................................................................54

       B.     Volkswagen and Porsche Caused Hundreds of Millions of Dollars
              in Harm to U.S. Consumers........................................................................55

VI.    TOLLING OF THE STATUTE OF LIMITATIONS ..........................................56

    A.    Discovery Rule Tolling .................................................................56

    B.    Fraudulent Concealment Tolling ..................................................57

    C.    Estoppel .......................................................................................57

VII.   CLASS ALLEGATIONS ....................................................................58

VIII.  VIOLATIONS ALLEGED ..................................................................61

    A.    Claims Brought on Behalf of Plaintiffs and the Class......................61

COUNT I  VIOLATIONS OF RACKETEER INFLUENCED AND  CORRUPT ORGANIZATIONS ACT (RICO) VIOLATION OF 18 U.S.C. § 1962(C) - (D) ...............61

    1.    The Members of the Emissions Fraud Enterprise. ..........................62

        1.    Volkswagen Entities. ................................................62

        2.    The Volkswagen Entities' Executives, Officers and Engineers. ...............................................................63

            (1)    Martin Winterkorn................................................63

            (2)    Ulrich Hackenberg................................................64

            (3)    Frank Tuch.............................................................64

            (4)    Wolfgang Hatz.......................................................65

    2.    Emissions Fraud Enterprise Allegations. .......................................65

    3.    The Predicate Acts. ........................................................68

COUNT II  FRAUD BY CONCEALMENT ........................................................72

COUNT III  VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, *ET SEQ.*).........................................................75

COUNT IV  VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)........................................78

COUNT V  VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*).........................................80

REQUEST FOR RELIEF.................................................................................81

JURY TRIAL DEMANDED ...........................................................................82

## I.   INTRODUCTION

1.      When Ferdinand Porsche launched the Porsche brand, his goal was to create the "perfect" vehicle – the ideal combination of stunning design and amazing performance.[1] Porsche is synonymous with innovation – the brand created the world's first hybrid car, and the world's first electric car – over one hundred years ago.[2] Porsche markets its luxurious and expensive cars as clean and emissions-friendly and emissions compliant to appeal to this same tradition of innovation, sustainability, and no-compromise performance that Porsche enthusiasts expect in this modern, environmentally aware era. Porsche described its signature sports car, the 911, as offering "greater performance and a remarkable reduction in fuel consumption and emissions," a car that "harnesses the power of Porsche and the power of nature – to bring you the best of all worlds."[3] Porsche is no ordinary sports car, it is the "perfect" sports car – one that can be driven without expense to the environment.

2.      These loyal and discerning Porsche owners are now discovering that their cars are not just not perfect, they are equipped with software that derates or turns off emissions controls under real world driving conditions. Instead of purchasing the ultimate modern luxury - a non-polluting sports car or at least one with "moderate fuel values and exhaust emission values"- they have unwittingly become part of Volkswagen/Audi's and Porsche's ongoing emissions cheating scandal. It is undisputed that Volkswagen installed cheating emissions software on more than a

---

[1] *What Makes Porsche so Special*, Porsche Oakland Park (March 6, 2020), https://www.porscheorlandpark.com/what-makes-porsche-so-special/.

[2] Press Release, Porsche, *Prof. Ferdinand Porsche Created the First Functional Hybrid Car* (April 20, 2011), https://press.porsche.com/prod/presse_pag/PressResources.nsf/Content?ReadForm&languageversionid=857388&archive=10; *From Plumber's Apprentice to Engineer* (August 16, 2013), https://www.porsche-holding.com/en/history/ferdinand-porsche/inventive-genius, "Porsche is finally getting involved with hybrids and alternative fuel vehicles, and we think it's about time, right? I mean, hybrid technology is now as old as the first 1997 Toyota Prius, right? Well… no, not if you've been paying attention. The truth is the first Porsche that Dr. Ferdinand Porsche created was a full electric car and his second was the first-ever gasoline-hybrid car created… and this was way back in 1898!," "The first Porsche: Ahead of Its Time," John McCabe, June 12, 2015, https://www.drivingline.com/articles/the-first-porsche-ahead-of-its-time/.

[3] Porsche AG brochure dated May 2010 at 35, *available at* file:///C:/Users/12063/AppData/Local/Temp/The%20models.pdf5. (URL no longer active as of Oct. 2, 2020.)

half-million diesel cars in the U.S. and roughly 10.5 million more worldwide, and that Porsche itself was also involved in this fraud as a result. As alleged below, the cheating scandal extends to Porsche gasoline-powered vehicles as well and was implemented at roughly the same time as the diesel cheating scandal was implemented. One of the greatest environmental crimes of our time is not only more widespread, but much more calculated than previously thought.

3.       This latest scheme, according to recent admissions by Porsche itself, involves the manipulation of emissions hardware and software impacting exhaust systems and engine components and used in certification testing. The emissions tampering occurred after the engines were type-approved by German's Federal Motor Transport Authority (KBA) and by the United States Environmental Protection Agency and the California Air Resources Board.[4] The scheme involves at least two popular Porsche model vehicles, including the lifeblood of the brand, the flagship 911 sports car, as well as the mid-full sized Panamera, a sports car in a spacious four-door package, introduced to broaden the appeal of the brand. The vehicles at issues are those built between 2008 and 2013 and in the market prior to 2017, thereby implicating total of eight model years of the 911 and Panamera, from the years 2008 to 2016. The scheme involves, among other manipulations, the switching of exhaust filters depending on the internal engine modes, similar in execution to the defeat devices found in the diesel engines supplied by Audi.

4.       During the period immediately before the release of the impacted models, VW and Porsche were under pressure to grow market share, and break the association between speed and pollution that had created a real stigma around driving an ordinary, gas guzzling, sports car. Environmental restrictions were tightening, and customer expectations had evolved. New innovator Tesla launched the Roadster in 2006, and garnered Time Magazine's award for best transportation invention of the year. And during this same period, Porsche was attempting to buy VW, and was taking on debt. There were many forces at play, but ultimately – this scheme is about corporate greed and shortcuts – something Ferdinand Porsche would certainly have disapproved of.

---

[4] *Porsche Investigated for Gasoline Engine Manipulation*, VM Wards Auto, https://www.wardsauto.com/powertrain/porsche-investigated-for-gasoline-engine-manipulation (last visited, Oct. 1, 2020).

Defendants knew that to attract market share they had to appeal to buyers' desire to have a sports car that was as environmentally sensitive as possible and defendants therefore promised that Porsche vehicles were in "harmony" with the environment and were designed to produce "moderate fuel and exhaust emissions values". But, as in the case of diesel cars, defendants knew this promise of moderate fuel values could not be achieved if the emissions systems were on in normal driving conditions.

5.      Volkswagen/Audi and Porsche's actions have again harmed their loyal customers, and in this case, their deliberate deception was all the more egregious, as they harmed some of the most devoted customers, those customers willing to pay a premium for a Porsche – a vehicle that already delivers one of the highest profit margins in the industry for VW. Through the sale and lease of vehicles that purported to be "in harmony with the environment" that complied with emissions standards, but which actually emitted at illegal levels and were thus anything but "in harmony" gasoline-powered vehicles, defendants unjustly and fraudulently obtained hundreds of millions of dollars from these consumers, in the form of sale proceeds for all such vehicles purchased, as well as leasing fees earned through the lease of any vehicles leased through VW and Porsche. Defendants obtained this money regardless of whether consumers sold or otherwise disposed of their vehicles prior to the discovery of the fraud.

6.      Volkswagen and Porsche promised emissions levels in each year's model as well as certain specified fuel consumption.  Specifically, Volkswagen sold and/or leased approximately 114,000 gasoline-powered Porsche 911 and Panamera model vehicles for the model years 2008-2016 that had software designed to turn off or down $CO_2$ emissions controls in the "Class Vehicles," as defined below:

| Brand/Model | Porsche/Panamera |
|---|---|
| 2010 | 7,741 |
| 2011 | 6,879 |
| 2012 | 7,614 |
| 2013 | 5,421 |
| 2014 | 5,740 |
| 2015 | 4,985 |
| 2016 | 4,403 |

| Brand/Model | Porsche/Panamera |
|---|---|
| Total Panamera Models | 42,783 |
| (Assumed) Proportion of Panamera Models that were Petrol | 37,649 |

| Brand/Model | Porsche/911 |
|---|---|
| 2008 | 8,324 |
| 2009 | 6,839 |
| 2010 | 5,736 |
| 2011 | 6,016 |
| 2012 | 8,528 |
| 2013 | 10,142 |
| 2014 | 9,707 |
| 2015 | 12,904 |
| 2016 | 8,901 |
| Total 911 Models | 77,097 |

7.     As a result, there are over 114,000 of these model vehicles on American roads with illegal and/or manipulated emission systems that never should have been leased or sold, and would not have been, but for Porsche's fraudulently obtained EPA Certificates of Conformity ("COCs") and California Air Resources Board ("CARB") Executive Orders ("EOs").

8.     Plaintiffs and Class members (defined below) are persons and entities who purchased or leased a Class Vehicle.

9.     Defendants induced plaintiffs and Class members to purchase or lease the Class Vehicles – by concealing the fact that the vehicles had emissions systems programmed to be defeated and manipulated during normal driving conditions and  spewed excessive levels of pollutants during normal driving conditions.

10.     On behalf of themselves, the Nationwide Class, and their respective State Class, plaintiffs sue for violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961, *et seq.* ("RICO")); the federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301, *et seq.* ("MMWA")); consumer protection laws of the relevant states and territories, and unjust enrichment.

11.     Plaintiffs seek monetary damages (including treble damages under RICO), appropriate restitution and/or disgorgement, Class counsel's reasonable attorney fees and expenses, and other equitable relief.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Subject-matter jurisdiction also arises under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C. § 1961, *et seq*., as well as the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq.* The citizenship of each party is described further below in the "Parties" Section. The Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this District. Volkswagen and Porsche have marketed, advertised, sold, and leased the Class Vehicles, and defendants otherwise conducted extensive business within this District. A significant percentage of the Class Vehicles were registered in this District and thousands of Class Vehicles were in operation in this District. Further, CARB maintains a significant presence in this District through its Bay Area Air Quality Management District branch. CARB previously played an important initial role in investigating and, ultimately, in revealing Volkswagen's illegal use of defeat devices in diesel-powered vehicles.

14.     The Court has personal jurisdiction over defendants pursuant to 18 U.S.C. §§ 1965(b) and (d), and Cal. Code Civ. P. § 410.10, and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367. This Court has personal jurisdiction over defendants because they have minimum contacts with the United States, this judicial district and this State, and intentionally availed themselves of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture,

distribution, testing, sale, lease, and/or warranty of Volkswagen vehicles in this State and District. At least in part because of defendants' misconduct as alleged in this lawsuit, Class Vehicles ended up on this state's roads and dozens of franchise dealerships.

### III.    PARTIES

**A.    Plaintiffs**

**1.    Plaintiff Ashish Chadha**

15.    Ashish Chadha is a citizen and resident of California domiciled in Oakland, California. On or about January 20, 2018, Mr. Chadha purchased a certified pre-owned 2012 Porsche 911 Carrerra, VIN WP0AA2A92CS106128, for $65,800.00. His vehicle's mileage was 36,539 at the time of purchase. He identified this particular vehicle while conducting online research from his residence on the website Cars.com. A link on the Cars.com website for this vehicle directed him to the Porsche Atlanta Perimeter website, a dealership in Atlanta, Georgia. Mr. Chadha flew to the dealership to purchase the car, and had the vehicle shipped to and registered in his home state of California. Plaintiff paid cash for the vehicle and still owns the vehicle.

16.    Unbeknownst to Mr. Chadha, at the time of acquisition, the Vehicle contained a defeat device used to bypass emissions standards and deceive consumers and regulators. Consequently, the vehicle could not deliver the advertised emissions, high performance, and fuel economy–and was illegal. Volkswagen, Audi, and Porsche's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling Mr. Chadha's vehicle without proper emission controls has caused him out-of-pocket loss, future attempted repairs, future additional fuel costs, decreased performance of the vehicle, and diminished value of his vehicle. Mr. Chadha purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had certain emissions, fuel economy, and performance, complied with United States and state emissions standards, was properly EPA and CARB certified, and would retain all of its operating characteristics throughout its useful life.

17.    Mr. Chadha selected and ultimately purchased his vehicle, in part, because of the emissions, fuel economy, and performance promised, as represented through advertisements and

representations made by Volkswagen and Porsche. None of the advertisements reviewed or representations received by Mr. Chadha contained any disclosure of the defeat device utilized in Mr. Chadha's vehicle. Had Volkswagen and Porsche disclosed this design, and the fact that Mr. Chadha vehicle emitted unlawfully high levels of pollutants, Mr. Chadha would not have purchased the vehicle, or would have paid less for it.

18.     Mr. Chadha used the vehicle for daily driving and commuting to work. Fuel efficiency is important to Mr. Chadha He measured his own vehicle's fuel efficiency and has noticed that his vehicle consistently gets approximately five miles less than gallon as promised, and never exceeds 20 miles per gallon.

19.     In about the first week of March 2020, Mr. Chadha noticed that his vehicle's P0456 trouble code had started to illuminate. At the time, he reset the code as it denoted a "minor leak" and added a fuel additive and replaced his gas cap, as this was the first course of action recommended on a Porsche forum.

20.     The code reappeared in approximately September 2020. The week of September 14, 2020 Plaintiff took his car to the Porsche Walnut Creek dealership. He spoke to service advisor Jon Kim when he booked his appointment. He also spoke to another gentleman whose name he cannot recall. This gentleman told him that there was a recall on the valve that enters his car, that the valve had the tendency to get clogged, that it was a common issue, and that sometimes this valve needed to be replaced multiple times on one car. He was also told that when the code is on, his car is generating poorer emissions performance. He was told he may have an EVAP leak, and that his poorer mileage may also be a result of a leak, as his vehicle may be burning fuel at a lower rate.

21.     Mr. Chadha would not have purchased the vehicle, and would certainly not have paid as much for it, had Defendants not failed to disclose and actively concealed the derating of the emission's controls. Mr. Chadha would not have purchased the vehicle, and would certainly not have paid as much for it, if he had known that the promised improvements in fuel economy and performance could only be achieved by increasing emissions to illegal levels.

**2.      Plaintiff Milton Lee**

22.      Milton Lee is a citizen and resident of California domiciled in Hillsborough, California. On or about July 16, 2019, Mr. Lee purchased a pre-owned 2013 Porsche 911 CS, VIN WP0AB2A91DS122657, for $74,000 plus tax from the RMC Motorcars dealership in San Bruno, California. Mr. Lee's vehicle's mileage was approximately 8,764 at the time of purchase. Mr. Lee paid cash for the vehicle and still owns the vehicle. Mr. Lee previously owned a 1974 911 Coup.

23.      Unbeknownst to Mr. Lee, at the time of acquisition, the vehicle contained a device used to bypass emissions standards and deceive consumers and regulators. Consequently, the vehicle could not properly deliver the advertised emissions, high performance, and fuel economy. Volkswagen and Porsche's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, and selling, Mr. Lee's vehicle without proper emission controls has caused Plaintiff to overpay for his vehicle. Mr. Lee purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had certain emissions, fuel economy, and performance, complied with United States emissions standards, was properly EPA and CARB certified, and would retain all of its operating characteristics throughout its useful life.

24.      Mr. Lee selected and ultimately purchased his vehicle, in part, because of the emissions, fuel economy, and performance promised, as represented through advertisements and representations made by Volkswagen and Porsche. None of the advertisements reviewed or representations received by Mr. Lee contained any disclosure of the defeat device utilized in Mr. Lee's vehicle. Had Volkswagen and Porsche disclosed this defeat device, Mr. Lee would not have purchased the vehicle, or would have paid less for it. Had Volkswagen and Porsche disclosed the fact that Mr. Lee's vehicle emitted unlawfully high levels of pollutants and that fuel economy was only achieved thru turning down emissions controls, Mr. Lee would not have purchased the vehicle, or would have paid less for it.

**B.      Defendants and Co-Conspirators**

**1.      Volkswagen AG**

25.      Volkswagen AG ("VW" or "VWAG") is a German corporation with its principal place of business in Wolfsburg, Germany.  VWAG is one of the largest automobile manufacturers

in the world, and is in the business of designing, developing, manufacturing, and selling automobiles.  VWAG is the parent corporation of Audi AG, and Porsche AG.  According to VWAG, it sold 10.14 million cars worldwide in 2014 – including 6.12 million VW-branded cars, 1.74 million Audi-Branded cars, and 189,849 Porsche-branded cars.  Combined with other brands, VWAG boasts a 12.9% share of the worldwide passenger car market.  VWAG's sales revenue in 2014 totaled €202 billion (approximately $221 billion) and sales revenue in 2013 totaled €197 billion (approximately $215 billion).  At €12.7 billion (approximately $13.9 billion), VWAG generated its highest ever operating profit in fiscal year 2014, beating the previous record set in 2013 by €1.0 billion.

26.     VWAG, with the assistance of Porsche engineered, designed, developed, manufactured, and installed the software on the Class Vehicles and exported these vehicles with the knowledge and understanding that they would be sold throughout the United States to consumers.  VWAG also developed, reviewed, and approved the marketing and advertising campaigns designed to drive sales of the Class Vehicles.

27.     At all times relevant to this action, Volkswagen manufactured, distributed, sold, leased, and warranted the Class Vehicles under the Porsche brand names throughout the United States.  Volkswagen and/or its parents, affiliates and agents designed, manufactured, and installed the Clean engine systems in the Class Vehicles. Volkswagen and/or its parents, affiliates, and agents developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

**2.     Porsche AG**

28.     Porsche AG ("Porsche") is a German corporation with its principal place of business in Stuttgart, Germany. Porsche AG is a wholly-owned subsidiary of VW AG. Porsche AG designs, develops, manufactures, and sells luxury automobiles. According to Porsche AG, the Porsche AG Group sold 277,000 cars worldwide in 2019, with sales revenues in 2019 totaling 26,060,000

1    million euros.[5]

2         29.    Porsche AG with the assistance of Volkswagen engineered, designed, developed,

3    manufactured and installed the software on the Class Vehicles and exported these vehicles with the

4    knowledge and understanding they would be sold throughout the United States. Porsche AG also

5    developed, reviewed, and approved the marketing and advertising campaigns designed to sell the

6    Class Vehicles. According to an estimate, over 114,000 vehicles containing the defeat device were

7    sold by Porsche AG in the United States.

8                      **a.    Porsche Cars North America, Inc.**

9         30.    Porsche Cars North America, Inc. ("Porsche North America") is a company with its

10   principal place of business at Atlanta, Georgia. Porsche North America is a wholly-owned U.S.

11   subsidiary of Porsche AG, and it engages in business, including the advertising, marketing and sale

12   of Porsche automobiles, in all 50 states.

13                     **b.    Audi AG**

14        31.    Audi AG ("Audi") is a motor vehicle manufacturer based in Ingolstadt Germany

15   and a subsidiary of VWAG. Audi engineers were directly involved in programming and designing

16   defeat devices in the Porsche vehicles that were the subject of a plea agreement between VWAG

17   and the United States of America.

18        32. VW, Audi, Porsche are sometimes collectively referred to herein as Defendants.

19                 **IV.    COMMON FACTUAL ALLEGATIONS**

20        32.    To understand the plausibility of the allegations with respect to Defendants'

21   manipulation of the Porsche petrol Class Vehicles, it is necessary to detail the VW/Audi/Porsche

22   diesel-cheating scheme that was occurring at the same time as the petrol-cheating scheme.

23

24

25

26

27        [5] Volkswagen AG 2019 Annual Report, *available at*
     https://annualreport2019.volkswagenag.com/divisions/porsche.html (last visited Oct. 1, 2020).
28   (URL no longer active as of Oct. 2, 2020).

## A.     U.S. Emissions Standards

33.     The purpose of the Clean Air Act and its implementing regulations was to protect human health and the environment by, among other things, reducing emissions of pollutants from new motor vehicles, including nitrogen oxides ("NOx" and "$CO_2$").

34.     The Clean Air Act required the U.S. Environmental Protection Agency ("EPA") to promulgate emissions standards for new motor vehicles. The EPA established standards and test procedures for light-duty motor vehicles sold in the United States, including emission standards for NOx and $CO_2$.

35.     The Clean Air Act prohibited manufacturers of new motor vehicles from selling, offering for sale, introducing or delivering for introduction into U.S. commerce, or importing (or causing the foregoing with respect to) any new motor vehicle unless the vehicle complied with U.S. emissions standards, and was issued an EPA certificate of conformity.

36.     To obtain a certificate of conformity, manufacturer was required to submit an application to the EPA for each model year and for each test group of vehicles that it intended to sell in the United States. The application was required to be in writing, to be signed by an authorized representative of the manufacturer, and to include, among other things, the results of testing done pursuant to the published Federal Test Procedures that measure NOx emissions, and a description of the engine, emissions control system, and fuel system components, including a detailed description of each Auxiliary Emission Control Device ("AECD") to be installed on the vehicle,

37.     An AECD was defined under U.S. law as "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." The manufacturer was also required to include a justification for each AECD if the EPA, in reviewing the application for a certificate of conformity, determined that the AECD "reduced the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," and that (1) it was not substantially included in the Federal Test Procedure, (2) the need for the AECD was not

justified for protection of the vehicle against damage or accident, or (3) it went beyond the requirements of engine starting, the AECD was considered a "defeat device." Whenever the term "defeat device" is used in this Statement of Facts, it refers to a defeat device as defined by U.S. law.

38.     The EPA would not certify motor vehicles equipped with defeat devices. Manufacturers could not sell motor vehicles in the United States without a certificate of conformity from the EPA.

39.     The California Air Resources Board "(CARB") (together with the EPA, "U.S. Regulators") issued its own certificates, called Executive Orders, for the sale of motor vehicles in the State of California. To obtain such a certificate, the manufacturer was required to satisfy the standards set forth by the State of California, which were equal to or more stringent than those of the EPA.

40.     As part of the application for a certification process, manufacturers often worked in parallel with the EPA and CARB. To obtain a certificate of conformity from the EPA, manufacturers were required to demonstrate that the light-duty vehicles were equipped with an on-board diagnostic ("OBD") system capable of monitoring all emissions-related systems or components. Manufacturers could demonstrate compliance with California OBD standards in order to meet federal requirements. CARB reviewed applications from manufacturers, including VW, to determine whether their OBD systems were in compliance with California OBD standards, and CARB's conclusion would be included in the application the manufacturer submitted to the EPA.

41.     In 1998, the United States established new federal emissions standards that would be implemented in separate steps, or Tiers. Tier II emissions standards, including for NOx emissions, were significantly stricter than Tier I. For light-duty vehicles; the regulations required manufacturers to begin to phase in compliance with the new stricter Tier II NOx emissions standards in 2004 and required manufacturers to fully comply with the stricter standards for model year 2007. These strict $CO_2$ emissions standards were applicable specifically to vehicles in the United States.

**B.**     **Volkswagen's Plot to Dominate the Automotive Market**

42.     With respect to its diesel vehicles, the United States entered an illegal diesel emissions scheme that was borne out of greed and ambition to dominate the global automotive market at any cost. By Volkswagen's own admissions, the seeds for the scandal were planted in 2005, as Volkswagen was repositioning its fleet of vehicle offerings in light of tightening U.S. emission regulations, "with a strategic decision to launch a large-scale promotion of diesel vehicles in the United States in 2005."[6]  While other automakers focused on hybrid, electric or hydrogen fueled vehicles, Volkswagen pivoted toward "clean diesel" technology as its primary strategy to reach the growing target market of environmentally conscious consumers.

43.     In 2004, the second-generation Toyota Prius became an explosive success, tripling global sales from years prior and changing environmentally-friendly vehicles from a niche market to a standard consumer option.  Although it was the first mainstream hybrid vehicle, the Prius was widely viewed as "boring," because the improvements in fuel efficiency and emissions were offset by relatively bland styling and lackluster driving performance.

44.     Volkswagen took note of the success of the Prius and sought to achieve the same (or better) efficiency benchmarks, but in a "fun-to-drive," high-performance vehicle. By 2006, the market was changing, and there was increased demand for vehicles that were high performance, but environmentally friendly. This was to be achieved with a purported remarkable breakthrough in diesel technology:  the EA189 TDI engine. TDI, short for "turbocharged diesel injection," was the culmination of millions of dollars in research and development, and was heralded by VW as the critical factor that would be responsible for its growth and success in the U.S.

45.     In 2007, Martin Winterkorn left his position at Audi to become VWAG's CEO. Winterkorn set goals for Volkswagen to become a world leader in automobile manufacturing.  This

---

[6] *Volkswagen making good progress with its investigation, technical solutions, and Group realignment*, VOLKSWAGEN AG (Dec. 10, 2015), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/12/VW_PK.html.

included a target of tripling U.S. sales to at least 800,000 vehicles by 2018.[7] At the time, diesel-engine vehicles made up just 5% of the U.S. car market, and Winterkorn recognized this as the perfect opportunity to expand Volkswagen's market share.

46.     But diesel engine vehicles made up just 5% of the U.S. market. To expand its market penetration in the U.S., Volkswagen and Porsche needed to overcome the stigmas associated with diesel cars. Foremost among these was the consumer perception that speed and performance equaled pollution, and that sports cars emitted thick, toxic smoke full of dangerous and destructive pollutants, and should be relegated to the smog-filled cities of the past. One article written in 2008 compared admitting to liking a sports car to being as politically correct as "claiming you're Osama Bin Laden's tennis partner."[8] Another 2008 article discussed the waning popularity of trucks and SUVs, and the previous year's increase of 38% in hybrid car registrations.[9] There was a real, perceptible pressure to hold onto market share and grow it by combatting the consumer perception that sports car engines were dirty engines that emitted thick, toxic smoke full of dangerous and destructive pollutants and take advantage of the demand for "clean" sports cars.[10] The Porsche brand needed to remain relevant and desirable for Generation Y drivers who came of age during a time of increased environmental awareness. Volkswagen and Porsche aggressively marketed their cars as a clean, "green" alternative to ordinary sports cars.

---

[7] William Boston, *Volkswagen Emissions Investigation Zeroes In on Two Engineers*, WALL STREET JOURNAL (Oct. 5, 2015), http://www.wsj.com/articles/vw-emissions-probe-zeroes-in-on-two-engineers-1444011602.

[8] "Sports cars. With the exception of the real die-hard lentil sandal wearing environmentalists, most people love the idea of a sports car. But admit that at an Islington dinner party and it's about as PC as claiming you're Osama Bin Laden's tennis partner. So can you really have a green sports car?", *I want a Green Sports Car*, benjahedley, posted September 26, 2008. https://co2calculator.wordpress.com/2008/09/26/i-want-a-green-sports-car/ .

[9] Skaidra Smith-Heisters, *Cars Disproportionately Blamed for Greenhouse Gas Emissions*, Reason Foundation (Aug. 12, 2008), https://reason.org/commentary/cars-disproportionately-blamed/ .

[10] "If automakers make green cars people want to drive as opposed to cars they think people should drive, everyone wins and the technology catches on that much faster. Tesla Motors gets it, but the Roadster runs 100 large. The Fisker Karma and electric Porsche that Ruf is working on won't be much cheaper. Make a green(er) car that's fun to drive, pleasant to look at and affordable and people will line up for them." Tony Borroz, *Bring On The Affordable Green Sports Cars*, Wired (Apr. 1, 2009), https://www.wired.com/2009/04/bring-on-the-af/ .

47.     Behind the scenes, however, Volkswagen realized internally that it was not possible to roll out these so-called "clean" high-performance vehicles within its self-imposed budgets and engineering constraints.  To get the job done, Winterkorn appointed two engineers with whom he had worked closely at Audi (Ulrich Hackenberg and Wolfgang Hatz) to lead up R&D and engine development for this project.  These two engineers were the chief developers of the TDI engine.[11] Their primary mandate from management was to develop a high-performance gasoline engine that maintained the performance of traditional gasoline engines with reduced $CO_2$ emissions and lower gas mileage, all while meeting the strict $NO_X$ emission standards in the U.S.

48.     In recent years, the EPA and the CARB have promulgated stricter $NO_X$ emission standards, requiring all diesel models starting in 2007 to produce 90% less $NO_X$ than years prior.[12] These strict emission standards posed a challenge to Volkswagen's engineers in developing the EA189 engines. In fact, during a 2007 demonstration in San Francisco, VW engine R&D chief Hatz lamented presciently that "[Volkswagen] can do quite a bit and we will do a bit, but 'impossible' we cannot do. . . .  From my point of view, the CARB is not realistic . . .  I see it as nearly impossible for [Volkswagen]."[13]

49.     Yet, the "impossible" is just what Volkswagen set out to do. To successfully grow the U.S. sports car market and meet its ambitious goals, Volkswagen needed to develop the technology to reduce $NO_X$ emissions, while maintaining the efficient, powerful performance of a lean-state gasoline engine. This seemingly impossible dilemma mired Volkswagen in an internal struggle about how to best proceed, with two divergent technological solutions available: selective catalytic reduction ("SCR"), or use of a lean $NO_X$ trap ("LNT").

---

[11] Jack Ewing, *Volkswagen Engine-Rigging Scheme Said to Have Begun in 2008*, N.Y. TIMES (Oct. 5, 2015), http://www.nytimes.com/2015/10/05/business/engine-shortfall-pushed-volkswagen-to-evade-emissions-testing.html.

[12] *Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements*, ENVIRONMENTAL PROTECTION AGENCY (Dec. 2000), http://www3.epa.gov/otaq/highway-diesel/regs/f00057.pdf.

[13] Danny Hakim, *et al.*, *VW Executive Had a Pivotal Role as Car Maker Struggled With Emissions*, N.Y. TIMES (Dec. 21, 2015), http://www.nytimes.com/2015/12/22/business/international/vw-executive-had-a-pivotal-role-as-car-maker-struggled-with-emissions.html?mt rref=undefined&gwh=7E46E42F7CCC3D687AEC40DFB2CFA8BA&gwt=pay.

50.     Advocating the former of these solutions, in 2006, Wolfgang Bernhard, then a top executive at VWAG (and former Daimler executive), championed a technology-sharing agreement with Mercedes-Benz and BMW to jointly develop a SCR system using urea.  This system, which assists in neutralizing emissions of NO$_X$, was generically known as a "Diesel Exhaust Fluid" system and marketed as "Bluetec" by Mercedes and "AdBlue" by Volkswagen and other German vehicle manufacturers.  This solution, touted by Bernhard, worked by injecting urea into a diesel vehicle's exhaust stream to react with the NO$_X$, converting it into harmless nitrogen and oxygen.

51.     While Hatz initially supported this solution, stating publicly at the Detroit Auto Show in early 2007 that "Bluetec technology allows us to demonstrate Audi's commitment to always being at the very forefront of diesel technology,"[14] his support dissipated as Volkswagen's leadership factionalized – split between those who balked at the $350 per-vehicle cost of the SCR system advocated by Bernhard, and those who thought that the SCR system was the only technologically feasible method to meet emission regulations.

52.     Bernhard, the advocate for SCR, ultimately lost the internal battle at Volkswagen and resigned. Consequently, Hatz remained and was tasked with implementing the alternative strategy: the lower-cost LNT.  This relatively inexpensive technology involved the storage of NO$_X$ emissions in a separate compartment during vehicle operation.  Once that compartment filled up, the system burned off the stored NO$_X$ by pumping an extra burst of fuel into the cylinders, most of which passed through to the converter, where it then burned the NO$_X$ into nitrogen and oxygen. While this method was cheaper and easier to implement than the SCR system advocated by Bernhard, it was less effective and resulted in lower fuel efficiency.

53.     According to many sources (including journalists, industry insiders, and Volkswagen whistleblowers), Volkswagen's top brass issued a directive to its engineers to find a way to meet emission standards despite tight budgetary and technical constraints, or suffer the consequences. Volkswagen AG's former CEO, Ferdinand Piëch, created "a culture where performance was driven by fear and intimidation" and whose leadership was characterized as "a

---

[14] *Id.*

reign of terror."[15]  Employees were told, "[y]ou will sell diesels in the U.S., and you will not fail. Do it, or I'll find somebody who will."[16]  Piëch was infamous for firing subordinates who failed to meet his exacting standards:  "Stories are legion in the industry about Volkswagen engineers and executives shaking in their boots prior to presentations before Piëch, knowing that if he was displeased, they might be fired instantly."[17]  And so it seems, out of self-preservation, the defeat device scandal was borne.

**C.**     **VW's and Porsche's finances at the onset of the emissions cheating period**

54.     On September 25, 2005, Porsche announced that it was paying $4.2 billion to acquire a 20% stake in Volkswagen. Though this was a sizable part of Porsche's $6.0 billion cash reserve, the transaction would make it very difficult for a corporate raider or competing car company to swoop up Volkswagen, and thusly compromise Porsche's ability to build cars on Volkswagen's platforms.  In his initial announcement, Porsche CEO Wiedeking made it clear that this minority position was taken just to stave off potential hostile takeovers. Porsche, he adamantly stated, would not be trying to take over the company: "Our planned investment is the strategic answer to this risk.  We wish in this way to ensure the independence of the Volkswagen Group."

55.     Financial markets were baffled by Porsche's acquisition of Volkswagen shares. Why was a sports car company pouring so much money into a struggling mass-market car company? "Porsche told us that they were going to invest back into the company rather than pay higher dividends," wrote a German financial analyst at Dresdner Kleinwort Wasserstein. "Now they're investing into one of the least profitable car companies in Europe."

56.     *The Economist* weighed in on CEO Wiedeking's move – somewhat prophetically, it turns out: "Mr. Wiedeking is one of those rare beasts in the corporate jungle who have not yet had their come-uppance. He is widely revered for his forthrightness and his leadership of Porsche, from

---

[15] Bob Lutz, *One Man Established the Culture That Led to VW's Emissions Scandal*, ROAD & TRACK (Nov. 4, 2015), http://www.roadandtrack.com/car-culture/a27197/bob-lutz-vw-diesel-fiasco/.

[16] *Id.*

[17] Doron Levin, *The man who created VW's toxic culture still looms large*, FORTUNE (Oct. 16, 2015), http://fortune.com/2015/10/16/vw-ferdinand-piech-culture/.

the dark days of near-bankruptcy in 1993 when he took over, to years of growth and glowing results today. So it would be a pity if this David overreached himself and fell victim instead to another phenomenon, known as the Peter principle: promotion beyond one's level of competence."

57.     In 2005, it was technically impossible for Volkswagen to get acquired by anyone because of something known as the "Volkswagen Rule." The essence of this rule was that the local German government of Lower Saxony owned 20% of Volkswagen and could prevent anyone from acquiring the company without their permission, or anyone from having more votes than they have over shareholder matters. But this law was incompatible with European Union laws that barred capital restrictions like this, and there was reason to believe that it would be soon repealed. When this happened, Volkswagen would be fair game for an acquisition. With its 20%share in the company, Porsche made it less likely that anyone else would be able to buy Volkswagen in the event of a repeal.

58.     One year later, in August 2006, Porsche modestly increased its stake in Volkswagen from 20% to 25%. Moreover, the company started actively lobbying for Germany to repeal the Volkswagen Rule so that Porsche could "take full advantage of [its] rights as a shareholder." Publicly, Porsche still claimed to not be interested in an acquisition. By November of 2006, Porsche had increased its holdings in Volkswagen to 29.9%.

59.     By 2008, Porsche had acquired 42.6% of Volkswagen and had the option to acquire 31.5% more. However, in this process the company had also acquired $13 billion in debt to finance the acquisition.

60.     While Volkswagen stock had appreciated substantially, and the company had made a paper fortune on these financial trades; speculators shorting Volkswagen stock had lost tens of billions of real dollars. Moreover, once it acquired 75% of Volkswagen, the company's $12 billion cash reserves would become available to Porsche.

61.     Wiedeking, the CEO, and Härter, the CFO, were hailed as financial geniuses. Arndt Ellinghorst, an analyst at Credit Suisse, called Porsche "one of the most sophisticated investors on the planet, as well as being a car maker." *The Economist* humorously noted: "Great cornering and eye-popping acceleration make Porsche's cars popular among thrill-seeking bankers and hedge-

fund managers. Now its clients are discovering that the carmaker itself has an unexpected talent for cornering markets," as they reported that Porsche made between $7-15BN from the short squeeze."

62.    But Porsche was actually in a very tough position. Their primary asset was the shares they held in Volkswagen. Those shares were only valuable because of the market's expectation that Porsche would continue to buy up Volkswagen stock; and if they did, it would be very expensive to buy the rest of the company. If Porsche stopped buying up Volkswagen shares, the price of Volkswagen stock would plummet, the value of most of Porsche's assets would fall, and the company would experience massive losses.

63.    This scenario would look very bad for Porsche's many creditors. By the spring of 2009, Porsche had accumulated $13 billion in debt. While Porsche was still making a $2 billion operating profit a year from selling Porsches, and owned more than half of Volkswagen, in order to pull off buying the rest of Volkswagen,  it would need access to a lot more capital.

64.    And precisely when Porsche needed banks the most, banks stopped lending money. By the end of 2008, the great Financial Crisis had hit and all the banks had either given Porsche new funds or allowed the company to rollover the debt when it came due; in any case, they were no longer interested in funding a speculative scheme to corner the market for Volkswagen shares.

65.    Porsche's debts were coming due much sooner than they expected. And not only that – after years of consistent growth in automobile sales, Porsche's core business of selling cars was hurt severely by the recession and unit sales dropped 27% in one year.

66.    A financial maneuver that had been considered "brilliant" just a few months earlier was now a poor decision: Porsche was out of money. On March 24, 2009, loan payments of $13 billion were due. While previously it would have been a trivial matter to refinance the amount, this time the banks were not interested. Moreover, Porsche owed money to 15 different banks, each of which could bankrupt the company if it so wished.

67.    Porsche's CFO managed to avert disaster the day before the loan was due and refinance most – but not all – of the $13 billion debt into a new loan. The catch: $4.4 billion of it would be due within 6 months.

68.     But even with most of the debt refinanced, Porsche would need additional capital to pay the part of the loan that was currently due. It just so happens that one of the board members was able to get the company an emergency infusion of almost a billion dollars from another company that he also sat on the board of. That loan would be from Volkswagen, orchestrated by their Chairman Ferdinand Piëch.

69.     In the blink of an eye, Porsche went from predator to prey. Once on the brink of acquiring Volkswagen, Porsche now found itself borrowing a billion dollars from them just five months later.

70.     Porsche eventually received a bailout from the German government. Volkswagen would acquire the Porsche automotive business for $11.3 billion in cash (49% of it right away, and 51% of it later, for tax reasons). The Porsche family would retain their shares in a holding company that owned 50% of Volkswagen –but also all the Porsche debt. [18]

**D.      The Illegal "Defeat Device" Scheme in VW, Audi and Porsche Diesel Vehicles**

71.     Ultimately, time ran out, and Volkswagen executives and engineers were either unable or unwilling to devise a solution within the constraints of the law and their self-imposed cost-cutting measures.  So instead of being honest (and risk being summarily fired), they and others conspired to cheat and defraud regulators, consumers and their own customers – Franchise Dealers – by installing a "defeat device" in the new diesel vehicles.  The defeat device enabled the affected vehicles to "pass" the EPA and CARB emission testing so that Volkswagen could obtain COCs and EOs to sell illegally polluting cars throughout the U.S and in California.

72.     Volkswagen had a ready-made solution at hand.  As reported by the New York Attorney General, starting as far back as 1999, Audi engineers had come up with a similar solution to a problem they were facing related to the development of the 3.0-liter diesel engine for Audi models sold in Europe.  The engineers had eliminated a noise problem associated with diesel engines by changing the software in the electronic controls (necessarily with the assistance of

---

[18] Rohin Dhar, *Porsche: The Hedge Fund that Also Made Cars*, Priceonomics (Oct. 24, 2014), https://priceonomics.com/porsche-the-hedge-fund-that-also-made-cars/.

Bosch GmbH, which strictly controlled programming software) to inject additional fuel into the engine on ignition. But as a result, the engine could not meet European emissions standards during testing. To solve this problem, the engineers developed defeat device software that could recognize when the car was being tested and deactivate the extra fuel injection function during testing, and then reactivate it during normal driving conditions. From 2004-2008, Audi incorporated the defeat device software in its 3.0-liter diesel engines sold in Europe.  Since the defeat device, software was originally related to the goal of reducing engine noise, it became known as the "Acoustic Function" or, in German, the "Akustikfunktion."  In its guilty plea, IAV GmbH confirmed that "Acoustic Function" was a code name for the defeat device software.  Engineers at Bosch GmbH also commonly referred to the defeat-device software with the code name "cycle-beater."[19]

73.     When it became clear that the 2.0-liter TDI engine being developed for the U.S. market could not meet U.S. emission regulations, and initial emission testing failed, the launch of the Jetta TDI "clean" diesel, initially scheduled for 2007 as part of the "US '07 project," had to be delayed.  The prospect of failure was unacceptable, so Volkswagen cheated instead.  Starting in the mid-2000s, Volkswagen engineers, working with IAV GmbH and Bosch Diesel Systems (at both Bosch GmbH and Bosch LLC) – as detailed further below – and with the knowledge of management, adapted Audi's "akustikfunktion" concept to the 2.0-liter and 3.0-liter diesel engines for Volkswagen and Audi models to be sold in the U.S.

74.     On or about May 17, 2006, a VW engineer emailed employees in the VW Brand Engine Development department and described aspects of the software.  He cautioned against using it in its current form because it was nothing more than a mechanism to detect, evade and defeat U.S. emissions cycles and tests.  As he explained (in German): "within the clearance structure of the pre-fuel injection the acoustic function is nearly always activated within our current US '07-data set.  This function is pure [cycle-beating] and can like this absolutely not be used for US '07."

---

[19] *See, e.g.*, RBG-MDL2672-NE-002143427; RBG-MDL2672-NE-002038118; RBG-MDL2672-NE-002121559; RBG-MDL2672-NE-001965783.

75.     VW executives, including Richard Dorenkamp (Head of VW's Engine Development After-Treatment Department) and Jens Hadler (Head of VW Brand Engine Development and Head of Diesel Engine Development), authorized the creation and installation of this software. It has been reported that the decision to cheat the EPA, CARB, and countless other regulators worldwide was an "open secret" in Volkswagen's engine development department, as it was necessary for the "EA 189 engine to pass U.S. diesel emissions limits within the budget and time frame allotted." With the knowledge and assistance of Bosch GmbH, the resulting defeat device was incorporated into the software required to operate the 2.0-liter and 3.0-liter TDI engines in VW and Audi diesel vehicles.

76.     The defeat device that Volkswagen and Bosch installed in the Class Vehicles to evade emission testing is software code residing the vehicles' electronic control unit.  All modern engines are integrated with sophisticated computer components to manage the vehicle's operation. In diesel vehicles, this software is known as electronic diesel control ("EDC").  The EDC equipped in the Class Vehicles is formally referred to as the Electronic Diesel Control Unit 17 (also known as "EDC Unit 17," "EDC 17," and "EDC17").  Bosch GmbH tested, manufactured, and sold customized EDC17's to Volkswagen for the Class Vehicles.

77.     The EDC17 was widely used throughout the automotive industry, including by BMW, Mercedes, FCA, Ford and GM, to operate modern "Clean Diesel" engines.  Bosch GmbH and Bosch LLC, through their employees in the Bosch Diesel Systems group, worked with each vehicle manufacturer that utilized the EDC17 to create a unique set of specifications and software code to manage the vehicle's engine operation.  Bosch GmbH and Bosch LLC were highly protective of the proprietary code and programming that operated the EDC17.  Bosch GmbH had detailed agreements with the automakers that governed the use, modification and programming of the EDC17, and which prevented automakers from making modifications to the EDC17 that were not known, approved, and tested by Bosch GmbH.  Whatever emissions ultimately came out of a VW tailpipe did so with the knowledge and approval of Bosch.

78.     Bosch's EDC Unit 17 controls emissions by periodically reading sensor values, evaluating a control function, and controlling actuators based on the control signal.[20]  Sensor readings include crankshaft position, air pressure, air temperature, air mass, fuel temperature, oil temperature, coolant temperature, vehicle speed, exhaust oxygen content, as well as driver inputs such as accelerator pedal position, brake pedal position, cruise control setting, and selected gear. Based on sensor input, EDC17 controls and influences the fuel combustion process including, in particular, fuel injection timing, which affects engine power, fuel consumption, and the composition of the exhaust gas.[21]

79.     All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch exerts near-total control.  In fact, the software is typically locked to prevent customers, like Volkswagen, from making significant changes on their own. Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end.

80.     With respect to the Class Vehicles, the EDC17 was used surreptitiously to evade emissions regulations.  Bosch GmbH, Bosch LLC and Volkswagen worked together to develop and implement a specific set of software algorithms for implementation in the Class Vehicles, including algorithms to adjust fuel levels, exhaust gas recirculation, air pressure levels, and urea injection rates in vehicles equipped with SCR systems.

81.     Bosch's EDC17 contained the defeat device programming that was necessary for the Class Vehicles to "pass" emission tests in the U.S.  When carmakers test their vehicles against EPA emission standards, they place the cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations.  Bosch's customized EDC17 controllers created for Class Vehicles detected test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure and even the position of the steering wheel.  When the

---

[20] Moritz Contag, *et al.*, *How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles*, 4, 2017 IEEE Symposium on Security and Privacy, SP 2017 – Proceedings, Institute of Electrical and Electronics Engineers Inc. (June 23, 2017).

[21] *Id.*

EDC17's algorithm detected that the vehicle was on a dynamometer (and, therefore, undergoing an emission test), software code within the EDC17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration," temporarily reducing emissions to legal levels.  Once the EDC17 detected that the emission test was complete, it would then enable a different "road calibration" that caused the engine to return to full power and efficiency while reducing the emissions control systems' performance, and consequently, caused the car to spew up to 40 times the legal limit of NO$_X$ emissions.  This process is illustrated in this diagram:



82.     This workaround was highly illegal. And, according to the New York Attorney General, Volkswagen management knew the use of these devices to detect the test and change the calibrations was illegal, as they studied the issue extensively during 2006-2007 when preparing to launch their vehicles in the U.S. market.

83.     The CAA expressly prohibits "defeat devices," defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device.").  Moreover, the CAA prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3).  Finally, in order to obtain a COC, automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

84.     Thus, in order to obtain the COCs necessary to sell their vehicles, Volkswagen did not disclose, and affirmatively concealed, the presence of the test-detecting and performance altering software code that it developed with engineers from IAV, Bosch GmbH and Bosch LLC within the EDC17 from government regulators, thus making that software an illegal "defeat device."  In other words, Volkswagen lied to the government, its Franchise Dealer customers, consumers and the public at large.

85.     Because the COCs were fraudulently-obtained, and because the diesels did not conform "in all material respects" to the specifications provided in the COC applications, the Class Vehicles were never covered by a valid COC, and thus, were never legal for sale, nor were they EPA and/or CARB compliant, as represented.  Volkswagen and Bosch Diesel Systems (in particular employees at Bosch LLC, which appeared to take the lead for Bosch Diesel Systems in interactions with regulators in the United States) hid these facts from the EPA, other regulators, Franchise Dealers and consumers, and it continued to sell and lease the Class Vehicles through Franchise Dealers to the driving public, despite their illegality, and with the complicity of Bosch.

86.     Volkswagen's cheating continued.  VW of America submitted COC applications on behalf of VWAG, Audi AG, and itself, for the 2.0-liter and VW-and Audi-branded 3.0-liter Class Vehicles, describing compliant specifications and concealing the dual-calibration strategy of the

defeat device.  Similarly, VW of America submitted COC applications on behalf of itself and for the Porsche-branded 3.0-liter Class Vehicles, describing compliant specifications and concealing the dual-calibration strategy of the defeat device.

87.     VW of America coordinated the submission of these and other regulatory submissions with Audi to ensure that discrepancies among the companies' submissions did not alert regulators to emission problems with the Class Vehicles. Executives from the companies even devised a policy of cross-brand communication and coordination to minimize the risk that U.S. regulators would learn of fraudulent representations in regulatory filings. But the diesels differed in "material respects" from the specifications described in the COC applications because they had undisclosed auxiliary emissions control devices that functioned as an illegal "defeat device."

88.     James Robert Liang was a member of Volkswagen's development department from 1983 to 2008 and then Leader of Diesel Competence for VW of America from 2008 to 2015. Liang was indicted by a federal Grand Jury for his role in the Volkswagen-IAV-Bosch conspiracy. In pleading guilty to fraud and other charges, Liang admitted that he and several co-conspirators knowingly designed, authorized, and managed the production of an EA 189 engine that could only comply with U.S. emissions standards by using an illegal defeat device.  He and others knowingly attended meetings with the EPA in Ann Arbor Michigan on or around October 3, 2006, and with CARB in El Monte, California on or around October 5, 2006, where they presented the engine as one that complied with U.S. emissions standards to obtain COCs.

89.     Because the COCs were fraudulently obtained, the Class Vehicles were never covered by valid COCs, and thus, were never offered legally for sale.  Volkswagen hid these facts from the EPA, CARB and other state regulators, and consumers, and it continued to sell and lease these diesels despite their illegality.

**E.     Once Caught, Volkswagen Admitted its Fraud – in Part**

90.     On September 3, 2015, Volkswagen officials finally disclosed at a meeting with the EPA and CARB that it had installed a sophisticated software algorithm on the 2.0-liter vehicles, which could detect when the car was undergoing emission testing on a test bench and switch the

car into a cleaner running mode.  During that meeting, Volkswagen admitted that the software was a "defeat device" forbidden by the CAA and state regulations.

91.     On September 18, 2015, the EPA issued a Notice of Violation of the CAA (the "First NOV") to VWAG, Audi AG, and VW America for installing illegal defeat devices in 2009-2015 Volkswagen and Audi diesel cars equipped with 2.0-liter diesel engines.  That same day, CARB sent a letter to VWAG, Audi AG, and VW America, advising that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the First NOV.

92.     Two days later, Volkswagen made its first public admission of wrongdoing in a written statement and video by VWAG's then-CEO Winterkorn (who would soon resign as a result of this scandal), posted on VWAG's website.  Winterkorn's statement read, in pertinent part:

> I personally am deeply sorry that we have broken the trust of our customers and the public.  We will cooperate fully with the responsible agencies, with transparency and urgency, to clearly, openly, and completely establish all of the facts of this case. Volkswagen has ordered an external investigation of this matter. . . . We do not and will not tolerate violation of any kind of our internal rules or of the law.[22]

93.     In his video, Winterkorn further apologized by stating:

> The irregularities in our group's diesel engines go against everything Volkswagen stands for.  To be frank with you, manipulation at Volkswagen must never happen again. . . . I personally am deeply sorry that we have broken the trust of our customers.  I would like to make a formal apology to our customers to the authorities and to the general public for this misconduct.[23]

---

[22] *See Statement of Prof. Dr. Martin Winterkorn, CEO of Volkswagen AG*, Volkswagen AG (Sept. 20, 2012), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/ 2015/09/statement_ceo_of_volkswagen_ag.html. (URL no longer active as of Oct. 2, 2020).

[23] *See* Joe Lorio, *VW Chairman Martin Winterkorn Releases Video Addressing Scandal, Is Not Stepping Down*, Car and Driver (Sept. 22, 2015), http://blog.caranddriver.com/vw-chairman-martin-winterkorn-releases-video-addressing-scandal-is-not-stepping-down/. (URL no longer active as of Oct. 2, 2020).

94.     That same day, Volkswagen confirmed that it had ordered dealers to stop selling both new and used vehicles with 2.0-liter diesel engines.[24] Volkswagen continued to sell its 3.0-liter diesel models, despite containing similar, but not-yet-disclosed defeat devices.

95.     On September 21, 2015, Volkswagen spokesman John Schilling stated in an email that Volkswagen was "committed to fixing this issue as soon as possible" and to "developing a remedy that meets emissions standards and satisfies our loyal and valued customers."[25]

96.     Michael Horn, President and CEO of Volkswagen Group of America, Inc., echoed this sentiment when he took the stage later that evening at a launch event for the 2016 Volkswagen Passat in Brooklyn, New York, telling reporters:

> Our company was dishonest, with the EPA and the California Air Resources Board, and with all of you and in my German words, *we have totally screwed up*.  We have to make things right, with the government, the public, our customers, our employees and also very important, our dealers.[26] (Emphasis added.)

97.     While Horn spoke of "customers" as the ultimate consumer purchasers of VW cars, in fact, Franchise Dealers are the direct purchasers of cars from VW and consumers, in turn, are the customers of the Franchise Dealers.  This distinction is important because it illustrates that the severe harm visited upon consumers through Volkswagen and Bosch's fraudulent scheme necessarily had a direct and substantial effect upon Franchise Dealers, because it is their lifeblood – their customer base – that has been left feeling cheated and defrauded by the only brand that Franchise Dealers are permitted to sell.

98.     Horn's presentation on the new Passat, notably, did not promote the environmental efficiency of the car's "clean" diesel model.

---

[24] Jack Ewing, *Volkswagen to Stop Sales of Diesel Cars Involved in Recall*, N.Y. Times (Sept. 20, 2015), http://www.nytimes.com/2015/09/21/business/international/volkswagen-chief-apologizes-for-breach-of-trust-after-recall.html.

[25] Jad Mouadwad, *et al.*, *The Wrath of Volkswagen's Drivers*, N.Y. Times (Sept. 21, 2015), http://www.nytimes.com/2015/09/22/business/the-wrath-of-volkswagens-drivers.html.

[26] Christine Seib, *Volkswagen's US Boss: We Totally Screwed Up*, CNBC (Sept. 22, 2015), http://www.cnbc.com/2015/09/21/volkswagen-us-ceo-screwed-up-on-eca-emissions-diesel-test-rigging.html.

99.     On September 22, 2015, Volkswagen announced that 11 million diesel cars worldwide were installed with the same defeat device software that had evaded emission testing by U.S. regulators.  Contemporaneously, Volkswagen announced that it had set aside reserves of 6.5 billion euros ($7.3 billion) in the third quarter to address the matter.[27]

100.     On September 23, 2015, Winterkorn resigned from his position as CEO of VWAG. In his resignation statement, Winterkorn insisted that he was not personally involved in the emissions scandal:  "Above all, I am stunned that misconduct on such a scale was possible in the Volkswagen Group.  I am doing this in the interests of the company even though I am not aware of any wrongdoing on my part."[28]

101.     Following Winterkorn's resignation, Volkswagen released a statement that it had set up a special committee to lead its own inquiry into the scandal and expected "further personnel consequences in the next days."  It added:  "The internal group investigations are continuing at a high tempo.  All participants in these proceedings that have resulted in immeasurable harm for Volkswagen will be subject to the full consequences."  However, the committee insisted that Winterkorn "had no knowledge of the manipulation of emissions data."[29]

102.     On September 25, 2015, Matthias Müller, the Chairman of Porsche AG, was named as Winterkorn's successor.  Immediately upon assuming his new role, Müller issued a press release stating:

> My most urgent task is to win back trust for the Volkswagen Group –
> by leaving no stone unturned and with maximum transparency, as
> well as drawing the right conclusions from the current situation.
> Under my leadership, Volkswagen will do everything it can to

---

[27] Nathan Bomey, *Volkswagen Emission Scandal Widens: 11 Million Cars Affected*, USA Today (Sept. 22, 2015), http://www.usatoday.com/story/money/cars/2015/09/22/volkswagen-emissions-scandal/72605874/.

[28] Graham Ruddick, *Volkswagen chief quits over emissions scandal as car industry faces crisis*, The Guardian (Sept. 23, 2015), http://www.theguardian.com/business/2015/sep/23/volkswagen-chief-martin-winterkorn-quits-emissions-scandal.

[29] *Id.*

develop and implement the most stringent compliance and governance standards in our industry.[30]

103.    Meanwhile, in Auburn Hills, Michigan, where VGoA houses its Information Technology Group, VW employees were ignoring a Department of Justice Directive to stop deleting and maintain any electronic records related to the Dieselgate scandal.  In a lawsuit filed March 8, 2016, a former VW Technical Manager named Daniel Donovan alleges that he was fired for his refusal to participate in, and attempt to stop, destruction of electronic evidence relevant to the Dieselgate scandal.

104.    Donovan alleges in his lawsuit that on the day the NOV was issued, September 18, 2015, he was instructed by his supervisor, Robert Arturi, to contact VW Executive Vice President and Chief Information Officer, Abdallah Shanti, and advise him to "stop deleting data effective immediately pursuant to a Department of Justice hold."  Donovan further alleges that when he relayed this message to Shanti, Shanti swore at him and did not stop deletion jobs at VW until September 21, 2015.  Donovan alleges that thereafter, VW did not stop deleting back-up data relevant to the Dieselgate scandal, even though it knew that it was supposed to preserve such back-ups.  And he alleges that VW did not provide to its outside investigator full access to the electronically stored information available.  Finally, Donovan alleges that after contacting VW's Office of General Counsel to report his concerns with these practices, he was fired in retaliation for whistle-blowing.[31]

105.    On October 8, 2015, Horn made frank admissions of culpability in his testimony before the House Committee on Energy and Commerce's Subcommittee on Oversight and Investigations.  Under oath, Horn testified: "On behalf of our Company, and my colleagues in Germany, I would like to offer a sincere apology for Volkswagen's use of a software program that

---

[30] *Matthias Müller appointed CEO of the Volkswagen Group*, Volkswagen AG (Sept. 25, 2015), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/CEO.html. (URL no longer active as of Oct. 2, 2020).

[31] *See Donovan v. Volkswagen Group of America*, *Inc. and Abdallah Shanti*, Case No. 2016-151877-CD (Oakland County Circuit Court March 8, 2016).

served to defeat the regular emissions testing regime."[32]  In response to a question from the Subcommittee Chairman, Representative Tim Murphy, whether the software was installed "for the express purpose of beating tests," Horn testified, "it was installed for this purpose, yes."[33]

106.   On November 2, 2015, the EPA issued a second Notice of Violation of the CAA (the "Second NOV") to VWAG, Audi AG, and VGoA, this time directed at the larger 3.0-liter, 6-cylinder diesel models – the same vehicles that Volkswagen continued to sell through its dealers after the First NOV.[34]  The Second NOV, which was also issued to Porsche AG and Porsche America, alleged that Volkswagen had installed illegal defeat devices in certain vehicles equipped with 3.0-liter diesel engines for model years 2014-16.  Although not identical, the cheating alleged of Volkswagen in the Second NOV concerned essentially the same mechanism Volkswagen used – and admitted to using – in the First NOV.

107.   However, shortly after it received the Second NOV, Volkswagen fired back at the EPA's new claims of fraud, denying that it installed defeat device software in the identified 3.0-liter diesel vehicles.  In response to the Second NOV, Volkswagen issued the following bold statement: "Volkswagen AG wishes to emphasize that no software has been installed in the 3.0-liter V6 diesel power units to alter emissions characteristics in a forbidden manner."[35]

108.   Yet, the following day, despite Volkswagen's insistence that the 3.0-liter diesel emission system was legal, Volkswagen ordered dealers to stop selling all six models at issue in the Second NOV, in addition to the Audi Q7, which was also equipped with a 3.0-liter diesel engine.[36]

---

[32] Keith Laing, *Volkswagen exec offers 'sincere apology' for emissions scandal*, The Hill (Oct. 8, 2015),  https://thehill.com/policy/transportation/256337-volkswagen-exec-offers-sincere-apology-for-emissions-scandal.

[33] *Id.*

[34] Letter from Susan Shinkman, Director, EPA Office of Civil Enforcement to Volkswagen dated Nov. 2, 2015, http://www.epa.gov/sites/production/files/2015-11/documents/vw-nov-2015-11-02.pdf.

[35] Emily Field, *Volkswagen Slams Newest EPA Emissions Fraud Claims*, Law360 (Nov. 3, 2015), http://www.law360.com/articles/722478/volkswagen-slams-newest-epa-emissions-fraud-claims.

[36] Paul Lienert, *Volkswagen tells dealers to stop selling some 3.0 V6 diesel models*, Reuters (Nov. 4, 2015), http://www.reuters.com/article/us-volkswagen-emissions-stopsale-idUSKCN0ST2E420151104.

109.    On November 4, 2015, following its directive to halt sales of the 3.0-liter diesel models, Volkswagen announced that an internal investigation revealed "unexplained inconsistencies" with the carbon-dioxide output of 800,000 of its gasoline-powered vehicles.[37]

110.    On November 22, 2015, after almost three weeks of denying the EPA's allegations contained in the Second NOV, Audi finally admitted that defeat device software was installed in all of its diesel vehicles.  Specifically, Audi stated that it had failed to disclose three auxiliary emissions control devices in its 3.0-liter diesel engines to U.S. regulators, and further admitted: "One of them is regarded as a defeat device according to applicable U.S. law.  Specifically, this is the software for the temperature conditioning of the exhaust-gas cleaning system."[38]  This admission came almost three months after Volkswagen's initial, more limited *mea culpa*.

111.    Still, despite the admissions and apologies that followed each time a Volkswagen lie was exposed, it became apparent that Volkswagen was not ready to fully accept responsibility for its actions.  Indeed, merely one month after Volkswagen admitted to the findings in the Second NOV, Hans-Gerd Bode, Volkswagen's Group Communications Chief, told a group of reporters:  "I can assure you that we certainly did not, at any point, knowingly lie to you. . . . We have always tried to give you the information which corresponded to the latest level of our own knowledge at the time."[39]

112.    On January 4, 2016, the DOJ, on behalf of the EPA, filed a civil complaint against VWAG, VGoA, Volkswagen Group of America Chattanooga Operations LLC, Audi AG, Audi, Porsche AG, and Porsche America for injunctive relief and the assessment of civil penalties for their violations of the CAA.  In addition to alleging the various violations of the CAA, the

---

[37] Benedikt Kammel and Christoph Rauwald, *VW Emissions Issues Spread to Gasoline Cars*, Bloomberg (Nov. 3, 2015), http://www.bloomberg.com/news/articles/2015-11-03/volkswagen-emissions-woes-deepen-as-800-000-more-cars-affected.

[38] *Statement on Audi's discussions with the US environmental authorities EPA and CARB*, Volkswagen AG (Nov. 23, 2015), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/11/epa.html. (URL no longer active as of Oct. 2, 2020).

[39] Andreas Cremer, *Das Auto' no more: Volkswagen plans image offensive*, Reuters (Dec. 22, 2015), http://www.reuters.com/article/us-volkswagen-emissions-communications-i-idUSKBN0U514L20151222.

complaint states that the Defendants impeded the government's efforts to learn the truth about the emission irregularities related to the Class Vehicles with material omissions and misleading information.

113.    On January 10, 2016, in an interview with NPR at the North American International Auto Show, Müller claimed that Volkswagen **did not lie** to U.S. regulators about emissions problems with its diesel engines, and suggested that the whole thing had been a misunderstanding of U.S. law.  Müller stated:

> Frankly spoken, it was a technical problem.  We made a default, we had a . . . not the right interpretation of the American law.  And we had some targets for our technical engineers, and they solved this problem and reached targets with some software solutions which haven't been compatible to the American law.  That is the thing.  And the other question you mentioned – it was an ethical problem?  I cannot understand why you say that. . . .We didn't lie. We didn't understand the question first.  And then we worked since 2014 to solve the problem.[40]

114.    Moreover, since the fraud was first exposed, Volkswagen has consistently denied that its top executives were involved with, or had knowledge of, the fraudulent scheme, instead pinning the blame on the work of a few rogue engineers.

115.    As an alternative tactic, during Horn's Congressional hearing on October 8, 2015, Horn testified that the installation of the defeat device in certain Volkswagen diesel vehicles was the work of "a couple of software engineers who put this in for whatever reason."[41]  Horn's explanation is not only contrary to prior admissions, but entirely implausible.

116.    To date, at least a dozen of Volkswagen's top executives have either resigned under pressure or been fired.  Among the top executives dismissed are Winterkorn, CEO and Chairman of Volkswagen, who resigned almost immediately once the scandal became public; Dr. Ulrich Hackenberg, a top engineering boss in the Audi Group, who was suspended and later resigned;

---

[40] Sonari Glinton, *'We Didn't Lie,' Volkswagen CEO Says Of Emissions Scandal*, NPR (Jan. 11, 2016), http://www.npr.org/sections/thetwo-way/2016/01/11/462682378/we-didnt-lie-volkswagen-ceo-says-of-emissions-scandal.

[41] Paul A. Eisenstein, *Could Rogue Software Engineers Be Behind VW Emissions Cheating?*, NBC News (Oct. 9, 2015), http://www.nbcnews.com/business/autos/could-rogue-software-engineers-be-behind-vw-emissions-cheating-n441451.

Heinz-Jakob Neusser, described as a Volkswagen "development" boss, who was suspended and later resigned; and Wolfgang Hatz, Porsche's "development" boss and previously Volkswagen's head of engine development, who was suspended and then resigned.  Furthermore, one of Volkswagen's top advertising executives purportedly "resigned" (although the company has said that the resignation was unrelated to the present scandal), and VGoA has replaced their general counsel and head of public affairs, David Geanacopoulos.  Just recently, Frank Tuch, VWAG's head of quality assurance, also resigned, his departure likely tied to leadership overhauls as Volkswagen's internal investigations continue.  Finally, Michael Horn, the centerpiece of VW's Congressional responses and head of VGoA, has also recently departed the company.

117.    That a few rogue engineers could orchestrate this massive, worldwide scheme is implausible not only because of the firings of the above-listed executives, but also because Volkswagen has been implicated using not just one, but *two* sophisticated defeat device software programs, in *two* separate engines designed and manufactured by different engineers in different corporate facilities.  In addition, more than a dozen different Class Vehicles, involving three separate brands – Volkswagen, Audi and Porsche – have been implicated in a fraud that began more than a decade ago.

118.    On October 17, 2015, Reuters reported that anonymous insiders, including a Volkswagen manager and a U.S. official close to the government's investigation of the company, claimed that Volkswagen made several modifications to its emission defeat device software over the seven years the company has admitted to cheating.[42]  Such incremental updates to the software, which were made to accommodate new generations of engines during that timeframe, evidences a larger group of employees making an ongoing effort to continue their deception.

119.    For example in or around 2012, Volkswagen engineers looking into hardware failures in 2.0-liter Class Vehicles determined that many vehicles were improperly operating in test mode (with reduced performance) while driving in normal conditions. They hypothesized that

---

[42] Andreas Cremer, *et al.*, *VW made several defeat devices to cheat emissions tests: sources*, Reuters (Oct. 17, 2015), http://www.reuters.com/article/us-volkswagen-emissions-software-idUSKCN0SB0PU20151017.

remaining in test mode for too long, which the cars were not designed to do, was stressing their exhaust systems. In or around July 2012, engineers from the VW Brand Engine Development department explained this theory to Neusser and Gottweis in separate meetings. Neusser and Gottweis encouraged further concealment of the software and instructed the engineers to destroy the document(s) they had used to illustrate the operation of the defeat device and the effects it could have on the exhaust system.

120.     In or around February 2013, during a "Summer Drive" event in South Africa, Volkswagen and Audi management discussed the defeat device software.[43] According to witnesses, and the minutes from the meeting, Axel Eiser, the head of Audi's powertrain division, said "the shifting program needs to be configured so that it runs at 100% on the treadmill but only 0.01% with the customer."[44]

121.     In or around April 2013, Neusser authorized engineers to add a new steering wheel angle detecting function to the software, to optimize its performance and prevent Class Vehicles from operating under testing protocols unnecessarily (and ensure it properly recognized test conditions).  These new software functions were added to new 2.0-Liter Class Vehicles sold in the United States.  It was later installed in existing 2.0-Liter Class Vehicles during maintenance.  In or around 2014, this function was part of the software updates that VW employees falsely told U.S. regulators would fix the problems with the 2.0-Liter Class Vehicles when, in fact, they were actually improving the accuracy of the defeat device.

122.     ,On January 22, 2016, Germany's *Sueddeutsche Zeitung* newspaper reported that Volkswagen's development of defeat device software to cheat diesel emissions tests was an "open secret" in its engineering development department.  Staff members in engine development have stated that they felt pressure from the top of Volkswagen's corporate hierarchy to find a cost-effective solution to develop clean diesel engines to increase U.S. market share.  Rather than

---

[43] *New Cheating Allegation Broadens VW's Crisis*, Wall Street Journal, Nov. 11 2016,
[44] *Id.*

concede that such engines could not be built (*i.e.*, were "impossible" as R&D chief Hatz once proclaimed), the development team decided to push ahead with manipulation.[45]

123.    Quoting documents from Volkswagen's internal investigation, which included testimony from a staff member who took part in the fraud, the German newspaper said: "Within the company there was a culture of 'we can do everything', so to say something cannot be done, was not acceptable. . . . Instead of coming clean to the management board that it cannot be done, it was decided to commit fraud."[46]  The newspaper further reported that staff in Volkswagen's engine development department took comfort from the fact that regulators would not be able to detect the fraud using conventional examination techniques.

124.    The role of Volkswagen's top management in the fraud has come under increased scrutiny after reports have emerged that Winterkorn was aware that Volkswagen was rigging emissions tests on its vehicles more than a year before the scandal emerged, yet did nothing to stop the practice.[47]

125.    According to German newspaper *Bild-Zeitung*, Winterkorn and other high-level Volkswagen managers were warned by a senior executive about the risk of a U.S. investigation into the use of the defeat devices back in May 2014.[48]  The newspaper reported that the warning came in the form of a letter from Bernd Gottweis, an employee known internally as the "fire-fighter," who led a team called the "Product Safety Taskforce," which concentrated on crisis prevention and management.  The letter, which was uncovered by the internal investigation carried out on Volkswagen's order, stated: "There is no well-founded explanation for the dramatically higher $NO_X$ emissions that can be given to the authorities.  It is to be suspected, that the authorities

---

[45] Georgina Prodhan, *Volkswagen probe finds manipulation was open secret in department: newspaper*, Reuters (Jan. 22, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.

[46] *Id.*

[47] Geoffrey Smith, *VW's ex-CEO Winterkorn 'Knew About Defeat Device in Early 2014*,' Fortune (Feb. 15, 2016), http://fortune.com/2016/02/15/vw-ceo-winterkorn-defeat-device/. (URL no longer active as of Oct. 2, 2020).

[48] *Id.*

will examine the VW systems to see whether Volkswagen has installed engine management

software (a so-called Defeat Device)."

126.    The newspaper also reported that a senior Volkswagen manager had admitted the

true level of emissions to a CARB official on August 5, 2015, over a month before the EPA issued

the First NOV, and that Volkswagen brand chief Herbert Diess had convened meetings on

August 24th and August 25th to discuss how to react to the scandal that was about to break.[49]

127.    The letter, of which *Bild-Zeitung* claims to have a copy, is the second leak

suggesting that knowledge of the emissions problems and use of the defeat devices extended far

higher, far earlier, than Volkswagen has admitted.  Indeed, the German magazine *Manager* has

reported that Volkswagen's management had already discussed the issue in the spring of 2014 in

reference to a letter received from the EPA.[50]  The revelations from these reports directly contradict

arguments made by Winterkorn and Horn that they were unaware of the use of defeat devices

applied specifically to circumvent U.S. regulations.

128.    At a December 10, 2015, press conference, during which Volkswagen discussed

preliminary results of their internal investigation, executives summed up the state of affairs, and

admitted that Volkswagen had installed defeat devices to take shortcuts around engineering

challenges.  Faced with "[s]trict and significantly toughening NOx limits," Volkswagen knew those

"NOx limits could not be met with [their] technological design" for lean NOx traps so instead they

dealt with the problem by installing defeat devices.  The Class Vehicles with urea treatments faced

a separate problem: the urea tanks were too small for consumers to maintain urea levels at standard

maintenance intervals.  Volkswagen also took shortcuts around these engineering challenges by

implementing a defeat device to reduce urea consumption and illegally stretch the capacity of its

urea tanks outside of test conditions.  Volkswagen concluded this presentation by implicitly

acknowledging the toxicity of its corporate culture, as Volkswagen announced it would establish a

---

[49] *Id*.

[50] *Id*.

"new mindset" among Volkswagen leadership that has "[m]ore capacity for criticism."[51]

**F.      The 3.0 Liter Defeat Device in the United States**

129.     Starting in or around 2006, Audi AG engineers designed a 3.0 liter diesel for the U.S. market. The 3.0 liter engine was more powerful than the 2.0 liter engine, and was included in larger and higher-end model vehicles. The 3.0 liter engine was ultimately placed in various Volkswagen, Audi and Porsche-diesel vehicles sold in the United States for model years 2009 through 2016. In order to pass U.S. emissions tests, Audi engineers designed and installed software designed to detect, evade and defeat U.S. emissions standards, which constituted a defeat device under U.S. law.

130.     Specifically, Audi AG engineers calibrated a defeat device for the 3.0 Liter diesels and the Porsche diesels that varied injection levels of a solution consisting of urea and water ("AdBlue") into the exhaust gas system based on whether the vehicle was being tested or not, with less NOx reduction occurring during regular driving conditions. In this way, the vehicle consumed less AdBlue, and avoided a corresponding increase in the vehicle's AdBlue tank size, which would have decreased the vehicle's trunk size, and made the vehicle less marketable in the United States. In addition, the vehicle could drive further between service intervals, which was also perceived as important to the vehicle's marketability in the United States.

**G.      The Concealment of the Defeat Devices in the United States — 3.0 Liter**

131.     On or about January 27, 2015, CARB informed VW AG that CARB would not approve certification of the Model Year 2016 3.0 Liter Subject Vehicles until Audi AG confirmed that the 3.0 Liter Subject Vehicles did not possess the same emissions issues as had been identified by the ICCT study and as were being addressed by VW with the 2.0 Liter Subject Vehicles.

132.     On or about March 24, 2015, in response to CARB's questions, Audi AG employees made a presentation to CARB, during which Audi AG employees did not disclose that the Audi 2.0 and 3.0 Liter vehicles and the Porsche diesels in fact contained a defeat device, which caused

---

[51] *Volkswagen AG, The Volkswagen Group is moving ahead: Investigation, customer solutions, realignment*, Volkswagen AG (Dec. 10, 2015), http://www.volkswagenag.com/ content/vwcorp/info_center/en/talks_and_presentations/2015/12/Presentation_MUE_POE.bin.html /binarystorageitem/file/2015_12_10_Pr%C3%A4sentation+PK_Final_ENG.pdf.  (URL no longer active as of Oct. 2, 2020).

emissions discrepancies in those vehicles. The Audi AG employees informed CARB that the 3.0 Liter vehicles did not possess the same emissions Issues as the 2.0 Liter vehicles when, in fact, the 3.0 Liter vehicles possessed at least one defeat device that interfered with the emissions systems to reduce NOx emissions on the dyno but not on the road. On or about March 25, 2015, CARB, based on the misstatements and omissions made by the Audi AG representatives, issued an executive order approving the sale of Model Year 2016 3.0 Liter diesels.

133.    On or about November 2, 2015, EPA issued a Notice of Violation to VWAG, Audi AG and Porsche AG, citing violations of the Clean Air Act related to EPA's discovery that the 3.0 diesels contained a defeat device that resulted in excess NOx emissions when the vehicles were driven on the road.

134.    On or about November 2, 2015, VWAG issued a statement that "no software has been installed in the 3-liter V6 diesel power units to alter emissions characteristics in a forbidden manner."

135.    On or about November 19, 2015, Audi AG representatives met with EPA and admitted that the 3.0 diesels contained at least three undisclosed AECDs. Upon questioning from EPA, Audi AG representatives conceded that one of these three undisclosed AECDs met the criteria of a defeat device under U.S. law.

136.    On or about May 16, 2016, Audi AG representatives met with CARE and admitted that there were additional elements within two of these undisclosed AECDs, which impacted the dosing strategy in the 3.0 Liter diesels.

137.    On or about July 19, 2016, in a presentation to CARB, Audi AG representatives conceded that elements of two of these undisclosed AECDs met the definition of a defeat device.

**H.    Porsche Marketed Its Cars as Environmentally Friendly and Emissions Compliant.**

138.    During the class period for each year and for each model Porsche promised that it was reducing $CO_2$ emissions and that its cars were environmentally compliant.

139.    In the 2008 Porsche brochure promised:

**Environment**:

1

**Powerful performance needn't cost the earth.**

2

In an era of intensifying debate about CO2 emissions, every automotive manufacturer is considering how to deal with the question of fuel consumption. Our answer has long been the same: maximum efficiency. Porsche reduces the CO2 emissions of its vehicles annually by an average of 1.7%. In relation to engine power, Porsche is already among those manufacturers achieving the lowest CO2 emissions. This has been achieved through an efficient drive concept, optimised aerodynamics, low rolling resistance and lightweight construction. This high degree of environmental responsibility is clearly demonstrated by our approach to environmental management at the Porsche development centre in Weissach.

3

4

5

6

7

Here, all technological developments are carried out with environmental protection in mind. The aim: pure performance – but not at the expense of the environment. You can find more information about environmental matters in the separate brochure 'Porsche and the Environment', or on our website www.porsche.com.

8

9

10

**Exhaust emission control.**

11

The 911 GT2 easily meets the stringent emissions standards for the EU4 regulations in Europe and LEV II regulations in the USA. This demonstrates that even high performance sports cars can achieve moderate emissions values in their respective categories. The 911 GT2 is not only one of the most powerful cars around, but also one of the cleanest. One pair of sensors is used to monitor the oxygen levels in each of the twin exhaust tracts. An additional pair of sensors* – again, one on each tract – is located downstream from the catalytic converters. This information is used by the engine management system to monitor the efficiency of the catalysts.

12

13

14

15

16

**Fuel.**

17

The current Porsche sportscar model range is already compatible with fuels that have an ethanol content of up to 10%. A 'biofuel' made from naturally replenishing materials, ethanol has a positive impact on the carbon dioxide balance since the plants grown for its production also absorb carbon dioxide from the atmosphere.

18

19

20

**Fuel system.**

21

In the fuel supply system, we've minimised the evaporation of hydrocarbons. This is achieved through a combination of active carbon filter and special fuel-tank coating. All fuel lines are made from aluminum, while those carrying vapours are made from multi-layer plastic. * Not featured in markets with leaded fuel.

22

23

24

25

26

27

28

## Technical data

| Engine | | Weights | |
|---|---|---|---|
| Cylinders | 6 | Unladen weight (DIN) | 1,440 kg |
| Displacement | 3,600 cm³ | Unladen weight (EC)* | 1,515 kg |
| Max. power (DIN) | 390 kW (530 hp) | Permissible gross weight | 1,750 kg |
| at rpm | 6,500 | **Performance** | |
| Max. torque | 680 Nm | Top speed | 329 km/h (204 mph) |
| at rpm | 2,200–4,500 | 0–100 km/h (0–62 mph) | 3.7 secs |
| Compression ratio | 9.0 : 1 | 0–160 km/h (0–99 mph) | 7.4 secs |
| **Transmission** | | 0–200 km/h (0–124 mph) | 11.2 secs |
| Layout | Rear-wheel drive | Flexibility 80–120 km/h (50–75 mph) in 5th gear | 4.1 secs |
| Manual gearbox | 6-speed | **Fuel consumption/emissions**** | |
| **Chassis** | | In accordance with 80/1268/EC as valid at the time of going to print | |
| Front axle | McPherson-strut suspension | Urban in l/100 km (mpg) | 18.8 (15.0) |
| Rear axle | LSA multi-link suspension | Extra urban in l/100 km (mpg) | 8.9 (31.7) |
| Steering | Variable steering ratio, power-assisted (hydraulic) | Combined in l/100 km (mpg) | 12.5 (22.6) |
| Turning circle | 10.9 m | $CO_2$ emissions in g/km | 298 |
| Brakes | Porsche Ceramic Composite Brake (PCCB): 6-piston monobloc aluminium fixed calipers at front, 4-piston monobloc aluminium fixed calipers at rear, discs internally vented and cross-drilled | **Dimensions/aerodynamics** | |
| | | Length | 4,469 mm |
| | | Width | 1,852 mm |
| | | Height | 1,285 mm |
| | | Wheelbase | 2,350 mm |
| Vehicle stability system | PSM | Luggage compartment volume | 105 litres |
| Anti-lock braking system | ABS 8.0 | Tank capacity (refill volume) | 90 litres |
| Wheels | Front: 8.5J x 19 ET 53 Rear: 12J x 19 ET 51 | Drag coefficient | 0.32 |
| Tyres | Front: 235/35 ZR 19 (sport tyres) Rear: 325/30 ZR 19 (sport tyres) | | |

* Weight is calculated in accordance with the relevant EC Directives and is valid for standard specification vehicles only. Optional equipment means greater weight. The figure given includes 68 kg for the driver and 7 kg for luggage.
** The figures given refer to vehicles with standard specification in Germany. Data determined in the NEDC (New European Driving Cycle) in accordance with the EU5 (80/1268/EEC) measurement method in the version valid at time of going to print. The figures do not relate to an individual vehicle, nor do they constitute part of the offer. They are intended solely as a means of comparing different types of vehicle. Further information on the individual vehicles can be obtained from your Porsche Centre.

140.   In the 2009 brochure Porsche promised:

**Environment**

**Accepting responsibility and being aware of our obligation. That is also close to our heart.**

**It's all about efficiency.**

**And your relationship with the environment.**

In an era of intensifying debate about CO2 emissions, every automotive manufacturer is being asked the question, 'What is your answer to the issue of fuel consumption?' Our answer has long been the same: maximum efficiency.

Porsche has been reducing the CO2 emissions of its vehicles annually by an average of around 1.7%. In relation to engine power, Porsche is already among those manufacturers achieving the lowest CO2 emissions. This has been achieved through a new efficient drive concept, optimum aerodynamics, low rolling resistance and lightweight construction. This high level of environmental responsibility is demonstrated by our approach to environmental management at the Porsche development centre in Weissach. Here, all technological developments are carried out with environmental protection in mind. The objective is to achieve pure performance, but not at the expense of the environment.

You will find more information in our separate brochure, 'Porsche and the Environment' or at www.porsche.com.

**Exhaust emission control.**

The new 911 GT3 complies with stringent emissions standards, including Euro 5 in Europe and LEV II in the USA. Porsche vehicles demonstrate that even high performance sports cars can achieve moderate emission values in their respective category. The 911 GT3 is not only one of the most powerful sportscars, but it is also one of the cleanest. This is achieved using two catalytic converters and an oxygen-sensor control system. The two banks of cylinders are monitored separately. Two corresponding oxygen sensors control the exhaust gas composition individually for each exhaust section. In addition to this, another sensor for each bank of cylinders monitors the conversion of pollutants in each catalytic converter.*

**Fuel.**

Today's Porsche sportscars are already designed to run on 10% ethanol. Ethanol has a positive impact on the $CO_2$ balance since the plants grown for the production of this biofuel also absorb $CO_2$ from the atmosphere.

**Technical data**

| Engine | |
|---|---|
| Cylinders | 6 |
| Displacement | 3,797 cm³ |
| Max. power (DIN) | 320 kW (435 hp) |
| at rpm | 7,600 |
| Max. torque | 430 Nm |
| at rpm | 6,250 |
| Compression ratio | 12.0:1 |
| **Transmission** | |
| Layout | Rear-wheel drive |
| Manual gearbox | 6-speed |
| **Chassis** | |
| Front axle | McPherson strut suspension |
| Rear axle | LSA multi-link suspension |
| Steering | Power-assisted (hydraulic), with variable steering ratio |
| Turning circle | 10.9 m |
| Brakes | Six-piston aluminium monobloc fixed calipers at front and four-piston aluminium monobloc fixed calipers at rear, composite brake discs internally vented and cross-drilled |
| Vehicle stability system | Porsche Stability Management (PSM) |
| Anti-lock braking system | ABS 8.0 (incorporated in PSM) |
| Wheels | Front: 8.5J x 19 ET 53 Rear: 12J x 19 ET 63 |
| Tyres | Front: 235/35 ZR 19 (sport tyres) Rear: 305/30 ZR 19 (sport tyres) |

| Weights* | |
|---|---|
| Unladen weight (DIN) | 1,395 kg |
| Unladen weight (EC)** | 1,470 kg |
| Permissible gross weight | 1,680 kg |
| **Performance*** | |
| Top speed | 312 km/h (194 mph) |
| 0–100 km/h (0–62 mph) | 4.1 secs |
| 0–160 km/h (0–99 mph) | 8.2 secs |
| 0–200 km/h (0–124 mph) | 12.3 secs |
| Flexibility 80–120 km/h (50–75 mph) in 5th gear | 5.9 secs |
| **Fuel consumption/emissions*** | |
| Urban in l/100 km (mpg) | 19.8 (14.3) |
| Extra urban in l/100 km (mpg) | 8.9 (31.7) |
| Combined in l/100 km (mpg) | 12.8 (22.1) |
| $CO_2$ emissions in g/km | 303 |
| **Dimensions/aerodynamics** | |
| Length* | 4,465 mm |
| Width* | 1,808 mm |
| Height* | 1,280 mm |
| Wheelbase* | 2,355 mm |
| Luggage compartment volume | 105 litres |
| Tank capacity (refill volume) | 67 litres |
| Drag coefficient | 0.32 |

* No officially verified values were available at the time of going to print.
* Weight is calculated in accordance with the relevant EC Directives and is valid for vehicles with standard specification only. Optional equipment increases this figure. The figure given includes 68 kg for the driver and 7 kg for luggage.
** Data determined for standard specification and in the NEDC (New European Driving Cycle) in accordance with the Euro 5 (715/2007/EC and 692/2008/EC) measurement method. The figures do not refer to an individual vehicle, nor do they constitute part of the offer. They are intended solely as a means of comparing different types of vehicle. Further information on individual vehicles can be obtained from your Porsche Centre.

141.    In the 2010 brochure Porsche promised:

**What's urgently expected of today's management teams?**

**Responsibility.**

**Environment.**

Think twice about every additional ounce. Get more power out of every drop of fuel. Examine every path to a solution. Why? Well, because it's our duty. And because our efforts to achieve greater efficiency will also give us the engineering lead.

In an era of intensifying debate about CO2 emissions, every automotive manufacturer is being asked the question, 'What is your answer to the issue of fuel consumption?' Our answer has long been the same: maximum efficiency.

Porsche has been reducing the CO2 emissions of its vehicles by an average of around 1.7%* every year for the past 15 years. In relation to engine power, Porsche is already among those manufacturers achieving the lowest CO2 emissions. This has been achieved through efficient drive concepts (e.g. DFI), lightweight construction, optimised aerodynamics and low rolling resistance.

This high level of environmental responsibility is demonstrated by our approach to environmental management at the Porsche development centre in Weissach. Here, all technological developments are carried out with environmental protection in mind. The objective is to achieve pure performance, but not at the expense of the environment.

You will find more information in our separate brochure 'Porsche and the Environment' or at www.porsche.com.

**Exhaust emission control.**

The 911 Turbo and the 911 Turbo S models comply with stringent emissions standards, including Euro 5 in Europe and LEV II/LEV in the USA. Porsche vehicles demonstrate that even high performance sportscars can achieve moderate emission values in their respective category. This makes them not just extremely exciting sportscars, but very clean ones too.

*\*The stated reduction in fuel consumption has been calculated from the NEDC (New European Drive Cycle) fuel consumption figures for the respective model years of the vehicles and in relation to the applicable European legislation.*

## Technical data

| 911 Turbo/911 Turbo Cabriolet | |
|---|---|
| **Engine** | |
| Cylinders | 6 |
| Displacement | 3,800 cm³ |
| Power (DIN) | 368 kW (500 hp) |
| at | 6,000–6,500 rpm |
| Max. torque at | 650 Nm at 1,950–5,000 rpm with 'overboost' 700 Nm at 2,100–4,000 rpm |
| Compression ratio | 9.8 : 1 |
| **Transmission** | |
| Layout | All-wheel drive with electronically controlled multi-plate clutch |
| 6-speed manual gearbox | Standard |
| 7-speed PDK | Optional |
| **Chassis** | |
| Front axle | McPherson strut suspension |
| Rear axle | LSA multi-link suspension |
| Steering | Variable steering ratio, power-assisted (hydraulic) |
| Turning circle | 10.9 m |
| Brakes | 6-piston monobloc aluminium fixed calipers at front, 4-piston monobloc aluminium fixed calipers at rear, discs internally vented and cross-drilled |
| Vehicle stability system | Porsche Stability Management (PSM) |
| Anti-lock braking system | ABS 8.0 |
| Wheels Front | 8.5 J x 19 ET 56 |
| Rear | 11 J x 19 ET 51 |
| Tyres Front | 235/35 ZR 19 |
| Rear | 305/30 ZR 19 |

| Weights | 911 Turbo | 911 Turbo Cabriolet |
|---|---|---|
| | Manual gearbox/PDK | Manual gearbox/PDK |
| Unladen weight (DIN) | 1,570 kg/1,595 kg | 1,645 kg/1,670 kg |
| Unladen weight (EC)* | 1,645 kg/1,670 kg | 1,720 kg/1,745 kg |
| Permissible gross weight | 1,935 kg/1,960 kg | 1,995 kg/2,020 kg |
| **Performance** | Manual gearbox/PDK | Manual gearbox/PDK |
| Top speed km/h (mph) | 312 (194)/312 (194) | 312 (194)/312 (194) |
| 0–100 km/h (0–62 mph) | 3.7 secs/3.6 secs (3.4 secs*) | 3.8 secs/3.7 secs (3.5 secs*) |
| 0–160 km/h (0–99 mph) | 7.8 secs/7.7 secs (7.4 secs*) | 8.1 secs/8.0 secs (7.7 secs*) |
| 0–200 km/h (0–124 mph) | 11.9 secs/11.6 secs (11.3 secs*) | 12.4 secs/12.1 secs (11.8 secs*) |
| Flexibility 80–120 km/h (50–75 mph) in 5th gear | 3.7 secs/– | 3.8 secs/– |
| Acceleration 80–120 km/h (50–75 mph) | –/2.1 secs | –/2.2 secs |
| **Fuel consumption/emissions*** | Manual gearbox/PDK | Manual gearbox/PDK |
| Urban in l/100 km (mpg) | 16.5 (17.1)/16.5 (17.1) | 16.7 (16.9)/16.7 (16.9) |
| Extra urban in l/100 km (mpg) | 8.3 (34.0)/8.1 (34.9) | 8.4 (33.6)/8.2 (34.4) |
| Combined in l/100 km (mpg) | 11.6 (24.4)/11.4 (24.8) | 11.7 (24.1)/11.5 (24.6) |
| $CO_2$ emissions g/km | 272/268 | 275/270 |
| **Dimensions/aerodynamics** | | |
| Length | 4,450 mm | 4,450 mm |
| Width (incl. exterior mirrors) | 1,852 mm (1,952 mm) | 1,852 mm (1,952 mm) |
| Height | 1,300 mm | 1,300 mm |
| Wheelbase | 2,350 mm | 2,350 mm |
| Luggage compartment volume (VDA) | 105 litres | 105 litres |
| Tank capacity | 67 litres | 67 litres |
| Drag coefficient | $c_w = 0.31$ | $c_w = 0.32$ |

Some of the vehicles illustrated in this brochure are fitted with optional equipment which is available at additional cost. All information regarding supplied equipment, appearance, performance, dimensions, weight, fuel consumption and running costs is correct to the best of our knowledge at the time of going to press. Porsche reserves the right to alter specifications and other product information without prior notice.

* Weight is calculated in accordance with the relevant EC Directives and is valid for vehicles with standard specification only. Optional equipment increases this figure. The figure given includes 68 kg for the driver and 7 kg for luggage.
* Figures for PDK include the optional Sport Chrono Package Turbo with SPORT PLUS button selected.

*** Data determined in the NEDC (New European Driving Cycle) in accordance with the Euro 5 (715/2007/EC and 692/2008/EC) measurement method. The figures do not refer to an individual vehicle nor do they constitute part of the offer. They are intended solely as a means of comparing different types of vehicle. You can obtain further information about individual vehicles from your Porsche Centre. Fuel consumption calculated for vehicles with standard specification only. Optional equipment may affect fuel consumption and performance.

142.   In the 2011 brochure Porsche promised:

**Environment:**

For us, developing a 911 will forever be an obligation. To our roots. To individuality. And, naturally, to sportiness.

Nevertheless, our efforts in development do not concern themselves solely with the hunt for the highest horsepower, but with the search for efficiency.

In fact, the 911 gives much and takes little.

Another sign of inner strength.

**Harmony between driver and the 911.**

**Harmony with the environment as well.**

In an era of intensifying debate about $CO_2$ emissions, every automotive manufacturer is being asked the question, "What is your answer to the issue of fuel consumption?" Our answer has long been the same: maximum efficiency.

Over the last 15 years, Porsche has reduced the $CO_2$ emissions of its vehicles annually by an average of 1.7 percent. As far as engine output is concerned, we are already among those manufacturers achieving the lowest $CO_2$ emissions. This has been achieved through the efficient Direct Fuel Injection (DFI), lightweight construction, optimal aerodynamics and low rolling resistance.

This high level of environmental responsibility is clearly demonstrated by our approach to environmental management at the Porsche development center in Weissach. Here, all technological developments are carried out with environmental protection in mind. The goal? Pure performance—but not at the expense of the environment. The result? The 911. Find out more on the subject of the environment at porsche.com.

**Exhaust emissions control.**

Both 911 engines comply with stringent emissions standards, including Euro 5 in Europe and LEV II in the USA. Vehicles manufactured by Porsche demonstrate that even high performance sports cars can achieve moderate emissions values in their respective categories. Indeed, not only is the 911 one of the most exciting cars around, but it is also one of the cleanest.

This is achieved through the use of a two-stage cascade type catalytic converter which comprises two monolith substrates on each of the twin exhaust tracts. These specially coated substrates contain ultrafine honeycomb channels in which pollutants are converted as exhaust gas passes through.

The stereo Lambda Sensor® circuitry controls and monitors each cylinder bank separately, while another Lambda Sensor® on each cylinder bank monitors pollutant conversion in the respective catalytic converter.

**Fuel economy and recycling.**

It is also ecological because all materials used are meticulously selected. We use only innovative and environmentally friendly components. All lightweight materials are easily recyclable and each material is labeled to facilitate its separation for recycling. The reduction in the number of plastic variants helps to ensure more efficient recycling. Recycled plastics are used where they meet our exacting technical requirements. This all combines to make the current 911 approximately 95-percent recyclable.

In addition, Porsche primarily uses environmentally friendly water-based paints. The 911 is absolutely free of asbestos, CFCs and components manufactured using CFCs. This is because, here at Porsche, environmental protection does not begin at the end of a vehicle's life. It starts at the planning and development stage.

143.   In the 2012 brochure Porsche promised:

**Earth is a beautiful place to drive.**

**The 911 helps to keep it that way.**

**Porsche and the environment.**

In a racing series, every competitor reads the same rulebook—which is why so many arrive at similar solutions. At Porsche, we realized long ago that the best way to beat the competition was by thinking and doing the unconventional.

Our approach to the environment is no different. We share with other carmakers the concern with global climate change and $CO_2$ emissions. But we bring novel solutions that not only reduce environmental impact, but enhance overall performance. We call this Intelligent Performance.

Through its application, Porsche has managed to reduce fuel consumption in every model range, when compared to their predecessors. At the same time, we've improved acceleration and responsiveness, to make performance vehicles that are better for the environment and the driver. This is achieved through a disciplined approach to every vehicle system.

With its aerodynamic shape, lightweight composite construction, and a powerful and efficient engine, the new 911 demonstrates the beauty of Intelligent Performance.



144.   In the 2013 brochure, Porsche promised:

**Earth is a beautiful place to drive.**

**The 911 helps to keep it that way.**

**Porsche and the environment.**

In a racing series, every competitor reads the same rulebook—which is why so many arrive at similar solutions. At Porsche, we realized long ago that the best way to beat the competition was by thinking and doing the unconventional.

Our approach to the environment is no different. We share with other carmakers the concern with global climate change and $CO_2$ emissions. But we bring novel solutions that not only reduce environmental impact, but enhance overall performance. We call this Intelligent Performance.

Through its application, Porsche has managed to reduce fuel consumption in every model range, when compared to their predecessors. At the same time, we've improved acceleration and responsiveness, to make performance vehicles that are better for the environment and the driver. This is achieved through a disciplined approach to every vehicle system.

**Exhaust Emissions Control**

Vehicles manufactured by Porsche demonstrate that even high-performance sports cars can achieve moderate fuel consumption and exhaust emissions values in their respective category.

This is achieved, on the one hand, through the use of fuel-efficient technologies such as Auto Start Stop, thermal management, electrical system recuperation, Direct Fuel Injection (DFI), VarioCam Plus, and, in conjunction with optional PDK, coasting mode.

On the other hand, new catalytic converters developed for the 911 provide efficient emissions control.

The stereo lambda sensor circuitry controls and monitors each cylinder bank separately. For each exhaust tract, oxygen sensors regulate the composition of the exhaust gas, while another lambda sensor on each cylinder bank monitors pollutant conversion in the respective catalytic converter.

**Fuel**

All Porsche models are designed to operate on fuels with an ethanol content of up to 10 percent. Ethanol has a positive impact on the $CO_2$ balance since the plants grown for the production of this biofuel also absorb $CO_2$ from the atmosphere.

The release of hydrocarbons from the fuel system has been minimized thanks in no small part to the active carbon filter and the multilayered material from which the fuel tank is made. All fuel lines are made from multilayered plastic, steel, or aluminum.

145.    In the 2014 brochure, Porsche promised:

**Since 1963, we've defined the 911 in terms of sporty performance.**

**And we've scrutinised it daily for its efficiency-enhancing potential.**

**Porsche and the environment.**

We've already spoken about our contribution to motorsport. To be more precise, about our responsibility for the future of motorsport. We meet this responsibility with intelligent technology, unconventional ideas and optimum performance.

Our approach to environmental protection is no different. In an era of intensifying debate about global climate change and CO2 emissions, every automotive manufacturer is asking what it has to offer right now. Our answer has long been the same: excellent performance at the same time as greater efficiency.

Porsche has managed to reduce fuel consumption across all model ranges by a double-digit percentage compared with the respective previous model even though performance has been increased. This is made possible by an efficient drive concept (e.g. DFI and VarioCam Plus), lightweight construction, optimised aerodynamics and low rolling resistance.

The environmental management team at the Porsche Development Centre in Weissach aims to demonstrate a high level of environmental responsibility.

Here, technological developments are carried out with environmental protection in mind. The goal is to enhance performance – but, where possible, not at the expense of the environment. We achieve this goal with Intelligent Performance, as epitomised by the 911.

**Exhaust emission control.**

Vehicles manufactured by Porsche demonstrate that even high-performance sports cars can achieve moderate fuel consumption and exhaust emission values in their respective category.

This is achieved, on the one hand, through the use of fuel-efficient technologies such as auto start/stop, thermal management, electrical system recuperation, direct fuel injection, VarioCam Plus and, in conjunction with optional PDK, coasting mode.

On the other hand, new catalytic converters developed for the 911 provide efficient emission control. The stereo Lambda control circuitry controls and monitors each cylinder bank separately. For each exhaust tract, oxygen sensors regulate the composition of the exhaust gas, while another Lambda sensor on each cylinder bank monitors pollutant conversion in the respective catalytic converter.



Technical data.

146.     In the 2015 brochure, Porsche promised:

**Since 1963, we've defined the 911 in terms of sporty performance.**

**And we've scrutinised it daily for its efficiency-enhancing potential.**

**Porsche and the environment.**

We've already spoken about our contribution to motorsport. To be more precise, about our responsibility for the future of motorsport. We meet this responsibility with intelligent technology, unconventional ideas and optimum performance.

Our approach to environmental protection is no different. In an era of intensifying debate about global climate change and CO2 emissions, every automotive manufacturer is asking what it has to offer right now. Our answer has long been the same: excellent performance at the same time as greater efficiency.

Porsche has managed to reduce fuel consumption across all model ranges by a double-digit percentage compared with the respective previous model even though performance has been increased. This is made possible by an efficient drive concept (e.g. DFI and VarioCam Plus), lightweight construction, optimised aerodynamics and low rolling resistance.

The environmental management team at the Porsche Development Centre in Weissach aims to demonstrate a high level of environmental responsibility. Here, technological developments are carried out with environmental protection in mind. The goal is to enhance performance – but, where possible, not at the expense of the environment. We achieve this goal with Intelligent Performance, as epitomised by the 911.

**Exhaust emission control.**

Vehicles manufactured by Porsche demonstrate that even high-performance sports cars can achieve moderate fuel consumption and exhaust emission values in their respective category. This is achieved, on the one hand, through the use of fuel-efficient technologies such as auto start/stop, thermal management, electrical system recuperation, direct fuel injection, VarioCam Plus and, in conjunction with optional PDK, coasting mode. On the other hand, catalytic converters developed for the 911 provide efficient emission control. The stereo Lambda control circuitry controls and monitors each cylinder bank separately. For each exhaust tract, oxygen sensors regulate the composition of the exhaust gas, while another Lambda sensor on each cylinder bank monitors pollutant conversion in the respective catalytic converter.

**PANAMERA Brochures**

147.    In the 2010 brochure, Porsche promised:

**Porsche and the environment.**

**Environmental protection.**

In an era of intensifying debate about global climate change and CO2 emissions, every automotive manufacturer is asking what it has to offer in terms of environmental protection. Our answer has long been the same: maximum efficiency.

Porsche has been reducing the CO2 emissions of its vehicles by an average of around 1.7%* every year for the past 15 years. As far as engine output is concerned, we are already among those manufacturers achieving the lowest CO2 emissions. This has been achieved through the new efficient engine technology (e.g. by DFI and VarioCam Plus), lightweight construction, optimum aerodynamics and low rolling resistance.

This high level of environmental responsibility is clearly demonstrated by our approach to environmental management at the Porsche Development Centre in Weissach. Here, all technological developments are carried out with environmental protection in mind. The goal is pure performance – but not at the expense of the environment. A goal achieved by the Panamera.

**Fuel economy and emission control.**

Vehicles manufactured by Porsche demonstrate that even high performance sports cars can achieve moderate fuel consumption and exhaust emission values in their respective category.

The balance is exemplary: the Panamera, Panamera 4 and Panamera Turbo comply with the Euro 5 emission standard in Europe and the LEV regulations in the USA, the Panamera S and

Panamera 4S meet the requirements of EU 5 and ULEV.

This is achieved through the use of fuel-efficient technologies such as direct fuel injection (DFI, p. 51) and VarioCam Plus (p. 52).

Efficient emission control is achieved by a two-stage cascade type catalytic converter, which comprises two monoliths arranged in series. These specially coated substrates contain ultra-fine honey - comb channels in which pollutants are converted as exhaust gas passes through.

The stereo Lambda control circuitry controls and monitors each cylinder bank separately. For each exhaust tract, oxygen sensors regulate the composition of the exhaust gas, while another Lambda sensor on each cylinder bank monitors pollutant conversion in the respective catalytic converter.**

*\* The stated reduction in fuel consumption has been calculated from the NEDC (New European Drive Cycle) fuel consumption figures for the respective model years of the vehicles and in relation to the applicable European legislation. \*\* Not in markets with leaded fuel.*

148.    In the 2011 brochure, Porsche promised:

**Porsche and the environment.**

**Environmental protection.**

In an era of intensifying debate about global climate change and CO2 emissions, every automotive manufacturer is asking what it has to offer in terms of environmental protection. Our answer has long been the same: maximum efficiency.

Porsche has been reducing the CO2 emissions of its vehicles by an average of around 1.7%\* every year for the past 15 years. As far as engine output is

concerned, we are already among those manufacturers achieving the lowest $CO_2$ emissions. This has been achieved through the new efficient engine technology (e.g. by DFI and VarioCam Plus), lightweight construction, optimum aerodynamics and low rolling resistance.

This high level of environmental responsibility is clearly demonstrated by our approach to environmental management at the Porsche Development Centre in Weissach. Here, all technological developments are carried out with environmental protection in mind. The goal is pure performance – but not at the expense of the environment. A goal achieved by the Panamera.

**Fuel economy and emission control.**

Vehicles manufactured by Porsche demonstrate that even high performance sports cars can achieve moderate fuel consumption and exhaust emission values in their respective category.

The balance is exemplary: the Panamera, Panamera 4 and Panamera Turbo comply with the Euro 5 emission standard in Europe and the LEV regulations in the USA, the Panamera S and Panamera 4S meet the requirements of EU 5 and ULEV.

This is achieved through the use of fuel-efficient technologies such as direct fuel injection (DFI, p. 51) and VarioCam Plus (p. 52).

Efficient emission control is achieved by a two-stage cascade type catalytic converter, which comprises two monoliths arranged in series. These specially coated substrates contain ultra-fine honey - comb channels in which pollutants are converted as exhaust gas passes through.

*\* The stated reduction in fuel consumption has been calculated from the NEDC (New European Drive Cycle) fuel consumption figures for the respective model years of the vehicles and in relation to the applicable European legislation. \*\* Not in markets with leaded fuel.*

In models with the V8 engine, exhaust gas cleaning is supported by an air injection system. A compressor pumps extra air into the exhaust tract during the catalytic converter warm-up phase for faster heating and, therefore, lower emissions.

Other measures for improving fuel economy are the Auto Start/Stop function (p. 50) and electrical system recuperation, whereby the vehicle battery is charged predominantly under braking. Under acceleration, on the other hand, the charging current of the regulated alternator is reduced so that the engine does not need to work as hard to charge the battery.

149.    In the 2012 brochure, Porsche promised:

1
2

**Preserving resources and protecting the planet. Porsche and the environment.**

3

**Porsche and the environment.**

4

**Environmental protection.**

5
6
7
8

In an era of intensifying debate about global climate change, every automotive manufacturer is asking itself what it has to offer in terms of environmental protection. Our answer has long been the same: maximum efficiency. Porsche is among those manufacturers achieving the lowest $CO_2$ emissions. This has been achieved through the new efficient engine technologies (DFI and VarioCam Plus), lightweight construction, the Auto Start Stop function, optimized aerodynamics, and low rolling resistance.

9
10
11
12

This high level of environmental responsibility is clearly demonstrated by our approach to environmental management at the Porsche development center in Weissach. Here, all technological developments are carried out with environmental protection in mind. The goal is pure performance—but not at the expense of the environment. A goal also achieved by the new Panamera models.

13

**Exhaust emissions.**

14

The Panamera models are equipped with advanced emissions-control technology.

15
16
17
18

The figures are exemplary: Vehicles manufactured by Porsche demonstrate that even high-performance sports cars can achieve comparatively moderate exhaust emissions values in their respective category. This has been achieved in part by state-of-the art engine concepts, including the hybrid drive and gasoline engines. In addition, a fast heating catalytic converter system ensures that the optimal operating temperature is reached quickly after the vehicle is started, thereby further improving emissions control system performance.

19
20
21
22
23

The gasoline and hybrid models feature stereo Lambda control. Each of the two cylinder banks has a separate Lambda Sensor® control loop. This determines, via the engine management system, the optimal quantity of fuel, thus ensuring efficient emissions control. On the V8 engines, this is assisted by an air-injection system, where a compressor pumps extra air into the exhaust tract during the catalytic converter warm-up phase for faster heating and, consequently, lower emissions.

24
25
26

Other measures for improving fuel economy are the Auto Start Stop function and electrical system recuperation, where the vehicle battery is charged predominantly under braking. Under acceleration, on the other hand, the charging current of the regulated alternator is reduced so that the engine does not need to work as hard to charge the battery

27

150.    In the 2013 brochure, Porsche promised:

28

**As a Panamera driver, you are responsible for four people. We are responsible for everyone else.**

**Porsche and the environment.**

**Environmental protection.**

In an era of intensifying debate about global climate change and CO2 emissions, every automotive manufacturer is asking what it has to offer in terms of environmental protection. Our answer has long been the same: maximum efficiency.

Porsche has been reducing the CO2 emissions of its vehicles by an average of 1.7% every year for the past 15 years, while the reduction from 2006 to 2010 was 4.6% per year*. As far as engine output is concerned, we are already among those manufacturers achieving the lowest CO2 emissions. This has been achieved through the efficient engine technology, lightweight construction, optimum aerodynamics and low rolling resistance.

This comparatively high level of environmental responsibility is clearly demonstrated by our approach to environmental management at the Porsche Development Centre in Weissach. Here, all technological developments are carried out as much as possible with environmental protection in mind. The goal is pure performance – but not at the expense of the environment.

**Exhaust emissions.**

The Panamera models are equipped with advanced emission control technology.

The figures are exemplary: vehicles manufactured by Porsche demonstrate that even high performance sportscars can achieve comparatively moderate exhaust emission values in their respective category. This has been achieved in part by state-of-the-art engine concepts, including the hybrid drive and diesel and petrol engines. In addition, a fastheating catalytic converter system ensures that the optimum operating temperature is reached quickly after the vehicle is started, thereby further improving emission control system performance.

The petrol models and the hybrid feature stereo Lambda control. Each of the two cylinder banks has a separate Lambda control loop. This determines, via the engine management system, the optimum quantity of fuel, thus ensuring efficient emission control. On the V8 engines, this is assisted by an air injection system where a compressor pumps extra air into the exhaust tract during the catalytic converter warm-up phase for faster heating and, consequently, lower emissions.

*The stated reduction in fuel consumption has been calculated from the NEDC (New European Drive Cycle) fuel consumption figures for the respective model years of the vehicles and in relation to the applicable European legislation.*

*For fuel consumption, CO2 emissions and efficiency class, please refer to pages 162-165.*

The exhaust gas recirculation function on the Panamera Diesel returns some of the exhaust gases to the combustion process. This has the effect of reducing combustion peak temperature and, as a result, nitrogen oxide emissions. Of course, the engine also features an oxidation catalyst and a diesel particulate filter.

Other measures for improving fuel economy are the Auto start/stop function and electrical system recuperation, whereby the vehicle battery is charged predominantly under braking. Under acceleration, on the other hand, the charging current of the regulated alternator is reduced so that the engine does not need to work as hard to charge the battery.

## V.    THE VW PLEA AGREEMENT

**A.    The Latest Chapter: Volkswagen and Porsche's Admissions of "Irregularities"**

151.    On January 11, 2017, VWAG entered into a plea agreement with the United States, a copy of which is attached hereto as Exhibit A. In that plea agreement, VWAG admitted that Audi engineers had installed defeat devices in Porsche diesel vehicles.

152.    On August 22, 2020, Porsche announced it had discovered "irregularities" in the software and hardware in its engines manufactured from 2008-2013 in Porsche 911 and Panamera vehicles and on the market prior to 2017. Porsche contacted both German and U.S. authorities about its internal investigation, and is currently being investigated by Germany's KBA. Porsche announced that "These topics mainly relate to specific hardware and software used in certification testing. In certain cases, such components may also have differed from parts used in series vehicles. . . . Porsche is routinely and continuously reviewing technical and regulatory aspects of its vehicles. The company also conducts reviews of potential issues," the statement from Porsche read. "In such reviews, Porsche has identified topics that it has now–as in other instances– proactively brought to the attention of the regulators."[52] While Porsche "self reported," it certainly should not be congratulated for doing so – its new "transparency" has only come about due to the original diesel cheating scandal. More specifically the software in these vehicles with exhaust

---

[52] Colin Beresford, *Porsche Investigating Possible Manipulation of Emissions-Test Data*, Car and Driver (Aug. 24, 2020), https://www.caranddriver.com/news/a33753856/porsche-investigation-emissions-manipulation/ .

1  filters depending on internal engine models similar in execution to the defeat devices found in Audi

2  cars.

3  **B.      Volkswagen and Porsche Caused Hundreds of Millions of Dollars in Harm to U.S. Consumers**

4  
5      153.    Volkswagen and Porsche's illegal scheme duped hundreds of thousands of U.S.

6  consumers into buying Class Vehicles that never should have left the factory, let alone been sold, at

7  a cost of hundreds of millions of dollars.

8      154.    Volkswagen and Porsche engaged in a false and misleading advertising campaign

9  that touted its engines system as a high performance engine that still managed to be fuel efficient

10 and low-emission, while failing to disclose and actively concealing the fact that this combination of

11 benefits could not be achieved without a software  manipulation that concealed the true level of

12 emissions generated by the vehicles. Plaintiffs and Class members bought and/or leased the Class

13 Vehicles based on these claims, as well as VW and Porsche's concealment of the defeat device,

14 and would not have purchased and/or leased the vehicles had they known the truth about VW's

15 "clean" engines. Class members certainly would not have paid what they did for their vehicles had

16 they known the vehicles' true characteristics

17     155.    Similarly, VW and Porsche obtained tens of millions from Class members who

18 leased their vehicles but terminated those leases prior to the discovery of the fraud. For example,

19 VW and Porsche typically charge an "acquisition fee" at the start of a lease and a "termination fee"

20 at the end of a lease. That is, VW and Porsche charged a fee to lease a car that VW knew did not

21 comply with U.S. law and did not deliver the promised "clean" performance. VW and Porsche then

22 charged a fee to terminate a lease that it knew was not enforceable due to its fraud. These fees were

23 a product of VW's fraud but never returned to Plaintiffs or Class members.

24     156.    Plaintiffs and Class members would not have purchased or leased the Class Vehicles

25 were it not for Defendants' misrepresentations, omissions, and active concealment of material

26 facts.

27
28

CLASS ACTION COMPLAINT                        - 55 -

1

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

2

**A.   Discovery Rule Tolling**

3       157.   Plaintiffs and the Class members had no way of knowing about Volkswagen and

4   Porsche's deception with respect to its Clean engine system and "defeat device." It took federal

5   EPA and California Air Resources Board investigations to uncover Volkswagen's deception, which

6   involved sophisticated software manipulation on Defendants' part.  As reported by the *Los Angeles*

7   *Times* on September 18, 2015, it took California Air Resources Board testing on a special

8   dynamometer in a laboratory, open road testing using portable equipment, and the use of special

9   testing devised by the Board to uncover Volkswagen's scheme and to detect how software on the

10  engine's electronic control module was deceiving emissions certifications tests. It also appears that

11  Porsche notified investigators as far back as early summer, but only informed the public many

12  months later. Plainly, Volkswagen and Porsche were intent on expressly hiding their behavior from

13  regulators and consumers.  This is the quintessential case for tolling.

14      158.   Within the time period of any applicable statutes of limitation, Plaintiffs and

15  members of the proposed class could not have discovered through the exercise of reasonable

16  diligence that Volkswagen was concealing the conduct complained of herein and misrepresenting

17  the Company's true position with respect to the emission qualities of its vehicles.

18      159.   Plaintiffs and the other Class members did not discover, and did not know of facts

19  that would have caused a reasonable person to suspect, that Volkswagen did not report information

20  within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a

21  reasonable and diligent investigation have disclosed that Volkswagen had information in its

22  possession about the existence of its sophisticated emissions scheme and that it opted to conceal

23  that information, until it was announced by Porsche  only shortly before this action was filed.  Nor

24  in any event would such an investigation on the part of Plaintiffs and other Class members have

25  disclosed that Volkswagen valued profits over compliance with federal and state law, or the trust

26  that Plaintiffs and other Class members had placed in its representations, or that, necessarily,

27  Volkswagen actively discouraged its personnel from raising or disclosing issues with regard to the

28

1    true quality and quantity of the emissions, and the emissions software, of its vehicles, or of

2    Volkswagen's emissions scheme.

3        160.    For these reasons, all applicable statutes of limitation have been tolled by operation

4    of the discovery rule with respect to claims as to all vehicles identified herein.

5    **B.    Fraudulent Concealment Tolling**

6        161.    All applicable statutes of limitation have also been tolled by Volkswagen and

7    Porsche's  knowing and active fraudulent concealment and denial of the facts alleged herein

8    throughout the time period relevant to this action.

9        162.    Instead of disclosing its emissions scheme, or that the quality and quantity of

10   emissions from the subject vehicles were far worse than represented, and of its disregard of federal

11   and state law, Volkswagen falsely represented that its vehicles complied with federal and state

12   emissions standards, and that it was a reputable manufacturer whose representations could be

13   trusted.

14   **C.    Estoppel**

15       163.    Volkswagen and Porsche were under a continuous duty to disclose to Plaintiffs and

16   the other Class members the true character, quality, and nature of emissions from the vehicles at

17   issue, and of those vehicles' emissions systems, and of the compliance of those systems with

18   applicable federal and state law.

19       164.    Volkswagen and Porsche knowingly, affirmatively, and actively concealed the true

20   nature, quality, and character of the emissions systems, and the emissions, of the vehicles at issue.

21       165.    Volkswagen and Porsche were also under a continuous duty to disclose to Plaintiffs

22   and Class members that it had engaged in the scheme complained of herein to evade federal and

23   state emissions and clean air standards, and that it systematically devalued compliance with, and

24   deliberately flouted, federal and state laws regulating vehicle emissions and clean air.

25       166.    Based on the foregoing, Volkswagen and Porsche are estopped from relying on any

26   statutes of limitations in defense of this action.

27

28

1

## VII.   CLASS ALLEGATIONS

2       167.    Plaintiffs brings this case as a class action under Federal Rules of Civil Procedure

3   23(a); (b)(3); and/or (c)(4), on behalf of themselves and all others similarly situated as members of

4   the following Nationwide Class and State Classes (collectively, the "Classes"); on their federal and

5   state claims as the purchasers and lessees of the following Class Vehicles:

6
| Class Vehicles | |
| --- | --- |
| Porsche Panamera | 2008-2016 |
| Porsche 911 | 2008-2016 |

8       168.    The proposed Classes are defined as:

9                                    **Nationwide Class**

10          All persons and entities in the United States, including its territories,
            excluding Volkswagen or Porsche dealers or dealerships, who
11          purchased or leased a Class Vehicle.

12                                   **California Class**

13          All members of the Nationwide class who purchased or leased their
            Class Vehicle in California.

14      169.    Excluded from the Classes are Volkswagen and its subsidiaries and affiliates

15   including Porsche; all persons who make a timely election to be excluded from the Classes.

16   Plaintiffs reserve the right to revise Class definitions based upon information learned through

17   discovery.

18      170.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because

19   Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as

20   would be used to prove those elements in individual actions alleging the same claim.

21      171.    This action has been brought and may be properly maintained on behalf of the Class

22   under Federal Rule of Civil Procedure 23.

23      172.    <u>Numerosity</u>.  Federal Rule of Civil Procedure 23(a)(1):  The members of the Classes

24   are so numerous and geographically dispersed that individual joinder of all Class members is

25   impracticable. There are no less than 114,000 in the Nationwide Class, and at least hundreds of

26   members in the State Class. The precise number and identities of Nationwide Class and State Class

27   members may be ascertained from Porsche's books and records and motor vehicle regulatory data.

28

Defendants have comprehensive lists of Class Vehicle owners and lessees in their possession, and are using them to communicate in writing to the Class members. Accordingly, the disposition of the claims of Class members in a single action will provide substantial benefits to all parties and to the Court. Class members may be readily notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

173.    <u>Commonality and Predominance</u>:  Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.    Whether Volkswagen, Audi and Porsche, and other as of yet unnamed co-conspirators engaged in the conduct alleged herein;

b.    Whether Volkswagen, Audi and Porsche designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c.    Whether the Clean engine system in the Class Vehicles contains a defect in that it does not comply with U.S. EPA and CARB requirements and federal and state emissions regulations;

d.    Whether the Clean engine systems in Class Vehicles can be made to comply with EPA, CARB and state standards without substantially degrading the performance and/or efficiency of the Class Vehicles;

e.    Whether Volkswagen, Audi and Porsche knew about the defeat device;

f.    Whether Volkswagen and Porsche marketed, and distributed Class Vehicles with a defeat device and/or software that turned off in real world driving conditions;

g.    Whether Defendants' conduct violates RICO and other laws as asserted herein;

h.    Whether Defendants' conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws;

i. Whether Plaintiffs and the other Class members overpaid for their Class Vehicles;

j. Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

k. Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

174. Typicality:  Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Volkswagen and Porsche's wrongful conduct as described above. The claims of the representative Plaintiffs are typical of the claims of the other Class members in that the representative Plaintiff, like all Class members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Volkswagen and Porsche. The representative Plaintiffs, like all Class members, have been damaged by Defendants' misconduct because they have incurred similar or identical losses relating to the Class Vehicles. Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all Class members.

175. Adequacy:  Federal Rule of Civil Procedure 23(a)(4):  Plaintiffs are members of the Nationwide and State Class and will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products generally, and defective automobile systems and parts specifically. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

176. Declaratory and Injunctive Relief:  Federal Rule of Civil Procedure 23(b)(2): Volkswagen and Porsche have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

177.   <u>Superiority</u>:  Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  It would be impracticable for the members of the Class to individually seek redress for Volkswagen and Porsche's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   VIOLATIONS ALLEGED

**A.      Claims Brought on Behalf of Plaintiffs and the Class**

### COUNT I

### VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) VIOLATION OF 18 U.S.C. § 1962(C) - (D)

178.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

179.   Plaintiffs bring this Count individually and on behalf of the Nationwide Class and against defendants Volkswagen AG, Porsche AG, and Audi AG (collectively "RICO Defendants")

180.   The RICO Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

181.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate."

182.   For many years now, the RICO Defendants have aggressively sought to increase the sales of Class Vehicles in an effort to bolster revenue, augment profits and increase Volkswagen's share of the worldwide vehicle market.  Finding it impossible to achieve their goals lawfully,

however, the RICO Defendants resorted instead to orchestrating a fraudulent scheme and conspiracy.  In particular, the RICO Defendants, along with other entities and individuals, created and/or participated in the affairs of an illegal enterprise ("Emissions Fraud Enterprise") whose direct purpose was to deceive the regulators and the public into believing the Class Vehicles were in "harmony with the environment," and were achieving fuel consumption with "maximum efficiency."  As explained in greater detail below, the RICO Defendants' acts in furtherance of the Emissions Fraud Enterprise violate §§ 1962(c) and (d).

> 1. **The Members of the Emissions Fraud Enterprise.**

183.    Upon information and belief, the Emissions Fraud Enterprise consisted of the following entities and individuals: Porsche AG, Audi AG and Volkswagen AG.

> 1. **Volkswagen Entities.**

184.    The Volkswagen Entities include Volkswagen AG, Audi AG and Porsche AG. Although each Volkswagen Entity is a distinct legal entity, they are all wholly-owned[53] and controlled[54] by Volkswagen AG.

185.    As noted previously, in 2007, the Volkswagen Entities made it their mission to become the dominant automotive manufacturing conglomerate in the world.  At the time they articulated this goal, however, the Volkswagen Entities were struggling to retain their foothold in the American market.  Their strategy of wooing customers with premium products was not paying off and VGoA's costly plant in Chattanooga, Tennessee was "woefully underutilized."[55]

186.    In sum, as part of their effort to become the dominant automotive manufacturing conglomerate in the world, the Volkswagen Entities controlled and directed an eight-year-long

---

[53] http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2015/03/ Shareholdings.bin.html/binarystorageitem/file/Anteilsbesitz+VW+AG+31.12.2014_englisch.pdf. (URL no longer active as of Oct. 2, 2020).

[54] http://www.volkswagenag.com/content/vwcorp/content/en/brands_and_products.html; http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2015/03/ Y_2014_e.bin.html/binarystorageitem/file/GB+2014_e.pdf. (URL no longer active as of Oct. 2, 2020).

[55]  Jens Meiners, *VW Drama: Why Piech Wants Winterkorn Out–and What the Future May Hold*, Car and Driver, Apr. 16, 2015, https://www.caranddriver.com/news/a15356184/vw-drama-why-piech-wants-winterkorn-out-and-what-the-future-may-hold/ .

enterprise whose purpose was to deceive regulators, and the public through lies and deception concerning the emissions systems in both petrol vehicles.

### 2.   The Volkswagen Entities' Executives, Officers and Engineers.

187.   Upon information and belief, the Volkswagen Entities' leaders – including Martin Winterkorn, Ulrich Hackenberg, Frank Tuch, and Wolfgang Hatz – played central roles in the Emissions Fraud Enterprise's unlawful scheme.

### (1)   Martin Winterkorn.

188.   Winterkorn took the helm of Volkswagen AG in 2007 and was the chief architect of the Volkswagen Entities' strategy to triple sales in the American market by relying more heavily on their purportedly revolutionary "clean" diesel offerings, and was involved in the Porsche strategy in the United States.[56]

189.   Still, Winterkorn quickly realized his strategy could not succeed if the Volkswagen Entities relied on the same SCR technology they had used in their pre-2009 diesel vehicles and that all their competitors used on more expensive diesel offerings.  Winterkorn instead advocated an alternative course of action that enabled the Volkswagen Entities to cut costs and offer the public lower-priced diesel vehicles.  To that end, he appointed Ulrich Hackenberg and Wolfgang Hatz, two former Audi engineers and members of the Emissions Fraud Enterprise, to lead the research and development facet of the "clean" diesel project.

190.   Despite Hackenberg and Hatz' best efforts, the technological hurdles were too formidable and a viable; lawful LNT-based system could not be found.  Although Winterkorn was routinely apprised of these obvious technical setbacks, he continued to pursue the aggressive cost-cutting, profit driven plan he had originally envisioned.  In doing so, he directly participated in the scheme to defraud regulators and consumers.

---

[56] *Volkswagen AG, TDI: U.S. Market Success*, Clean Diesel Delivers (March, 2015), http://cleandieseldelivers.com/media/Douglas-Skorupski-VGoA_DTF_March2015.pdf. (URL no longer active as of Oct. 2, 2020).

### (2)     Ulrich Hackenberg

191.     On February 1, 2007, Hackenberg was appointed to Volkswagen's Brand Board of Development.  In this capacity, he was responsible for the technical development of all of the Volkswagen Entities' brands.[57]

192.     On July 1, 2013, Hackenberg was appointed to the Board of Management of Audi AG and made responsible for its Technical Development department.  In this capacity, Hackenberg spearheaded the development of Audi's TDI "Clean Diesel" engines.  As he explained in a press release, his strategy for Audi's technical development included the following:

> [P]ushing forward with development in . . . our TDI engines in the USA – our clean diesel offensive is bearing substantial fruit.  In China, too, we are already introducing the first clean diesel models and watching developments there very closely.  We also expect a great deal from g-tron technology, the most sustainable type of gas drive.[58]

193.     Hackenberg's statement is illustrative of the Volkswagen Entities' efforts to falsely bill Class Vehicles as "clean," "environmentally friendly," and "fuel efficient" when the opposite was true.

### (3)     Frank Tuch

194.     In 2010, Tuch was appointed head of quality control across several of the Volkswagen Entities' brands.  Winterkorn hoped Tuch would bring the Volkswagen Entities "forward in the USA."[59]  Volkswagen's in-house magazine reported that Tuch and Winterkorn worked closely to honor that pledge, meeting "every Monday to discuss quality issues, often taking test drives in vehicles manufactured by the company."  In his role as head of quality assurance, Tuch was also intimately familiar with Volkswagen, Audi, and Porsche engines and transmissions.  Among his duties was "the development and production of components such as engines,

---

[57] https://www.audiusa.com/newsroom/corporate/audi-ag-board-of-management/ulrich-hackenberg. (URL no longer active as of Oct. 2, 2020).

[58] *Gentlemen Start Your Engines*, http://audi-encounter.com/magazine/ technology/01-2015/126-gentlemen-start-your-engines (2014). (URL no longer active as of Oct. 2, 2020).

[59] William Boston, *Volkswagen suspends quality control chief*, MarketWatch (Oct. 20, 2015), http://www.marketwatch.com/story/volkswagen-suspends-quality-control-chief-2015-10-20-84855452.

transmissions, seats and suspension parts" for small, compact, midsize, and full size product lines, including all the Class Vehicles.[60]

195.    Significantly, Tuch also oversaw "36 laboratory locations throughout the world in terms of training and auditing and also finds staff to fill laboratory manager positions," including the Volkswagen Entities' laboratories in the United States, which were primarily responsible for emissions testing of the Class Vehicles.[61]

196.    On information and belief, Tuch knew Class Vehicles used defeat devices to evade federal and state vehicle emissions standards.

### (4)    Wolfgang Hatz

197.    Hatz directed engine development for the Porsche, Audi and Volkswagen brands. In this role, he supervised the development of the engines and transmissions for Class Vehicles and had knowledge of their technical details.  On information and belief, Hatz knew the Class Vehicles used defeat devices to evade federal and state vehicle emissions standards.

### 2.    Emissions Fraud Enterprise Allegations.

198.    The persons and entities described in the preceding section are members of and constitute an "association-in-fact" enterprise.

199.    The Emissions Fraud Enterprise began as early as 2005, when an internal feasibility study at VWAG identified Bosch's EDC17 as a solution to their engineering dilemma by reducing diesel vehicle emissions of nitrogen oxides ("NOx") through a change in engine electronics. Starting in mid-2005, Volkswagen and Bosch GmbH entered into a series of agreements to develop what ultimately became the defeat device for the Class Vehicles.  The Emissions Fraud Enterprise continued without interruption for approximately the next ten years, as the Volkswagen Entities continued to install Bosch EDC17s in the Class Vehicles that employed defeat devices and Bosch GmbH continued to work with Volkswagen to modify the EDC17 programming for new models

---

[60]   Jack Ewing. *Volkswagen Suspends 5th Executive in Emissions Scandal*, The New York Times (Oct. 20, 2015), https://www.nytimes.com/2015/10/21/business/volkswagen-suspends-5th-executive-in-emissions-scandal.html .

[61]  http://www.volkswagen-larriere.de/en/what_we_do/corporate_divisions/quality_assurance.html. (URL no longer active as of Oct. 2, 2020).

while Bosch LLC continued to promote diesel technology and coordinate the ongoing deception of state and federal regulators.  The Emissions Fraud Enterprise then expanded to Porsche petrol vehicles. The Defendants understood that Porsche consumers were interested in buying as environmentally friendly cars as possible and were interest in fuel efficiency to the extent possible in Porsche. Realizing that they could not meet emissions standards in real driving conditions and obtain the promised fuel efficiency, the defendants implemented the scheme to camouflage the true emissions profile of the Class Vehicles. The diesel aspect of the Emissions Fraud Enterprise was first publicly disclosed in approximately September of 2015 when Volkswagen finally admitted the fraudulent scheme to U.S. regulators who exposed the RICO Defendants to the public. The Emissions Fraud Enterprise ceased shortly after the September 18, 2015, and November 2, 2015 NOVs, when the Volkswagen Entities issued stop sale orders to all Class members to cease selling or leasing the Class Vehicles. At the same time the Enterprise was focused on diesel cars, it was also engaging in conduct to manipulate the emissions of gas-powered cars.

200.    At all relevant times, the Emissions Fraud Enterprise:  (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing as VW, Audi AG, and Porsche AG, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Class Vehicles through fraudulent COCs and EOs, false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities. Each member of the Emissions Fraud Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud consumers and franchise dealers alike nationwide.[62]

---

[62] The Volkswagen Entities sold more Class Vehicles by utilizing an emissions control system that was cheaper than SCRs, all the while charging consumers a premium for purportedly "clean," "environmentally friendly" and "fuel efficient" vehicles.  Bosch, in turn, sold more EDC Units because the Volkswagen Entities manufactured and sold more Class Vehicles.

201.    The Emissions Fraud Enterprise functioned by selling vehicles and component parts to the consuming public.  Many of these products are legitimate, including vehicles that do not contain defeat devices.  However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for RICO Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Class Vehicles.

202.    The Emissions Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Class Vehicles throughout the country, and the receipt of monies from the sale of the same.

203.    Within the Emissions Fraud Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Emissions Fraud Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Vehicles to the general public nationwide.

204.    Each participant in the Emissions Fraud Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the Emissions Fraud Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

205.    The RICO Defendants participated in the operation and management of the Emissions Fraud Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

206.    The RICO Defendants exerted substantial control and participated in the affairs of the Emissions Fraud Enterprise by:

        a.    designing the Class Vehicles with defeat devices;

        b.    failing to correct or disable the defeat devices;

1      c.     manufacturing, distributing, and selling the Class Vehicles that emitted
2      greater pollution than allowable under the applicable regulations;

3      d.     misrepresenting and omitting (or causing such misrepresentations and
4      omissions to be made) vehicle specifications on COC and EO applications;

5      e.     introducing the Class Vehicles into the stream of U.S. commerce without a
6      valid EPA COC and/or CARB EO;

7      f.     concealing the existence of the defeat devices and the unlawfully high
8      emissions from regulators and the public;

9      g.     persisting in the manufacturing, distribution, and sale of the Class Vehicles
10      even after questions were raised about the emissions testing and
11      discrepancies concerning the same;

12      h.     misleading government regulators as to the nature of the defeat devices and
13      the defects in the Class Vehicles;

14      i.     misleading the driving public as to the nature of the defeat devices and the
15      defects in the Class Vehicles;

16      j.     designing and distributing marketing materials that misrepresented and
17      concealed the defect in the vehicles;

18      k.     otherwise misrepresenting or concealing the defective nature of the Class
19      Vehicles from the public and regulators;

20      l.     illegally selling and/or distributing the Class Vehicles; collecting revenues
21      and profits from the sale of such products; and ensuring that the other RICO
22      Defendants and unnamed co-conspirators complied with the fraudulent
23      scheme.

24      **3.**     **The Predicate Acts.**

25      207.     To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants
26   conducted or participated in the conduct of the affairs of the Emissions Fraud Enterprise through a
27   pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of
28   18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

208.     Specifically, the RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit writings travelling in interstate or foreign commerce.

209.     The RICO Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of RICO Defendants' illegal scheme:

    a.    application for certificates submitted to the EPA and CARB and Approved Applications:

**911**

7/30/2007
7/2/2009
3/31/2010
1/13/2011
2/10/2012
5/21/2013
6/19/2014
4/7/2015

**Panamera**

9/29/2009
6/10/2010
5/25/2011
5/4/2012
8/6/2013
6/3/2014
5/26/2015

    b.    the Class Vehicles themselves;

    c.    component parts for the defeat devices;

    d.    essential hardware for the Class Vehicles;

    e.    falsified emission tests;

    f.    fraudulently-obtained EPA COCs and CARB EOs;

    g.    vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

    h.    documents and communications that facilitated the creation and implementation of the defeat device and facilitated the falsified emission tests, including those emails and documents described in this complaint that were obtained directly from Bosch and VW in discovery;

    i.    false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

j.      sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Class Vehicles;

k.      documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

l.      documents to process and receive payment for the Class Vehicles by unsuspecting franchise dealers, including invoices and receipts;

m.      deposits of proceeds; and

n.      other documents and things, including electronic communications.

210.    The RICO Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

211.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.  Specifically, Porsche North America, under the direction and control of Volkswagen AG and its executives, and Porsche AG, made misrepresentations about the Class Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

212.    The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

213.    The mail and wire transmissions described herein were made in furtherance of RICO Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Class Vehicles, which RICO Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Class Vehicles were "clean" diesel cars.

214.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to RICO Defendants' books and records.  However, Plaintiffs have described in this complaint the types of, and in many

instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

215. The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the RICO Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

216. The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

217. To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness and emission dangers of the Class Vehicles and obfuscated the true nature of the defect even after regulators raised concerns. The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the defeat devices present in the Class Vehicles.

218. The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and the defeat devices contained therein).

219. Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics – specifically complete secrecy about the defeat devices in the Class Vehicles.

220. The RICO Defendants knew and intended that government regulators, as well as Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them about the Class Vehicles.

221.     The RICO Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and the Class were harmed as a result of the RICO Defendants' intentional conduct.

222.     As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for many years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and Class members and obtaining significant monies and revenues from them and through them while providing Class Vehicles worth significantly less than the invoice price paid.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

223.     The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and consumers.  The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Emissions Fraud Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds.

224.     During the design, manufacture, testing, marketing and sale of the Class Vehicles, the RICO Defendants shared technical, marketing and financial information that plainly revealed the emissions control systems in the Class Vehicles as the ineffective, illegal and fraudulent piece of technology they were and are.  Nevertheless, the RICO Defendants shared and disseminated information that deliberately represented Class Vehicles as "environmentally friendly," and "fuel efficient."

**COUNT II**

**FRAUD BY CONCEALMENT**

225.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

226.     This claim is brought on behalf of the Nationwide Class, and in the alternative, on behalf of a nationwide subclass, against Volkswagen AG Audi AG and Porsche AG and Porsche Cars North America, Inc.

227.     VWAG and Porsche knowingly and intentionally concealed and suppressed the fact that the Class Vehicles used software that caused the Vehicles to operate in a low-emission mode only during emissions testing, and the true nature of its "clean" engine system, with the intent to mislead Plaintiffs and Class members.

228.     VWAG and Porsche owed Plaintiffs and Class members a duty to disclose the illegality of the Class Vehicles, public health and safety risks, the true environmental cleanliness, performance, and efficiency of the Class Vehicles, and the devaluing of concern for the environment and integrity at VWAG and Porsche, because VWAG and Porsche:

     a.    Possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that manipulated emissions controls to turn off under real world conditions;

     b.    Intentionally concealed the foregoing from regulators, Plaintiffs, and Class members; and/or

     c.    Made incomplete representations about the characteristics of the Class Vehicles generally through their widespread advertising of the Vehicles and materials created by VWAG and Porsche provided to consumers through dealerships, while purposefully withholding material facts from Plaintiffs and Class members that contradicted these representations.

229.     The facts that VWAG and Porsche misrepresented, omitted, and concealed were material to Plaintiffs and the Class. A vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles. A vehicle with the combination of characteristics advertised by VWAG and Porsche as "clean"—and which consumers and the market understood to be included in the "clean" Class Vehicles–is worth more than a vehicle that does not have that combination of characteristics.

230.     Plaintiffs and Class members reasonably and justifiably relied on VWAG and Porsche's concealment of material facts. No reasonable consumer would have purchased, or would

have paid a premium for, any Class Vehicle had VWAG revealed the existence of its cheating software and the true nature of its "clean" vehicles.

231.    The truth about the existence of the cheating software and the true nature of their "clean" vehicles was known only to VWAG and Porsche, was not known by Plaintiffs and Class members, and could not have been discovered by Plaintiffs and Class members through any reasonable investigation, since Defendants used extremely sophisticated methods to conceal the truth.

232.    Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including Plaintiffs and Class members. They did so in order to boost the reputations of the Class Vehicles and to falsely assure purchasers and lessors of the Vehicles that Porsche is a reputable manufacturer of environmentally friendly vehicles.

233.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Defendants money, and they did so at the expense of Plaintiffs and Class members.

234.    As a result of Defendants' concealment and/or suppression of material facts, Plaintiffs and Class members were damaged in that they paid more for the Class Vehicles than the Vehicles were worth at the time of purchase – and indeed, paid a premium based on the "clean" feature that they did not receive.

235.    Accordingly, VWAG and Porsche are liable to Plaintiffs and Class members for damages in an amount to be proven at trial, for restitution, and, as a conscious wrongdoer, for disgorgement of all profits wrongfully obtained as a result of their wrongful conduct.

236.    VWAG's and Porsche's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that VWAG and Porsche made to them, in order to enrich VWAG and Porsche. VWAG's and Porsche's conducts warrant an assessment of punitive damages in an

amount sufficient to deter such conducts in the future, which amount is to be determined according to proof.

## COUNT III

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, *ET SEQ.*)

237.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

238.    Plaintiffs sue on behalf of the California Class (for purposes of this Count, "Class") against VW and Porsche.

239.    VW and Porsche are "person[s]" under Cal. Civ. Code § 1761(c).

240.    Plaintiffs and Class members are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Class Vehicles.

241.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a). VW has engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below by, at a minimum, representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles was supplied in accordance with a previous representation when it has not.

242.    In the course of their business, VW and Porsche concealed and suppressed material facts concerning the Class Vehicles. VW and Porsche accomplished this by installing software in the Class Vehicles that caused the vehicles to operate in a low-emission mode only during emissions testing, and during normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. Plaintiffs and Class members had no way of discerning that VW and Porsche's representations were false and misleading. Plaintiffs and Class members did not and could not unravel VW and Porsche's

deception on their own. In fact, it took years before the academic engineering community – specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions – detected the cheating device used by VW in diesel engines using sophisticated, expensive equipment and applying decades of combined experience, and this is likely the case here as well.

243.    VW and Porsche engaged in misleading, false, unfair or deceptive acts or practices that violated the CLRA by installing, failing to disclose and actively concealing the true cleanliness and performance of the "clean" engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

244.    VW and Porsche knew of, and concealed, the fact that the Class Vehicles used software that caused the vehicles to operate in a low-emission mode only during emissions testing, and the true nature of their "clean" engine system, for at least six years.

245.    VW and Porsche were also aware of the facts, which they concealed, that they valued profits over environmental cleanliness, efficiency, and lawfulness, and that they were manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.

246.    VW and Porsche intentionally and knowingly misrepresented, omitted, and actively concealed material facts regarding the Class Vehicles with intent to mislead Plaintiffs and Class. VW and Porsche owed Plaintiffs and Class Members a duty to disclose the illegality of the Class Vehicles, public health and safety risks, the true environmental cleanliness, performance, and efficiency of the Class Vehicles, and the devaluing of concern for the environment and integrity at VW and Porsche because VW and Porsche:

           a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that manipulated emissions controls to turn off under real world conditions;

b.   intentionally concealed the foregoing from regulators, Plaintiff, and Class members; and/or

c.   made incomplete representations about the characteristics of the Class Vehicles generally, while purposefully withholding material facts from Plaintiffs and Class members that contradicted these representations.

247.   VW and Porsche's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true environmental cleanliness, efficiency, and true value of the Class Vehicles.

248.   As a direct and proximate result of VW and Porsche's violations of the CLRA, Plaintiffs and the California Class have suffered injury-in-fact, actual damage, and ascertainable loss. Had the truth been disclosed, Plaintiffs and California Class members would not have purchased or leased their Class Vehicles at all, or alternatively, would have paid less for them.

249.   Under Cal. Civ. Code § 1780(a), Plaintiffs and the Class seek monetary relief against VW and Porsche for the economic harm caused by VW's violations of the CLRA as alleged herein, including the lost expectation of driving a vehicle with the enhanced environmental performance of a "clean" engine, overpayment for the vehicles they did receive, and restitution for unjust enrichment.

250.   Under Cal. Civ. Code § 1780(b), Plaintiffs and the Class seek an additional award against VW and Porsche of up to $5,000 for each Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA. VW knew or should have known that their conduct was directed to one or more Class members who are senior citizens or disabled persons. One or more Class members who are senior citizens or disabled persons are substantially more vulnerable to VW's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from VW and Porsche's conduct.

251.   Plaintiffs also seek punitive damages against VW and Porsche because they carried out reprehensible conduct with willful and conscious disregard of the rights of others. VW

intentionally and willfully deceived Plaintiffs and Class members, concealing material facts that only VW and Porsche knew. VW and Porsche's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under Cal. Civ. Code § 3294.

252.    Plaintiffs further seek an order enjoining VW and Porsche's unfair or deceptive acts or practices, restitution, disgorgement, punitive damages, costs of court, attorneys' fees under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

253.    Plaintiffs have sent a letter complying with Cal. Civ. Code § 1782(a) on October 2, 2020.

## COUNT IV

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)

254.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

255.    This claim is brought on behalf of the California Class (for purposes of this section, "the Class"), against VW and Porsche.

256.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." VW and Porsche have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

257.    VW and Porsche's conduct, as described herein, was and is in violation of the UCL. VW and Porsche's conduct violates the UCL in at least the following ways:

      a.    By knowingly and intentionally concealing from Plaintiffs and Class members that the Class Vehicles suffer from a design defect, while obtaining money from Plaintiffs and Class members;

      b.    By marketing Class Vehicles as possessing EPA- and CARB-compliant "clean" engine systems;

      c.    By purposefully using software that allowed vehicles to pollute more than legally allowable under real world driving conditions.

258.     VW and Porsche's misrepresentations and omissions alleged herein caused Plaintiffs and Class members to purchase or lease their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have paid less for them.

259.     VW and Porsche owed Plaintiffs and Class Members a duty to disclose the illegality of the Class Vehicles, public health and safety risks, the true environmental cleanliness, performance, and efficiency of the Class Vehicles, and the devaluing of concern for the environment and integrity at VW and Porsche because VW and Porsche:

a.     Possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that manipulated emissions controls to turn off under real world conditions;

b.     Intentionally concealed the foregoing from regulators, Plaintiffs, and Class members; and/or

c.     Made incomplete representations about the characteristics of the Class Vehicles generally, while purposefully withholding material facts from Plaintiffs and Class members that contradicted these representations.

260.     Accordingly, Plaintiffs and the other California Class members have suffered injury in fact including lost money or property because of VW and Porsche's misrepresentations and omissions.

261.     Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants under Cal. Bus. & Prof. Code § 17200.

262.     Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and members of the Class any money they acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT V**

**VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW**
**(CAL. BUS. & PROF. CODE §§ 17500,** *ET SEQ.***)**

263.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

264.     Plaintiffs bring this Count for the California Class (for purposes of this section, "the Class"), against VW and Porsche.

265.     California Bus. & Prof. Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

266.     VW and Porsche caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to VW and Porsche, to be untrue and misleading to consumers, including Plaintiffs and other Class members.

267.     VW and Porsche have violated § 17500 because the misrepresentations and omissions regarding the functionality of Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

268.     Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of VW and Porsche's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs and Class members relied on the misrepresentations and/or omissions of VW and Porsche with respect to the environmental and other performance of the Class Vehicles. VW and Porsche's representations were false because the Class Vehicles were distributed with faulty and defective "clean" engine systems, rendering certain

safety and emissions functions inoperative. Had Plaintiffs and Class members known this, they would not have purchased or leased their Class Vehicles, or would have paid less for them. Accordingly, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

269.    All of the wrongful conduct alleged herein occurred in the conduct of VW and Porsche's business, and as part of a pattern or generalized course of conduct in the State of California and nationwide.

270.    Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and Class members any money VW and Porsche acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Class, respectfully request that the Court grant certification of the proposed Nationwide Class and State Class, including the designation of Plaintiffs as the named representatives of the Nationwide Class and respective State Class, the appointment of the undersigned as Class Counsel, and the designation of any appropriate subclasses, under the applicable provisions of Federal Rule of Civil Procedure 23, and that the Court enter judgment in their favor and against Defendants, as follows:

A.    Equitable relief in the form of a comprehensive program to fully reimburse and make whole all Class members for all costs and economic losses;

B.    A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

C.    Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, treble damages under Civil RICO, multiple damages under applicable states' laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

D.    Any and applicable statutory and civil penalties;

1      E.      An order requiring Defendants to pay both pre-and post-judgment interest on any

2   amounts awarded:

3      F.      An award of costs and attorneys' fees, as allowed by law;

4      G.     Leave to amend this Complaint to conform to the evidence produced at trial;

5      H.     Such other or further relief as the Court may deem appropriate, just, and equitable

6      C.     Injunctive relief for Plaintiffs individually and for the Class;

7      D.     Damages as proven at trial for Plaintiffs individually, and for the Class;

8      E.      Treble and punitive damages as allowed under law and as proven at trial;

9      F.      An award to the Plaintiffs individually and the Class of prejudgment interest, costs,

10  and attorneys' fees; and

11     G.     An award to the Plaintiffs and the Class for such other and further relief as the Court

12  deems just and proper.

13                           **JURY TRIAL DEMANDED**

14      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

15  claims in this Complaint so triable.

16

17  DATED:  October 5, 2020          HAGENS BERMAN SOBOL SHAPIRO LLP

18                          By      */s/ Shana E. Scarlett*
                              SHANA E. SCARLETT

19                        715 Hearst Avenue, Suite 202

20                        Berkeley, CA 94710
                        Telephone: (510) 725-3000

21                        shanas@hbsslaw.com

22                        Steve W. Berman (*pro hac* vice)

23                        HAGENS BERMAN SOBOL SHAPIRO LLP
                        1301 2nd Avenue, Suite 2000

24                        Seattle, WA 98101
                        Telephone: (206) 623-7292

25                        Facsimile: (206) 623-0594
                        steve@hbsslaw.com

26

27

28

Christopher A. Seeger
SEEGERWEISS LLP
77 Water Street 8th Floor
New York, NY 10005
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
cseeger@seegerweiss.com

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
& AGNELLO P.C.
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
JCecchi@carellabyrne.com

*Counsel for Plaintiffs*

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

- - - - - - - - - - - - - - - - - - - - - - - - - x

United States of America,               :     No. 16-CR-20394
                                        :
                    Plaintiff,          :     HONORABLE SEAN F. COX
            v.                          :
                                        :
VOLKSWAGEN AG,                          :     Offenses: (1) Conspiracy
                                        :               (2) Obstruction of Justice
                    Defendant.          :               (3) Entry of Goods by
                                        :                   False Statement
                                        :
                                        :     Violations:  (1) 18 U.S.C. § 371
                                        :                   (2) 18 U.S.C. § 1512(c)
                                        :                   (3) 18 U.S.C. § 542
                                        :
                                        :     Statutory Maximum Period of
                                        :     Probation:
                                        :     Five years per count
                                        :
                                        :     Statutory Minimum Period of
                                        :     Probation:
                                        :     None/Not Applicable
                                        :
                                        :     Statutory Maximum Fine:  18 U.S.C.
                                        :     § 3571(d) (the greater of twice the
                                        :     gross gain or twice the gross loss)
                                        :
                                        :     Statutory Minimum Fine:  None/Not
                                        :     Applicable

- - - - - - - - - - - - - - - - - - - - - - - - - x

1

### Rule 11 Plea Agreement

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section and with the approval of the Deputy Attorney General (collectively hereafter, "the Offices"), and the Defendant, Volkswagen AG (the "Defendant"), by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Management Board, with the consent of the Supervisory Board, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  The terms and conditions of this Agreement are as follows:

1.   **Guilty Plea**

   A.   **Waiver of Indictment and Venue**

   Pursuant to Fed. R. Crim. P. 7, the Defendant agrees to knowingly waive its right to grand jury indictment and its right to challenge venue in the United States District Court for the Eastern District of Michigan, and to plead guilty to Counts One through Three of the Third Superseding Information.

   B.   **Counts of Conviction**

   The Third Superseding Information charges three counts:  (1) Count One - conspiracy in violation of 18 U.S.C. § 371, (2) Count Two - obstruction of justice in

2

violation of 18 U.S.C. § 1512(c), and (3) Count Three – introducing imported merchandise into the United States by mean of false statements in violation of 18 U.S.C. § 542. The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Offices in their investigation into the conduct described in this Agreement and other conduct related to the introduction into the United States of diesel vehicles with defeat devices as defined under U.S. law.

C.   **Elements of Offenses**

The elements of Count One (conspiracy) are as follows:

(1)   The elements for conspiracy to defraud the United States by obstructing the lawful function of the federal government are as follows:

(a)   That two or more persons conspired, or agreed, to defraud the United States or one of its agencies or departments, in this case, the Environmental Protection Agency (EPA), by dishonest means;

(b)   That the defendant knowingly and voluntarily joined the conspiracy; and

(c)   That a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

3

(2)    The elements for conspiracy to violate the wire fraud statute and Clean Air Act are as follows:

(a)    That two or more persons conspired, or agreed, to commit a crime, in this case, a violation of the wire fraud statute (18 U.S.C. § 1343) and the Clean Air Act (42 U.S.C. § 7413(c)(2)(A)) as described below;

(b)    That the defendant knowingly and voluntarily joined the conspiracy; and

(c)    That a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

*Object of the Conspiracy – Wire Fraud – 18 U.S.C. § 1343*:

(a)    The defendant knowingly participated in, devised, or intended to devise a scheme to defraud in order to obtain money or property;

(b)    The scheme included a material misrepresentation or concealment of a material fact;

(c)    The defendant had the intent to defraud; and

4

(d)    The defendant used (or caused another to use) wire, radio or television communications in interstate or foreign commerce in furtherance of the scheme.

*Object of the Conspiracy – Clean Air Act – 42 U.S.C. § 7413(c)(2)(A)*

(a)    The defendant knowingly made (or caused to be made) a false material statement, representation, or certification, or omission of material information;

(b)    The statement, representation or certification that was made (or omitted), or caused to be made or omitted, was in a notice, application, record, report, plan or other document required to be filed or maintained under the Clean Air Act; and

(c)    The statement, representation, certification, or omission of information, was material.

The elements of Count Two (obstruction of justice) are as follows:

(1)    That the defendant altered, destroyed, mutilated, or concealed a record, document or other object;

(2)    That the defendant acted knowingly;

(3)    That the defendant acted corruptly; and

(4)    That the defendant acted with the intent to impair the record, document or object's integrity or availability for use in an official proceeding.

5

The elements of Count Three (entry of goods by false statement) are as follows:

(1)   That merchandise was imported;

(2)   That the defendant entered or introduced merchandise into the commerce of the United States;

(3)   That the defendant did so by means of a false statement, which it knew was false; and

(4)   That the false statement was material to the entry of the merchandise.

D.   **Statutory Maximum Penalties**

The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371 (Count One) is a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Code, Section 3571(c), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).   The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1512(c) (Count Two) is a fine of $500,000; five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).   The statutory maximum sentence that the Court can impose for a violation of Title 18,

6

United States Code, Section 542 (Count Three) is a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Code, Section 3571(c), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).

### E.   **Factual Basis for Guilty Plea**

The Defendant is pleading guilty because it is guilty of the charges contained in the Third Superseding Information.  The Defendant admits, agrees, and stipulates that the factual allegations set forth in Exhibit 2 (the Statement of Facts) are true and correct, that it is responsible under the laws of the United States for the acts of its employees described in Exhibit 2, and that the facts set forth in Exhibit 2 accurately reflect the Defendant's criminal conduct and provide a factual basis for the guilty plea.  The Defendant agrees that it will neither contest the admissibility of, nor contradict, the Statement of Facts contained in Exhibit 2 in any proceeding.

## 2.   **Sentencing Guidelines**

### A.   **Standard of Proof**

The Court will find sentencing factors by a preponderance of the evidence.

### B.   **Guideline Range**

There are no disputes with respect to the sentencing guidelines that require resolution by the court.  While the Defendant does not adopt, agree or accept the United States Sentencing Guidelines (U.S.S.G.) analysis contained herein, for

purposes of avoiding the need for a contested sentencing proceeding and achieving

a just and fair result, and because the Defendant agrees that the overall fine proposed

herein achieves such a result, the Defendant does not contest the factual or legal

basis of the Office's U.S.S.G. analysis contained in this Paragraph for the purposes

of this proceeding and stipulates that the proposed fine constitutes a reasonable

sentence under the factors listed in Title 18, United States Code, Section 3553(a).

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine

an advisory sentencing guideline range pursuant to the United States Sentencing

Guidelines (U.S.S.G.). The Court will then determine a reasonable sentence within

the statutory range after considering the advisory sentencing guideline range and the

factors listed in Title 18, United States Code, Section 3553(a). The Defendant also

understands that if the Court accepts this Agreement, the Court is bound by the

sentencing provisions in Paragraph 3. The Offices submit that a faithful application

of the U.S.S.G. to determine the applicable fine range yields the following analysis:

   a.   The 2016 U.S.S.G. are applicable to this matter.

   b.   <u>Offense Level</u>. Based upon U.S.S.G. § 2B1.1, the total offense level is 41, calculated as follows:

| (a)(1) | Base Offense Level | 7 |
|---|---|---|
| (b)(1)(P) | Amount of Loss > $550 million | +30 |
| (b)(2)(A)(i) | More Than 10 Victims | +2 |
| (b)(10)(B) | Substantial Part of Scheme Committed from Outside the United States | +2 |

8

**TOTAL** 41

c. <u>Base Fine</u>. Based upon U.S.S.G. § 8C2.4(a), the base fine is $8,543,169,187 (the pecuniary loss from the offense caused by the Defendant)

d. <u>Culpability Score</u>. Based upon U.S.S.G. § 8C2.5, the culpability score is 11, calculated as follows:

| (a) | Base Culpability Score | 5 |
|-----|---|---|
| (b)(1) | the unit of the organization within which the offense was committed had 5,000 or more employees and an individual within high-level personnel of the unit participated in, condoned, or was willfully ignorant of the offense | +5 |
| (e) | obstruction of justice | +3 |
| (g)(3) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 2 |

**TOTAL** 11

<u>Calculation of Fine Range</u>:

| Base Fine | $8,543,169,187[1] |
|---|---|
| Multipliers | 2 (min)/4 (max) |
| Fine Range | $17,086,338,374 (min)/ $34,172,676,746 (max) |

---

[1] The base fine amount consists of the loss amount as calculated under USSG § 2B1.1 and accompanying Application Notes, discounted to reflect a 50% reduction for the litigation risk that both parties would bear were there a contested sentencing proceeding. *See, e.g.*, *United States v. Giovenco*, 773 F.3d 866 (7th Cir. 2014); *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012).

3.   **Sentence**

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the Defendant agree that the appropriate disposition of this case is as set forth in this Section and agree to recommend jointly that the Court at a hearing to be scheduled at an agreed upon time impose it.

A.   **Relevant Considerations**

The Offices enter into this Agreement based on the individual facts and circumstances presented by this case and the Defendant.   Among the factors considered were the following:

1.   the Defendant did not voluntarily disclose to the Offices the conduct described in Exhibit 2 (the Statement of Facts);

2.   the Defendant cooperated with the Offices' investigation by, among other things, (i) gathering substantial amounts of evidence and performing forensic data collections in multiple jurisdictions; (ii) producing documents, including translations, to the Offices in ways that did not implicate foreign data privacy laws; (iii) collecting, analyzing, organizing, and producing voluminous evidence and information; (iv) interviewing hundreds of witnesses in the United States and overseas; (v) providing non-privileged facts relating to individuals and companies involved in the criminal conduct; and (vi) facilitating and encouraging

10

cooperation and voluntary disclosure of information and documents by current and former company personnel;

      3.     the Defendant has already agreed to compensate members of the class in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-md-2672 (N.D. Cal.), which consists of victims of the underlying criminal conduct that is the subject of this Agreement, and to pay into a NOx remediation trust, in an aggregate amount of approximately $11 billion (based on net present value);

      4.     despite obstruction of justice committed by certain of the Defendant's employees, principally in the form of document destruction, the Defendant, including through its outside counsel, self-disclosed this conduct to the Offices, remediated the conduct by recovering large portions of the deleted documents through a variety of forensic means, and conducted a thorough investigation of the conduct, the findings of which it reported to the Offices;

      5.     the Defendant engaged in remedial measures, including creation of a management board position to supervise the Defendant's legal and compliance functions, reorganization of the whistleblower system, improvements to its risk assessment systems, specific reforms to its engine-related practices, including a program to audit these reforms, termination the employment of six individuals who participated in, or failed to supervise employees who participated in, the misconduct

described in the Statement of Facts, suspending an additional eight individuals who participated in the misconduct described in the Statement of Facts for varying periods, and disciplining an additional three employees who participated in the misconduct described in the Statement of Facts; however, the Defendant's remediation remains incomplete;

      6.    the Defendant has committed to continue to enhance its compliance program and internal controls;

      7.    the Defendant has agreed, as part of its continuing cooperation obligations, and to ensure that the Defendant and its wholly-owned subsidiary Volkswagen Group of America ("VW GOA") implements an effective compliance program, to the appointment of an independent monitor (the "Monitor") for a period of up to three years, who will have authority with respect to the Defendant and VW GOA;

      8.    the nature and seriousness of the offenses;

      9.    the Defendant has no prior criminal history;

      10.    the Defendant has agreed to continue to cooperate with the Offices in any ongoing investigation of the conduct of the Defendant and its officers, directors, employees, agents, business partners, and consultants relating to the violations to which the Defendant is pleading guilty; and

11.    the Defendant has agreed to pay an additional $1,500,000,000 to the United States to resolve claims for civil penalties arising from the underlying conduct that is the subject of this Agreement;

12.    accordingly, after considering (1) through (11) above, (a) the Defendant received an aggregate discount of approximately 20% off of the bottom of the otherwise applicable U.S. Sentencing Guidelines fine range, reflecting its cooperation in the investigation, and (b) after application of the foregoing discount, the Defendant in addition received a credit of $11 billion, representing the net present value of the Defendant's settlements with consumers and payments to the NOx remediation trust in settlement of civil litigation.

B.    **Fine**

The Defendant shall pay to the United States a criminal fine of $2,800,000,000, payable in full within ten days of the entry of judgment following the sentencing hearing in this matter.  The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty amount that the Defendant pays pursuant to this Agreement.  The Defendant further agrees that it shall not claim, assert, or apply for, either directly or indirectly, any tax deduction, tax credit, or any other offset with regard to any U.S. federal, state, or local tax or taxable income for any fine or forfeiture paid pursuant to this Agreement.

13

### C.    Probation

The parties agree that a term of organizational probation for a period of three years should be imposed on the Defendant pursuant to 18 U.S.C. §§ 3551(c)(1) and 3561(c)(1). The parties further agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraphs 5 and 6 below as well as the payment of the fine set forth in this Paragraph, but shall not include the obligations set forth in Paragraph 7 below.

### D.    Special Assessment

The Defendant shall pay to the Clerk of the Court for the United States District Court for the Eastern District of Michigan within ten days of the time of sentencing the mandatory special assessment of $1,200 ($400 per count).

### E.    Restitution

No order of restitution is appropriate in this case pursuant to 18 U.S.C. § 3663A(c)(3), as the number of identifiable victims is so large as to make restitution impracticable and/or determining complex issues of fact related to the cause or amount of victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. Moreover, as noted in Paragraph 2(A) above, the Defendant has already agreed to compensate members of the class in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability*

14

*Litigation*, No. 3:15-md-2672 (N.D. Cal.), which consists of individuals who purchased affected vehicles described in Exhibit 2.

4.    **Other Charges**

In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Offices agree that they will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates or subsidiaries related to: (1) any conduct described in the Third Superseding Information or Exhibit 2; (2) any conduct related to the emissions, or compliance with U.S. emissions standards, of the Subject Vehicles or the Porsche Vehicles as described and defined in the Third Superseding Information and Exhibit 2; and (3) any conduct disclosed by, or on behalf of, the Defendant or otherwise known to the Offices or the EPA as of the date of this Agreement. The Offices, however, may use any information related to the conduct described in the Statement of Facts against the Defendant: (a) in a prosecution for perjury or obstruction of justice apart from the charge in the Third Superseding Information and identified in the Statement of Facts; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Paragraph does not provide any protection against prosecution for any other conduct, including but not limited

15

to crimes committed in the future by the Defendant or by any of its affiliates, subsidiaries, officers, directors, employees, agents or consultants, whether or not disclosed by the Defendant pursuant to the terms of this Agreement.  In addition, this Agreement does not provide any protection against prosecution of any joint ventures of which the Defendant is a part, or any individuals, regardless of their affiliation with the Defendant.  The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's excise and income tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

5.  **The Defendant's Obligations**

A.     Except as otherwise provided in Paragraph 6 below in connection with the Defendant's cooperation obligations, the Defendant's obligations under the Agreement shall last and be effective for a period beginning on the date on which the Third Superseding Information is filed and ending three years from the later of the date on which the Third Superseding Information is filed or the date on which the Monitor is retained by the Defendant, as described in Paragraph 15 below (the "Term").  The Defendant agrees, however, that, in the event the Offices determine, in their sole discretion, that the Defendant has failed specifically to perform or to fulfill each of the Defendant's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Offices, in their sole discretion, for

16

up to a total additional time period of one year, without prejudice to the Offices'
right to proceed as provided in Paragraph 9 below.  Any extension of the Term
extends all terms of this Agreement, including the terms of the Monitorship in
Exhibit 3, for an equivalent period.  Conversely, in the event the Offices find, in their
sole discretion, that there exists a change in circumstances sufficient to eliminate the
need for the Monitorship in Exhibit 3, and that the other provisions of this
Agreement have been satisfied, the Term may be terminated early, except for the
Defendant's cooperation obligations described in Paragraph 6 below.

B.    The Defendant agrees to abide by all terms and obligations of this
Agreement as described herein, including, but not limited to, the following:

1.    to plead guilty as set forth in this Agreement;

2.    to abide by all sentencing stipulations contained in this
Agreement;

3.    to appear, through its duly appointed representatives, as ordered
for all court appearances, and obey any other ongoing court order in this matter,
consistent with all applicable U.S. and foreign laws, procedures, and regulations;

4.    to commit no further crimes;

5.    to be truthful at all times with the Court and the Offices;

6.    to pay the applicable fine and special assessments;

7.     to cooperate with and report to the Offices as provided in Paragraph 6; and

8.     to continue to implement a compliance and ethics program designed to prevent and detect fraudulent conduct throughout its operations.

C.     The Defendant agrees that any fine or restitution imposed by the Court will be due and payable in full within ten days of the entry of judgment following the sentencing hearing, and the Defendant will not attempt to avoid or delay payment. The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the Eastern District of Michigan the mandatory special assessment of $400 per count within ten business days from the date of sentencing.

6.     **The Defendant's Cooperation and Reporting Obligations**

A.     The Defendant shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and Exhibit 2, and other related conduct under investigation by the Offices during the Term, subject to applicable law and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Offices, the Defendant shall also cooperate fully with other domestic law enforcement and regulatory authorities and agencies in any investigation of the Defendant, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other

18

party, in any and all matters relating to the conduct described in this Agreement and Exhibit 2, and other conduct related to the Defendant's installation of defeat devices and false and fraudulent representations pertaining thereto. The Defendant agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

      1.    The Defendant shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or attorney work product doctrine, or by applicable law and regulations, including applicable data protection laws, with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Defendant.

      2.    Upon request of the Offices, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described in Paragraph 6(A)(1) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

3.    The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Defendant.   This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic law enforcement and regulatory authorities.   Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

4.    With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Defendant consents to any and all disclosures, subject to applicable law and regulations, including applicable data protection laws, to other governmental authorities in the United States of such materials as the Offices, in their sole discretion, shall deem appropriate.

B.    In addition to the obligations in Paragraph 6(A), during the Term, should the Defendant learn of any evidence or allegation of a violation of U.S. federal law by or on behalf of the Defendant and relating to emissions of its vehicles, false or misleading statements made to public authorities or regulators, fraud or misrepresentations in the sale or marketing of its products, or obstruction of any pending or contemplated U.S. federal, state or local investigation or proceeding, the

20

Defendant shall promptly report such evidence or allegation to the Offices. Thirty days prior to the end of the Term, the Defendant, by the Chief Executive Officer of the Defendant and the Chief Financial Officer of the Defendant, will certify to the Offices that the Defendant has met its disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

7.   **Other Obligations**

     A.   The Defendant agrees to retain an independent compliance monitor in accordance with Exhibit 3 of this Agreement.

     B.   While the obligation set forth in this Paragraph is not a condition to the term of probation, any failure to comply with the obligation set forth in this Paragraph shall constitute a breach of this Agreement and be subject to the terms set forth in Paragraph 9 below.

8.   **Waiver of Appellate and Other Rights Under United States Law**

     A.   The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement. The Defendant understands that the rights of criminal defendants in the United States include the following:

1.    the right to plead not guilty and to persist in that plea;

2.    the right to a jury trial;

3.    the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

4.    the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

5.    pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

B.    Nonetheless, the Defendant knowingly waives the right to appeal the conviction and any sentence within the statutory maximum described above (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the United States in this plea agreement.  This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).  The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of

Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant waives all defenses based on the statute of limitations and venue with respect to any federal prosecution related to the conduct described in Exhibit 2 or the Third Superseding Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Offices are free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

C.    Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn. The Defendant expressly warrants that it has discussed these rules with

its counsel and understands them.  Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.  Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement, including the Statement of Facts set forth as Exhibit 2 to the Agreement, are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Offices have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

9.  **Breach of Agreement**

A.     If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraph 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraph 3(A)(7) of this Agreement; or (e) otherwise fails specifically to perform or to fulfill each of the Defendant's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term of the Agreement, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Third Superseding Information described in Paragraph 1, which may

be pursued by the Offices in the United States District Court for the Eastern District of Michigan or any other appropriate venue.   Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Offices' sole discretion.   Any such prosecution may be premised on information provided by the Defendant.   Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term of the Agreement plus one year.   Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time- barred on the date of the signing of this Agreement shall be tolled for the Term of the Agreement plus one year.   The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 6 of the Agreement will be tolled from the date upon which the

violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the term plus three years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

B.      In the event the Offices determine that the Defendant has breached this Agreement, the Offices agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty (30) days of receipt of such notice, the Defendant shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Defendant.

C.      In the event that the Offices determine that the Defendant has breached this Agreement:  (a) all statements made by or on behalf of the Defendant to the Offices or to the Court, including the attached Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution,

26

Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Offices.

D.     The Defendant acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment.  The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

10.    **Parties to Plea Agreement**

The Defendant understands and agrees that this Agreement is between the Offices and the Defendant.  Nevertheless, the Offices will bring this Agreement and the nature and quality of the conduct, cooperation and remediation of the Defendant, its direct or indirect affiliates and subsidiaries to the attention of other prosecuting

authorities or other agencies, as well as debarment authorities, if requested by the Defendant.

The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that a resolution duly adopted by the Defendant's Management Board, with the consent of the Supervisory Board in the form attached to this Agreement as Exhibit 1, authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Management Board, with the consent of the Supervisory Board, on behalf of the Defendant.

The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

11. **Change of Corporate Form**

Except as may otherwise be agreed by the parties in connection with a particular transaction, the Offices may require, in their sole discretion, that, in the event that, during the Term of the Agreement, the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in Exhibit 2 (the Statement of Facts), as they exist as of the date of this Agreement, whether such sale

28

is structured as a sale, asset sale, merger, transfer, or other change in corporate form, the Defendant shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  If the Offices so require, the purchaser or successor in interest must also agree in writing that the Offices' ability to declare a breach under this Agreement is applicable in full force to that entity, and the Defendant will agree that the failure to include these provisions in the transaction will make any such transaction null and void.  The Defendant shall provide notice to the Offices at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form.  The Offices will inform the Defendant within such 30-day period if the Offices require the Defendant to take the steps referred to above.  If the Offices notify the Defendant prior to such transaction (or series of transactions) that they have determined that the transaction(s) has the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Offices, the Defendant agrees that such transaction(s) will not be consummated.  In addition, if at any time during the Term of the Agreement the Offices determine in their sole discretion that the Defendant has engaged in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, they may deem it a breach of this Agreement pursuant to Paragraph 9 of this Agreement.  Nothing herein shall restrict

the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

12. **Failure of Court to Accept Agreement**

This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

13. **Presentence Report**

The Defendant and the Offices waive the preparation of a Pre-Sentence Investigation Report. The Defendant understands that the decision whether to proceed with the sentencing without a Pre-Sentence Investigation Report is exclusively that of the Court. In the event the Court directs the preparation of a Pre-

Sentence Investigation Report, the Offices will fully inform the preparer of the Pre-Sentence Investigation Report and the Court of the facts and law related to the Defendant's case. At the time of the plea hearing, the parties will suggest mutually agreeable and convenient dates for the sentencing.

14.    **Public Statements by the Defendant**

A.    The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above, contradicting the fact that the Defendant has pled guilty to the charges set forth in the Third Superseding Information, or contradicting the facts described in Exhibit 2. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraph 9 of this Agreement. The decision whether any such contradictory statement will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part the fact that the Defendant pled guilty to the charges in the Third Superseding Information or a statement contained in Exhibit 2, the Offices shall so notify the Defendant, and

31

the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Defendant shall be permitted to raise defenses, to take legal positions and to assert affirmative claims in other proceedings relating to the matters set forth in the Third Superseding Information and Exhibit 2 provided that such defenses and claims do not contradict, in whole or in part, the fact that the Defendant pled guilty to the charges in the Third Superseding Information or a statement in Exhibit 2. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

B.    The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Defendant; and (b) whether the Offices have any objection to the release or statement.

32

15. **Independent Compliance Monitor**

A.    Promptly after the Offices' selection pursuant to Paragraph 15(B) below, the Defendant agrees to retain the Monitor for the term specified in Paragraph 15(C).  The Monitor's duties and authority, and the obligations of the Defendant with respect to the Monitor and the Offices, are set forth in Exhibit 3, which is incorporated by reference into this Agreement.  The same Monitor shall serve as the Independent Auditor appointed pursuant to Paragraph 27(b) of the Third Partial Consent Decree in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC) (N.D. Cal.). No later than the date of execution of this Agreement, and after consultation with the Offices, the Defendant will propose to the Offices a pool of three qualified candidates to serve as the Monitor.  If the Offices determine, in their sole discretion, that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the Offices, in their sole discretion, are not satisfied with the candidates proposed, the Offices reserve the right to seek additional nominations from the Defendant.  The parties will endeavor to complete the monitor selection process within sixty (60) days of the execution of this Agreement.  The Monitor candidates or their team members shall have, at a minimum, the following qualifications:

1.    demonstrated expertise with respect to federal anti-fraud and environmental laws, including experience counseling on these issues;

33

2.　　experience designing and/or reviewing corporate ethics and compliance programs, including anti-fraud policies, procedures and internal controls;

3.　　knowledge of automotive or similar industries;

4.　　the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement;

5.　　sufficient independence from the Defendant to ensure effective and impartial performance of the Monitor's duties as described in the Agreement; and

6.　　the qualifications set out in Paragraph 27(a) of the Third Partial Consent Decree in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC) (N.D. Cal.).

B.　　The Offices retain the right, in their sole discretion, to choose the Monitor from among the candidates proposed by the Defendant, though the Defendant may express its preference(s) among the candidates.  In the event the Offices reject all proposed Monitors, the Defendant shall propose an additional three candidates within twenty (20) business days after receiving notice of the rejection. This process shall continue until a Monitor acceptable to both parties is chosen.  The Offices and the Defendant will use their best efforts to complete the selection process within sixty (60) calendar days of the execution of this Agreement.  If, during the

term of the monitorship, the Monitor becomes unable to perform his or her obligations as set out herein and in Exhibit 3, or if the Offices in their sole discretion determine that the Monitor cannot fulfill such obligations to the satisfaction of the Offices, the Offices shall notify the Defendant of the release of the Monitor, and the Defendant shall within thirty (30) calendar days of such notice recommend a pool of three qualified Monitor candidates from which the Offices will choose a replacement.

C.     The Monitor's term shall be three years from the date on which the Monitor is retained by the Defendant, subject to extension or early termination as described in Paragraph 5. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Exhibit 3. The Defendant agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires. Nor will the Defendant discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.

16.   **Complete Agreement**

This document states the full extent of the Agreement between the parties. There are no other promises or agreements, express or implied. Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

35

**AGREED:**

**FOR VOLKSWAGEN AG:**

Date: January 11, 2017

By: _____

Manfred Doess
General Counsel of Volkswagen AG

Date: January 11, 2017

By: _____

Reid Weingarten
Jason Weinstein
Christopher Niewoehner
Steptoe & Johnson LLP
Outside counsel for Volkswagen AG

Date: 11 January 2017

By: _____

Aaron R. Marcu
Olivia A. Radin
Linda Martin
Freshfields Bruckhaus Deringer US
  LLP
Outside counsel for Volkswagen AG

Date: January 11, 2017

By: _____

Robert J. Giuffra, Jr.
Sharon L. Nelles
Brent J. McIntosh
Sullivan & Cromwell LLP
Outside counsel for Volkswagen AG

36

**FOR THE DEPARTMENT OF JUSTICE:**

ANDREW WEISSMANN
Chief, Fraud Section
Criminal Division

Date: 1/11/17

By: _____

Benjamin D. Singer
Chief, Securities and Financial Fraud
Unit
Gary A. Winters
Alison Anderson
David Fuhr
Trial Attorneys

JOHN CRUDEN
Assistant Attorney General
Environment and Natural Resources
Division

Date: 1/11/17

By: _____

Jennifer L. Blackwell
Trial Attorney

BARBARA L. McQUADE
United States Attorney Eastern District
of Michigan

Date: 1/11/17

By: _____

John K. Neal
Chief, White Collar Crime Unit

37

# EXHIBIT 1

## CERTIFICATE OF CORPORATE RESOLUTIONS

A copy of the executed Certificate of Corporate Resolutions is annexed hereto as "Exhibit 1."

## COMPANY OFFICER'S CERTIFICATE

I have read the plea agreement between Volkswagen AG (the "Defendant") and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (the "Agreement") and carefully reviewed every part of it with outside counsel for the Defendant. I understand the terms of the Agreement and voluntarily agree, on behalf of the Defendant, to each of its terms. Before signing the Agreement, I consulted outside counsel for the Defendant. Counsel fully advised me of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of the Agreement with the Management Board and the Supervisory Board. I have advised and caused outside counsel for the Defendant to advise the Management Board and the Supervisory Board fully of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in the Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing the Agreement on behalf of the Defendant, in any

Exh. 1-2

way to enter into the Agreement.  I am also satisfied with outside counsel's representation in this matter.  I certify that I am the General Counsel for the Defendant and that I have been duly authorized by the Defendant to execute the Agreement on behalf of the Defendant.

Date: _January 11, 2017_

VOLKSWAGEN AG

By: _____
Manfred Doess
General Counsel

Exh. 1-3

## CERTIFICATE OF COUNSEL

I am counsel for Volkswagen AG (the "Defendant") in the matter covered by the plea agreement between the Defendant and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (the "Agreement"). In connection with such representation, I have examined relevant documents and have discussed the terms of the Agreement with the Management Board and the Supervisory Board. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Defendant has been duly authorized to enter into the Agreement on behalf of the Defendant and that the Agreement has been duly and validly authorized, executed, and delivered on behalf of the Defendant and is a valid and binding obligation of the Defendant. Further, I have carefully reviewed the terms of the Agreement with the Management Board and the Supervisory Board and the officers of the Defendant. I have fully advised them of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into the Agreement. To my knowledge, the decision of the Defendant to enter into the Agreement, based on the authorization of the Management Board, with the consent of the Supervisory Board, is an informed and voluntary one.

Exh. 1-4

Date: January 11, 2017

By: _____
Reid Weingarten
Jason Weinstein
Christopher Niewoehner
Steptoe & Johnson LLP
Counsel to Volkswagen AG


Date: 11 January 2017

By: _____
Aaron R. Marcu
Olivia A. Radin
Linda Martin
Freshfields Bruckhaus Deringer
  US LLP
Counsel to Volkswagen AG


Date: January 11, 2017

By: _____
Robert J. Giuffra, Jr.
Sharon L. Nelles
Brent J. McIntosh
Sullivan & Cromwell LLP
Counsel for Volkswagen AG


Exh. 1-5

**EXHIBIT 2**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the
Plea Agreement (the "Agreement") between the United States Department of
Justice (the "Department") and Volkswagen AG ("VW AG").  VW AG hereby
agrees and stipulates that the following information is true and accurate.  VW AG
admits, accepts, and acknowledges that under U.S. law it is responsible for the acts
of its employees set forth in this Statement of Facts, which acts VW AG
acknowledges were within the scope of the employees' employment and, at least in
part, for the benefit of VW AG.  All references to legal terms and emissions
standards, to the extent contained herein, should be understood to refer exclusively
to applicable U.S. laws and regulations, and such legal terms contained in this
Statement of Facts are not intended to apply to, or affect, VW AG's rights or
obligations under the laws or regulations of any jurisdiction outside the United
States.  This Statement of Facts does not contain all of the facts known to the
Department or VW AG; the Department's investigation into individuals is
ongoing.  The following facts took place during the time frame specified in the
Third Superseding Information and establish beyond a reasonable doubt the
charges set forth in the criminal Information attached to this Agreement:

Exh. 2-1

## Relevant Entities and Individuals

1.    VW AG was a motor vehicle manufacturer based in Wolfsburg, Germany.  Under U.S. law, VW AG acts through its employees, and conduct undertaken by VW AG, as described herein, reflects conduct undertaken by employees.  Pursuant to applicable German stock corporation law, VW AG was led by a Management Board that was supervised by a Supervisory Board.  Solely for purposes of this Statement of Facts, unless otherwise indicated, references in this Statement of Facts to "supervisors" are to senior employees below the level of the VW AG Management Board.

2.    Audi AG ("Audi") was a motor vehicle manufacturer based in Ingolstadt, Germany and a subsidiary approximately 99.55% owned by VW AG. Under U.S. law, Audi AG acts through its employees, and conduct undertaken by Audi AG, as described herein, reflects conduct undertaken by employees.

3.    Volkswagen Group of America, Inc. ("VW GOA") was a wholly-owned subsidiary of VW AG based in Herndon, Virginia.  Under U.S. law, VW GOA acts through its employees, and conduct undertaken by VW GOA, as described herein, reflects conduct undertaken by employees.

4.    VW AG, Audi AG, and VW GOA are collectively referred to herein as "VW."

Exh. 2-2

5.   "VW Brand" was an operational unit within VW AG that developed vehicles to be sold under the "Volkswagen" brand name.

6.   Company A was an automotive engineering company based in Berlin, Germany, which specialized in software, electronics, and technology support for vehicle manufacturers.  VW AG owned fifty percent of Company A's shares and was Company A's largest customer.

7.   "Supervisor A," an individual whose identity is known to the United States and VW AG, was the supervisor in charge of Engine Development for all of VW AG from in or about October 2012 to in or about September 2015.  From July 2013 to September 2015, Supervisor A also served as the supervisor in charge of Development for VW Brand, where he supervised a group of approximately 10,000 VW AG employees.  From in or about October 2011, when he joined VW, until in or about July 2013, Supervisor A served as the supervisor in charge of the VW Brand Engine Development department.

8.   "Supervisor B," an individual whose identity is known to the United States and VW AG, was a supervisor in charge of the VW Brand Engine Development department from in or about May 2005 to in or about April 2007.

9.   "Supervisor C," an individual whose identity is known to the United States and VW AG, was a supervisor in charge of the VW Brand Engine Development department from in or about May 2007 to in or about March 2011.

Exh. 2-3

10.  "Supervisor D," an individual whose identity is known to the United States and VW AG, was a supervisor in charge of the VW Brand Engine Development department from in or about October 2013 to the present.

11.  "Supervisor E," an individual whose identity is known to the United States and VW AG, was a supervisor with responsibility for VW AG's Quality Management and Product Safety department who reported to the supervisor in charge of Quality Management from in or about 2007 to in or about October 2014.

12.  "Supervisor F," an individual whose identity is known to the United States and VW AG, was a supervisor within the VW Brand Engine Development department from in or about 2003 until in or about December 2012.

13.  "Attorney A," an individual whose identity is known to the United States and VW AG, was a German-qualified in-house attorney for VW AG who was the in-house attorney principally responsible for providing legal advice in connection with VW AG's response to U.S. emissions issues from in or about May 2015 to in or about September 2015.

## U.S. NOx Emissions Standards

14.   The purpose of the Clean Air Act and its implementing regulations was to protect human health and the environment by, among other things, reducing emissions of pollutants from new motor vehicles, including nitrogen oxides ("NOx").

15.   The Clean Air Act required the U.S. Environmental Protection Agency ("EPA") to promulgate emissions standards for new motor vehicles.  The EPA established standards and test procedures for light-duty motor vehicles sold in the United States, including emission standards for NOx.

16.   The Clean Air Act prohibited manufacturers of new motor vehicles from selling, offering for sale, introducing or delivering for introduction into U.S. commerce, or importing (or causing the foregoing with respect to) any new motor vehicle unless the vehicle complied with U.S. emissions standards, including NOx emissions standards, and was issued an EPA certificate of conformity.

17.   To obtain a certificate of conformity, a manufacturer was required to submit an application to the EPA for each model year and for each test group of vehicles that it intended to sell in the United States.  The application was required to be in writing, to be signed by an authorized representative of the manufacturer, and to include, among other things, the results of testing done pursuant to the published Federal Test Procedures that measure NOx emissions, and a description

of the engine, emissions control system, and fuel system components, including a detailed description of each Auxiliary Emission Control Device ("AECD") to be installed on the vehicle.

18.   An AECD was defined under U.S. law as "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." The manufacturer was also required to include a justification for each AECD.  If the EPA, in reviewing the application for a certificate of conformity, determined that the AECD "reduced the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," and that (1) it was not substantially included in the Federal Test Procedure, (2) the need for the AECD was not justified for protection of the vehicle against damage or accident, or (3) it went beyond the requirements of engine starting, the AECD was considered a "defeat device."  Whenever the term "defeat device" is used in this Statement of Facts, it refers to a defeat device as defined by U.S. law.

19.   The EPA would not certify motor vehicles equipped with defeat devices.  Manufacturers could not sell motor vehicles in the United States without a certificate of conformity from the EPA.

20.   The California Air Resources Board ("CARB") (together with the EPA, "U.S. regulators") issued its own certificates, called executive orders, for the sale of motor vehicles in the State of California.  To obtain such a certificate, the manufacturer was required to satisfy the standards set forth by the State of California, which were equal to or more stringent than those of the EPA.

21.   As part of the application for a certification process, manufacturers often worked in parallel with the EPA and CARB.  To obtain a certificate of conformity from the EPA, manufacturers were required to demonstrate that the light-duty vehicles were equipped with an on-board diagnostic ("OBD") system capable of monitoring all emissions-related systems or components. Manufacturers could demonstrate compliance with California OBD standards in order to meet federal requirements.  CARB reviewed applications from manufacturers, including VW, to determine whether their OBD systems were in compliance with California OBD standards, and CARB's conclusion would be included in the application the manufacturer submitted to the EPA.

22.   In 1998, the United States established new federal emissions standards that would be implemented in separate steps, or Tiers.  Tier II emissions standards, including for NOx emissions, were significantly stricter than Tier I.  For light-duty vehicles, the regulations required manufacturers to begin to phase in compliance with the new, stricter Tier II NOx emissions standards in 2004 and required

manufacturers to fully comply with the stricter standards for model year 2007. These strict U.S. NOx emissions standards were applicable specifically to vehicles in the United States.

## VW Diesel Vehicles Sold in the United States

23.   In the United States, VW sold, offered for sale, introduced into commerce, delivered for introduction into commerce, imported, or caused the foregoing actions (collectively, "sold in the United States") the following vehicles containing 2.0 liter diesel engines ("2.0 Liter Subject Vehicles"):

  a. Model Year ("MY") 2009-2015 VW Jetta;

  b. MY 2009-2014 VW Jetta Sportwagen;

  c. MY 2010-2015 VW Golf;

  d. MY 2015 VW Golf Sportwagen;

  e. MY 2010-2013, 2015 Audi A3;

  f. MY 2013-2015 VW Beetle and VW Beetle Convertible; and

  g. MY 2012-2015 VW Passat.

24.   VW sold in the United States the following vehicles containing 3.0 liter diesel engines ("3.0 Liter Subject Vehicles"):

  a. MY 2009-2016 VW Touareg;

  b. MY 2009-2015 Audi Q7;

  c. MY 2014-2016 Audi A6 Quattro;

    d.   MY 2014-2016 Audi A7 Quattro;

    e.   MY 2014-2016 Audi A8L; and

    f.   MY 2014-2016 Audi Q5.

25.    VW GOA's Engineering and Environmental Office ("EEO") was located in Auburn Hills, Michigan, in the Eastern District of Michigan.  Among other things, EEO prepared and submitted applications (the "Applications") for a certificate of conformity and an executive order (collectively, "Certificates") to the EPA and CARB to obtain authorization to sell each of the 2.0 Liter Subject Vehicles and 3.0 Liter Subject Vehicles in the United States (collectively, the "Subject Vehicles").  VW GOA's Test Center California performed testing related to the Subject Vehicles.

26.    VW AG developed the engines for the 2.0 Liter Subject Vehicles. Audi AG developed the engines for the 3.0 Liter Subject Vehicles and the MY 2013-2016 Porsche Cayenne diesel vehicles sold in the United States (the "Porsche Vehicles").

27.    The Applications to the EPA were accompanied by the following signed statement by a VW representative:

> The Volkswagen Group states that any element of design, system, or emission control device installed on or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of the Volkswagen Group's information and belief,

cause the emission into the ambient air of pollutants in the
operation of its motor vehicles or motor vehicle engines which
cause or contribute to an unreasonable risk to public health or
welfare except as specifically permitted by the standards
prescribed under section 202 of the Clean Air Act. The
Volkswagen Group further states that any element of design,
system, or emission control device installed or incorporated in
the Volkswagen Group's new motor vehicles or new motor
vehicle engines, for the purpose of complying with standards
prescribed under section 202 of the Clean Air Act, will not, to
the best of the Volkswagen Group's information and belief,
cause or contribute to an unreasonable risk to public safety.

. . .

All vehicles have been tested in accordance with good
engineering practice to ascertain that such test vehicles meet the
requirement of this section for the useful life of the vehicle.

28.    Based on the representations made by VW employees in the

Applications for the Subject Vehicles, EPA and CARB issued Certificates for these

vehicles, allowing the Subject Vehicles to be sold in the United States.

29.    Upon importing the Subject Vehicles into the United States, VW

disclosed to U.S. Customs and Border Protection ("CBP") that the vehicles were

covered by valid Certificates by affixing an emissions label to the vehicles'

engines. These labels stated that the vehicles conformed to EPA and CARB

emissions regulations. VW affixed these labels to each of the Subject Vehicles that

it imported into the United States.

30.    VW represented to its U.S. customers, U.S. dealers, U.S. regulators

and others in the United States that the Subject Vehicles met the new and stricter

Exh. 2-10

U.S. emissions standards identified in paragraph 22 above.  Further, VW designed

a specific marketing campaign to market these vehicles to U.S. customers as "clean

diesel" vehicles.

## VW AG's Criminal Conduct

31.  From approximately May 2006 to approximately November 2015,

VW AG, through Supervisors A-F and other VW employees, agreed to deceive

U.S. regulators and U.S. customers about whether the Subject Vehicles and the

Porsche Vehicles complied with U.S. emissions standards.  During their

involvement with design, marketing and/or sale of the Subject Vehicles and the

Porsche Vehicles in the United States, Supervisors A-F and other VW employees:

(a) knew that the Subject Vehicles and the Porsche Vehicles did not meet U.S.

emissions standards; (b) knew that VW was using software to cheat the U.S.

testing process by making it appear as if the Subject Vehicles and the Porsche

Vehicles met U.S. emissions standards when, in fact, they did not; and (c)

attempted to and did conceal these facts from U.S. regulators and U.S. customers.

### The 2.0 Liter Defeat Device in the United States

32.  In at least in or about 2006, VW AG employees working under the

supervision of Supervisors B, C, and F were designing the new EA 189 2.0 liter

diesel engine (later known as the Generation 1 or "Gen 1") for use in the United

States that would be the cornerstone of a new project to sell passenger diesel

Exh. 2-11

vehicles in the United States.  Selling diesel vehicles in the U.S. market was an important strategic goal of VW AG.  This project became known within VW as the "US'07" project.

33.  Supervisors B, C, and F, and others, however, realized that VW could not design a diesel engine that would both meet the stricter U.S. NOx emissions standards that would become effective in 2007 and attract sufficient customer demand in the U.S. market.  Instead of bringing to market a diesel vehicle that could legitimately meet the new, more restrictive U.S. NOx emissions standards, VW AG employees acting at the direction of Supervisors B, C, and F and others, including Company A employees, designed, created, and implemented a software function to detect, evade and defeat U.S. emissions standards.

34.  While employees acting at their direction designed and implemented the defeat device software, Supervisors B, C, and F, and others knew that U.S. regulators would measure VW's diesel vehicles' emissions through standard U.S. tests with specific, published drive cycles.  VW AG employees acting at the direction of Supervisors B, C, and F, and others designed the VW defeat device to recognize whether the vehicle was undergoing standard U.S. emissions testing on a dynamometer (or "dyno") or whether the vehicle was being driven on the road under normal driving conditions.  The defeat device accomplished this by recognizing the standard drive cycles used by U.S. regulators.  If the vehicle's

software detected that it was being tested, the vehicle performed in one mode, which satisfied U.S. NOx emissions standards. If the defeat device detected that the vehicle was not being tested, it operated in a different mode, in which the effectiveness of the vehicle's emissions control systems was reduced substantially, causing the vehicle to emit substantially higher NOx, sometimes 35 times higher than U.S. standards.

35. In designing the defeat device, VW engineers borrowed the original concept of the dual-mode, emissions cycle-beating software from Audi. On or about May 17, 2006, a VW engineer, in describing the Audi software, sent an email to employees in the VW Brand Engine Development department that described aspects of the software and cautioned against using it in its current form because it was "pure" cycle-beating, i.e., as a mechanism to detect, evade and defeat U.S. emissions cycles or tests. The VW AG engineer wrote (in German), "within the clearance structure of the pre-fuel injection the acoustic function is nearly always activated within our current US'07-data set. This function is pure [cycle-beating] and can like this absolutely not be used for US'07."

36. Throughout in or around 2006, Supervisor F authorized VW AG engineers to use the defeat device in the development of the US'07 project, despite concerns expressed by certain VW AG employees about the propriety of designing and activating the defeat device software. In or about the fall of 2006, lower level

VW AG engineers, with the support of their supervisors, raised objections to the propriety of the defeat device, and elevated the issue to Supervisor B.  During a meeting that occurred in or about November 2006, VW AG employees briefed Supervisor B on the purpose and design of the defeat device.  During the meeting, Supervisor B decided that VW should continue with production of the US'07 project with the defeat device, and instructed those in attendance, in sum and substance, not to get caught.

37.  Throughout 2007, various technical problems arose with the US'07 project that led to internal discussions and disagreements among members of the VW AG team that was primarily responsible for ensuring vehicles met U.S. emissions standards.  Those disagreements over the direction of the project were expressly articulated during a contentious meeting on or about October 5, 2007, over which Supervisor C presided.  As a result of the meeting, Supervisor C authorized Supervisor F and his team to proceed with the US'07 project despite knowing that only the use of the defeat device software would enable VW diesel vehicles to pass U.S. emissions tests.

38.  Starting with the first model year 2009 of VW's new engine for the 2.0 Liter Subject Vehicles through model year 2016, Supervisors A-D and F, and others, then caused the defeat device software to be installed in the 2.0 Liter Subject Vehicles marketed and sold in the United States.

Exh. 2-14

### *The 3.0 Liter Defeat Device in the United States*

39.   Starting in or around 2006, Audi AG engineers designed a 3.0 liter diesel for the U.S. market.  The 3.0 liter engine was more powerful than the 2.0 liter engine, and was included in larger and higher-end model vehicles.  The 3.0 liter engine was ultimately placed in various Volkswagen, Audi and Porsche diesel vehicles sold in the United States for model years 2009 through 2016.  In order to pass U.S. emissions tests, Audi engineers designed and installed software designed to detect, evade and defeat U.S. emissions standards, which constituted a defeat device under U.S. law.

40.   Specifically, Audi AG engineers calibrated a defeat device for the 3.0 Liter Subject Vehicles and the Porsche Vehicles that varied injection levels of a solution consisting of urea and water ("AdBlue") into the exhaust gas system based on whether the vehicle was being tested or not, with less NOx reduction occurring during regular driving conditions.  In this way, the vehicle consumed less AdBlue, and avoided a corresponding increase in the vehicle's AdBlue tank size, which would have decreased the vehicle's trunk size, and made the vehicle less marketable in the United States.  In addition, the vehicle could drive further between service intervals, which was also perceived as important to the vehicle's marketability in the United States.

Exh. 2-15

### *Certification of VW Diesel Vehicles in the United States*

41. VW employees met with the EPA and CARB to seek the certifications required to sell the Subject Vehicles to U.S. customers. During these meetings, some of which Supervisor F attended personally, VW employees misrepresented, and caused to be misrepresented, to the EPA and CARB staff that the Subject Vehicles complied with U.S. NOx emissions standards, when they knew the vehicles did not. During these meetings, VW employees described, and caused to be described, VW's diesel technology and emissions control systems to the EPA and CARB staff in detail but omitted the fact that the engine could not meet U.S. emissions standards without using the defeat device software.

42. Also as part of the certification process for each new model year, Supervisors A-F and others certified, and/or caused to be certified, to the EPA and CARB that the Subject Vehicles met U.S. emissions standards and complied with standards prescribed by the Clean Air Act. Supervisors A-F, and others, knew that if they had told the truth and disclosed the existence of the defeat device, VW would not have obtained the requisite Certificates for the Subject Vehicles and could not have sold any of them in the United States.

### *Importation of VW Diesel Vehicles in the United States*

43.  In order to import the Subject Vehicles into the United States, VW was required to disclose to CBP whether the vehicles were covered by valid certificates for the United States.  VW did so by affixing a label to the vehicles' engines.  VW employees caused to be stated on the labels that the vehicles complied with applicable EPA and CARB emissions regulations and limitations, knowing that if they had disclosed that the Subject Vehicles did not meet U.S. emissions regulations and limitations, VW would not have been able to import the vehicles into the United States.  Certain VW employees knew that the labels for the Porsche Vehicles stated that those vehicles complied with EPA and CARB emissions regulations and limitations, when in fact, the VW employees knew they did not.

### *Marketing of "Clean Diesel" Vehicles in the United States*

44.  Supervisors A and C and others marketed, and caused to be marketed, the Subject Vehicles to the U.S. public as "clean diesel" and environmentally-friendly, when they knew the Subject Vehicles were intentionally designed to detect, evade and defeat U.S. emissions standards.

45.  For example, on or about November 18, 2007, Supervisor C sent an email to Supervisor F and others attaching three photos of himself with

Exh. 2-17

California's then-Governor, which were taken during an event at which Supervisor C promoted the 2.0 Liter Subject Vehicles in the United States as "green diesel."

### *The Improvement of the 2.0 Liter Defeat Device in the United States*

46.  Following the launch of the Gen 1 2.0 Liter Subject Vehicles in the United States, Supervisors C and F, and others, worked on a second generation of the vehicle (the "Gen 2"), which also contained software designed to detect, evade and defeat U.S. emissions tests.  The Gen 2 2.0 Liter Subject Vehicles were launched in the United States in or around 2011.

47.  In or around 2012, hardware failures developed in certain of the 2.0 Liter Subject Vehicles that were being used by customers on the road in the United States. VW AG engineers hypothesized that vehicles equipped with the defeat device stayed in "dyno" mode (i.e., testing mode) even when driven on the road outside of test conditions.  Since the 2.0 Liter Subject Vehicles were not designed to be driven for longer periods of time in "dyno" mode, VW AG engineers suspected that the increased stress on the exhaust system from being driven too long in "dyno" mode could be the root cause of the hardware failures.

48.  In or around July 2012, engineers from the VW Brand Engine Development department met, in separate meetings, with Supervisors A and E to explain that they suspected that the root cause of the hardware failures in the 2.0 Liter Subject Vehicles was the increased stress on the exhaust system from being

driven too long in "dyno" mode as a result of the use of software designed to detect, evade and defeat U.S. emissions tests. To illustrate the software's function, the engineers used a document. Although they understood the purpose and significance of the software, Supervisors A and E each encouraged the further concealment of the software. Specifically, Supervisors A and E each instructed the engineers who presented the issue to them to destroy the document they had used to illustrate the operation of the defeat device software.

49. VW AG engineers, having informed the supervisor in charge of the VW AG Engine Development department and within the VW AG Quality Management and Product Safety department of the existence and purpose of the defeat device in the 2.0 Liter Subject Vehicles, then sought ways to improve its operation in existing 2.0 Liter Subject Vehicles to avoid the hardware failures. To solve the hardware failures, VW AG engineers decided to start the 2.0 Liter Subject Vehicles in the "street mode" and, when the defeat device recognized that the vehicle was being tested for compliance with U.S. emissions standards, switch to the "dyno mode." To increase the likelihood that the vehicle in fact realized that it was being tested on the dynamometer for compliance with U.S. emissions standards, the VW AG engineers activated a "steering wheel angle recognition" feature. The steering wheel angle recognition interacted with the software by

enabling the vehicle to detect whether it was being tested on a dynamometer (where the steering wheel is not turned), or being driven on the road.

50. Certain VW AG employees again expressed concern, specifically about the expansion of the defeat device through the steering wheel angle detection, and sought approval for the function from more senior supervisors within the VW AG Engine Development department. In particular, VW AG engineers asked Supervisor A for a decision on whether or not to use the proposed function in the 2.0 Liter Subject Vehicles. In or about April 2013, Supervisor A authorized activation of the software underlying the steering wheel angle recognition function. VW employees then installed the new software function in new 2.0 Liter Subject Vehicles being sold in the United States, and later installed it in existing 2.0 Liter Subject Vehicles through software updates during maintenance.

51. VW employees falsely told, and caused others to tell, U.S. regulators, U.S. customers and others in the United States that the software update in or around 2014 was intended to improve the 2.0 Liter Subject Vehicles when, in fact, VW employees knew that the update also used the steering wheel angle of the vehicle as a basis to more easily detect when the vehicle was undergoing emissions tests, thereby improving the defeat device's precision in order to reduce the stress on the emissions control systems.

Exh. 2-20

### *The Concealment of the Defeat Devices in the United States – 2.0 Liter*

52.   In or around March 2014, certain VW employees learned of the results of a study undertaken by West Virginia University's Center for Alternative Fuels, Engines and Emissions and commissioned by the International Council on Clean Transportation (the "ICCT study").   The ICCT study identified substantial discrepancies in the NOx emissions from certain 2.0 Liter Subject Vehicles when tested on the road compared to when these vehicles were undergoing EPA and CARB standard drive cycle tests on a dynamometer.   The results of the study showed that two of the three vehicles tested on the road, both 2.0 Liter Subject Vehicles, emitted NOx at values of up to approximately 40 times the permissible limit applicable during testing in the United States.

53.   Following the ICCT study, CARB, in coordination with the EPA, attempted to work with VW to determine the cause for the higher NOx emissions in the 2.0 Liter Subject Vehicles when being driven on the road as opposed to on the dynamometer undergoing standard emissions test cycles.   To do this, CARB, in coordination with the EPA, repeatedly asked VW questions that became increasingly more specific and detailed, as well as conducted additional testing themselves.

54.   In response to learning about the results of the ICCT study, engineers in the VW Brand Engine Development department formed an ad hoc task force to

formulate responses to questions that arose from the U.S. regulators.  VW AG supervisors, including Supervisors A, D, and E, and others, determined not to disclose to U.S. regulators that the tested vehicle models operated with a defeat device.  Instead, Supervisors A, D, and E, and others decided to pursue a strategy of concealing the defeat device in responding to questions from U.S. regulators, while appearing to cooperate.

55.   Throughout 2014 and the first half of 2015, Supervisors A, D, and E, and others, continued to offer, and/or cause to be offered, software and hardware "fixes" and explanations to U.S. regulators for the 2.0 Liter Subject Vehicles' higher NOx measurements on the road without revealing the underlying reason – the existence of software designed to detect, evade and defeat U.S. emissions tests.

56.   On or about April 28, 2014, members of the VW task force presented the findings of the ICCT study to Supervisor E, whose supervisory responsibility included addressing safety and quality problems in vehicles in production. Included in the presentation was an explanation of the potential financial consequences VW could face if the defeat device was discovered by U.S. regulators, including but not limited to applicable fines per vehicle, which were substantial.

57.   On or about May 21, 2014, a VW AG employee sent an email to his supervisor, Supervisor D, and others, describing an "early round meeting" with

Supervisor A, at which emissions issues in North America for the Gen 2 2.0 Liter Subject Vehicles were discussed, and questions were raised about the risk of what could happen and the available options for VW. Supervisor D responded by email that he was in "direct touch" with the supervisor in charge of Quality Management at VW AG and instructed the VW AG employee to "please treat confidentially" the issue.

58. On or about October 1, 2014, VW AG employees presented to CARB regarding the ICCT study results and discrepancies identified in NOx emissions between dynamometer testing and road driving. In response to questions, the VW AG employees did not reveal that the existence of the defeat device was the explanation for the discrepancies in NOx emissions, and, in fact, gave CARB various false reasons for the discrepancies in NOx emissions including driving patterns and technical issues.

59. When U.S. regulators threatened not to certify VW model year 2016 vehicles for sale in the United States, VW AG supervisors requested a briefing on the situation in the United States. On or about July 27, 2015, VW AG employees presented to VW AG supervisors. Supervisors A and D were present, among others.

60. On or about August 5, 2015, in a meeting in Traverse City, Michigan, two VW employees met with a CARB official to discuss again the discrepancies in

emissions of the 2.0 Liter Subject Vehicles.  The VW employees did not reveal the existence of the defeat device.

61.   On or about August 18, 2015, Supervisors A and D, and others, approved a script to be followed by VW AG employees during an upcoming meeting with CARB in California on or about August 19, 2015.  The script provided for continued concealment of the defeat device from CARB in the 2.0 Liter Subject Vehicles, with the goal of obtaining approval to sell the Gen 3 model year 2016 2.0 Liter Subject Vehicles in the United States.

62.   On or about August 19, 2015, in a meeting with CARB in El Monte, California, a VW employee explained, for the first time to U.S. regulators and in direct contravention of instructions from supervisors at VW AG, that certain of the 2.0 Liter Subject Vehicles used different emissions treatment depending on whether the vehicles were on the dynamometer or the road, thereby signaling that VW had evaded U.S. emissions tests.

63.   On or about September 3, 2015, in a meeting in El Monte, California with CARB and EPA, Supervisor D, while creating the false impression that he had been unaware of the defeat device previously, admitted that VW had installed a defeat device in the 2.0 Liter Subject Vehicles.

64.   On or about September 18, 2015, the EPA issued a public Notice of Violation to VW stating that the EPA had determined that VW had violated the

Clean Air Act by manufacturing and installing defeat devices in the 2.0 Liter Subject Vehicles.

### *The Concealment of the Defeat Devices in the United States – 3.0 Liter*

65.  On or about January 27, 2015, CARB informed VW AG that CARB would not approve certification of the Model Year 2016 3.0 Liter Subject Vehicles until Audi AG confirmed that the 3.0 Liter Subject Vehicles did not possess the same emissions issues as had been identified by the ICCT study and as were being addressed by VW with the 2.0 Liter Subject Vehicles.

66.  On or about March 24, 2015, in response to CARB's questions, Audi AG employees made a presentation to CARB, during which Audi AG employees did not disclose that the Audi 2.0 and 3.0 Liter Subject Vehicles and the Porsche Vehicles in fact contained a defeat device, which caused emissions discrepancies in those vehicles. The Audi AG employees informed CARB that the 3.0 Liter Subject Vehicles did not possess the same emissions issues as the 2.0 Liter Subject Vehicles when, in fact, the 3.0 Liter Subject Vehicles possessed at least one defeat device that interfered with the emissions systems to reduce NOx emissions on the dyno but not on the road.  On or about March 25, 2015, CARB, based on the misstatements and omissions made by the Audi AG representatives, issued an executive order approving the sale of Model Year 2016 3.0 Liter Subject Vehicles.

67.   On or about November 2, 2015, EPA issued a Notice of Violation to VW AG, Audi AG and Porsche AG, citing violations of the Clean Air Act related to EPA's discovery that the 3.0 Liter Subject Vehicles and the Porsche Vehicles contained a defeat device that resulted in excess NOx emissions when the vehicles were driven on the road.

68.   On or about November 2, 2015, VW AG issued a statement that "no software has been installed in the 3-liter V6 diesel power units to alter emissions characteristics in a forbidden manner."

69.   On or about November 19, 2015, Audi AG representatives met with EPA and admitted that the 3.0 Liter Subject Vehicles contained at least three undisclosed AECDs. Upon questioning from EPA, Audi AG representatives conceded that one of these three undisclosed AECDs met the criteria of a defeat device under U.S. law.

70.   On or about May 16, 2016, Audi AG representatives met with CARB and admitted that there were additional elements within two of its undisclosed AECDs, which impacted the dosing strategy in the 3.0 Liter Subject Vehicles and the Porsche Vehicles.

71.   On or about July 19, 2016, in a presentation to CARB, Audi AG representatives conceded that elements of two of its undisclosed AECDs met the definition of a defeat device.

72.   Supervisors A-F and others caused defeat device software to be installed on all of the approximately 585,000 Subject Vehicles and the Porsche Vehicles sold in the United States from 2009 through 2015.

### Obstruction of Justice

73.   As VW employees prepared to admit to U.S. regulators that VW used a "defeat device" in the 2.0 Liter Subject Vehicles, counsel for VW GOA prepared a litigation hold notice to ensure that VW GOA preserved documents relevant to diesel emissions issues.  At the same time, VW GOA was in contact with VW AG to discuss VW AG preserving documents relevant to diesel emissions issues. Attorney A made statements that several employees understood as suggesting the destruction of these materials.  In anticipation of this hold taking effect at VW AG, certain VW AG employees destroyed documents and files related to U.S. emissions issues that they believed would be covered by the hold.  Certain VW AG employees also requested that their counterparts at Company A destroy sensitive documents relating to U.S. emissions issues.  Certain Audi AG employees also destroyed documents related to U.S. emissions issues.  The VW AG and Audi AG employees who participated in this deletion activity did so to protect both VW and themselves from the legal consequences of their actions.

74.   Between the August 19, 2015 and September 3, 2015 meetings with U.S. regulators, certain VW AG employees discussed issues with Attorney A and others.

75.   On or about August 26, 2015, VW GOA's legal team sent the text of a litigation hold notice to Attorney A in VW AG's Wolfsburg office that would require recipients to preserve and retain records in their control.  The subject of the e-mail was "Legal Hold Notice – Emissions Certification of MY2009-2016 2.0L TDI Volkswagen and Audi vehicles."  The VW GOA legal team stated that VW GOA would be issuing the litigation hold notice to certain VW GOA employees the following day.  On or about August 28, 2015, Attorney A received notice that VW GOA was issuing that litigation hold notice that day.  Attorney A indicated to his staff on August 31 that the hold would be sent out at VW AG on September 1.  Among those at VW AG being asked to retain and preserve documents were Supervisors A and D and a number of other VW AG employees.

76.   On or about August 27, 2015, Attorney A met with several VW AG engineers to discuss the technology behind the defeat device.  Attorney A indicated that a hold was imminent, and that these engineers should check their documents, which multiple participants understood to mean that they should delete documents prior to the hold being issued.

Exh. 2-28

77.  On or about August 31, 2015, a meeting was held to prepare for the September 3 presentation to CARB and EPA where VW's use of the defeat device in the United States was to be formally revealed.  During the meeting, within hearing of several participants, Attorney A discussed the forthcoming hold and again told the engineers that the hold was imminent and recommended that they check what documents they had.  This comment led multiple individuals, including supervisors in the VW Brand Engine Development department at VW AG, to delete documents related to U.S. emissions issues.

78.  On or about September 1, 2015, the hold at VW AG was issued.  On or about September 1, 2015, several employees in the VW Brand Engine Development department at VW AG discussed the fact that their counterparts at Company A would also possess documents related to U.S. emissions issues.  At least two VW AG employees contacted Company A employees and asked them to delete documents relating to U.S. emissions issues.

79.  On or about September 3, 2015, Supervisor A approached Supervisor D's assistant, and requested that Supervisor D's assistant search in Supervisor D's office for a hard drive on which documents were stored containing emails of VW AG supervisors, including Supervisor A.  Supervisor D's assistant recovered the hard drive and gave it to Supervisor A.  Supervisor A later asked his assistant to throw away the hard drive.

80.   On or about September 15, 2015, a supervisor within the VW Brand Engine Development department convened a meeting with approximately 30-40 employees, during which Attorney A informed the VW AG employees present about the current situation regarding disclosure of the defeat device in the United States.  During this meeting, a VW AG employee asked Attorney A what the employees should do with new documents that were created, because they could be harmful to VW AG.  Attorney A indicated that new data should be kept on USB drives and only the final versions saved on VW AG's system, and then, only if "necessary."

81.   Even employees who did not attend these meetings, or meet with Attorney A personally, became aware that there had been a recommendation from a VW AG attorney to delete documents related to U.S. emissions issues.  Within VW AG and Audi AG, thousands of documents were deleted by approximately 40 VW AG and Audi AG employees.

82.   After it began an internal investigation, VW AG was subsequently able to recover many of the deleted documents.

**EXHIBIT 3**

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Volkswagen AG, on behalf of itself and its subsidiaries and affiliates other than Porsche AG and Porsche Cars North America (for purposes of this Exhibit 3, the "Defendant" or "Company"), with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the United States Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (collectively hereafter, "the Offices"), are as described below. For the avoidance of doubt, the Monitorship described herein does not extend to Porsche AG or Porsche Cars North America.

1.     The Company will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the early termination provision of Paragraph 5(A) of the Plea Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.     The Monitor's responsibility is to assess, oversee, and monitor the Company's compliance with the terms of the Agreement, so as to specifically address and reduce the risk of any recurrence of the Company's misconduct, and to oversee the Company's obligations under Section V (Injunctive Relief for VW Defendants) of the Third Partial Consent Decree in *In re: Volkswagen "Clean Diesel"*

*Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC) (N.D. Cal.). During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the Company's implementation and enforcement of its compliance and ethics program for the purpose of preventing future criminal fraud and environmental violations by the Company and its affiliates, including, but not limited to, violations related to the conduct giving rise to the Third Superseding Information filed in this matter, and will take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate"). This Mandate shall include an assessment of the Board of Management's and senior management's commitment to, and effective implementation of, the Company's corporate compliance and ethics program.

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's ethics and compliance program in accordance with the principles set forth herein and applicable law, including applicable environmental, data protection, and labor laws and regulations. To that end, the Company shall:    facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data protection and

labor laws). The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement. The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third- party vendors, agents, and consultants.

4.     Any disclosure by the Company to the Monitor concerning fraudulent conduct shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Offices, pursuant to the Agreement.

### *Withholding Access*

5.     The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor. In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor consistent with applicable law.

6.     If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Offices. Such

notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Offices may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the Company and Review Methodology*

7.     In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (e.g., legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company- specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.     The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets.  In carrying out the Mandate, the Monitor should consider, for instance, risks presented by:  (a) organizational structure; (b) training programs or lack thereof;  (c) compensation structure;  (d) internal auditing

processes; (e) internal investigation procedures; (f) reporting mechanisms; (g) corporate culture; and (h) employee incentives and disincentives.

9. In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Company's current anti-fraud and environmental policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

### Monitor's Written Work Plans

10. To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least two follow-up reviews and reports as described in Paragraphs 16-19 below. With respect to the initial report, after consultation with the Company and the Offices, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained, and the Company and the Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the Offices, the Monitor shall prepare a written work plan at least thirty (30) calendar

Exh. 3-5

days prior to commencing a review, and the Company and the Offices shall provide comments within twenty (20) calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Offices in their sole discretion.

11.   All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement.   In developing such understanding the Monitor is to rely to the extent possible on available information and documents provided by the Company.  It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

### *Initial Review*

12.   The initial review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Offices).  The Monitor shall issue a written report within one hundred fifty (150) calendar days of commencing

the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with anti-fraud and environmental laws. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them. The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention. The Monitor shall provide the report to the Management Board of the Company and contemporaneously transmit copies to the Deputy Chief – Securities and Financial Fraud Unit, Fraud Section, Criminal Division, U.S. Department of Justice, at 1400 New York Avenue N.W., Bond Building, Washington, D.C. 20005; Chief, White Collar Crime Unit, United States Attorney's Office, Eastern District of Michigan, 211 W. Fort Street, Suite 2001, Detroit, Michigan 48226; and Deputy Chief, Environmental Crimes Section, U.S. Department of Justice, 601 D Street N.W., Washington D.C. 20530. After consultation with the Company, the Monitor may extend the time period for issuance

Exh. 3-7

of the initial report for a brief period of time with prior written approval of the Offices.

13. Within one hundred fifty (150) calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within sixty (60) calendar days of receiving the report, the Company notifies in writing the Monitor and the Offices of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred fifty (150) calendar days of receiving the report but shall propose in writing to the Monitor and the Offices an alternative policy, procedure or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company serves the written notice.

14. In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending

such determination, the Company shall not be required to implement any contested recommendation(s).

15.   With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

*Follow-Up Reviews*

16.   A follow-up review shall commence no later than one hundred and eighty (180) calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor and the Offices).  The Monitor shall issue a written follow-up report within one hundred twenty (120) calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the initial review.  After consultation with the Company, the Monitor may extend the time period for issuance of the follow-up report for a brief period of time with prior written approval of the Offices.

17.   Within one hundred twenty (120) calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Company notifies in writing the Monitor and the Offices

concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor and the Offices an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

18.    In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices.    The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).  With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

19.     The Monitor shall undertake a second follow-up review not later than one hundred fifty (150) calendar days after the issuance of the first follow-up report. The Monitor shall issue a second follow-up report within one hundred and twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18.  No later than sixty (60) days before the end of the Term, the Monitor shall submit to the Offices a final written report ("Certification Report"), setting forth an overview of the Company's remediation efforts to date, including the implementation status of the Monitor's recommendations, and an assessment of the sustainability of the Company's remediation efforts.  No later than thirty (30) days before the end of the Term, the Monitor shall certify whether the Company's compliance program, including its policies and procedures, is reasonably designed and implemented to prevent and detect violations of the anti-fraud and environmental laws.

*Monitor's Discovery of Potential or Actual Misconduct*

20.     (a) Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that:

- any defeat device has been designed, installed, or implemented in any vehicle of any kind manufactured by the Company,  and is in use after the date of this Agreement, whether such design, installation or implementation has been accomplished by the Company alone or in

Exh. 3-11

concert with any other person or entity contracting with or working with the Company; or

- the Company has made any materially false statement to any governmental entity, department, agency, or component within the United States, in connection with the certification, sale, offer for sale, importation or introduction of any vehicle or vehicle type

(collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed.  The Monitor also may report Potential Misconduct to the Offices at any time, and shall report Potential Misconduct to the Offices when they request the information.

(b)    In some instances, the Monitor should immediately report Potential Misconduct directly to the Offices and not to the Company.  The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Offices and not to the Company, namely, where the Potential Misconduct:   (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

Exh. 3-12

(c)     If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation of U.S. law ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Offices.  When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Offices, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as the Offices and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Offices or not.  Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Offices and address the Company's failure to disclose the necessary information in his or her reports.

(e)     Neither the Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

Exh. 3-13

*Meetings During Pendency of Monitorship*

21.　The Monitor shall meet with the Offices within thirty (30) calendar days after providing each report to the Offices to discuss the report, to be followed by a meeting between the Offices, the Monitor, and the Company.

22.　At least annually, and more frequently if appropriate, representatives from the Company and the Offices will meet together to discuss the Monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices, including with respect to the scope or costs of the Monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.　The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the Monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

Exh. 3-14